UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| STATE OF MICHIGAN, STATE OF WISCONSIN, | ) | |
| STATE OF MINNESOTA, STATE OF OHIO, | ) | |
| and COMMONWEALTH OF PENNSYLVANIA, | ) | Case No. |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Hon. |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS and METROPOLITAN WATER | ) | |
| RECLAMATION DISTRICT OF | ) | |
| GREATER CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

The State of Michigan, by and through its Attorney General, Michael A. Cox, and the

State of Wisconsin, by and through its Attorney General, J.B. Van Hollen, State of Minnesota,

by and through its Attorney General, Lori Swanson, the State of Ohio, by and through its

Attorney General, Richard Cordray, and the Commonwealth of Pennsylvania, by and through its

Attorney General, Thomas W. Corbett, Jr., (Plaintiff States) bring the following Complaint:

## NATURE OF THE CASE

1.      The Plaintiff States bring this action in their respective sovereign capacities, as

trustees for the waters and aquatic resources of the Great Lakes and other connected waterbodies

within their respective jurisdictions, and as parens patriae on behalf of their respective citizens.

The Defendants, the United States Army Corps of Engineers (Corps) and the Metropolitan Water

Reclamation District of Greater Chicago (District) have created and maintained, and continue to

operate and control facilities within the Chicago Area Waterway System (CAWS) that link

Illinois waters – that are infested with the harmful invasive species bighead carp and silver carp

(collectively Asian carp) – to Lake Michigan and other connected waters.  To the extent those

facilities are maintained and operated in a manner that allows the migration of Asian carp into

the Great Lakes and connected waters, they constitute a public nuisance that threatens grave and

irreparable harm to public trust resources as well as riparian and other rights of the citizens of the

Plaintiff States.  The Complaint seeks a declaratory judgment that Defendants are maintaining a

public nuisance and that the Corps has acted unlawfully, as well as injunctive relief.

Specifically, Plaintiffs seek to require Defendants to take immediate and comprehensive action

to abate the nuisance and to minimize the risk that Asian carp will migrate from the CAWS into

Lake Michigan, and to plan and implement, as soon as possible, permanent measures to

physically separate the Asian carp-infested Illinois waters from Lake Michigan.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702 as

this is a civil action seeking injunctive and declaratory relief pursuant to the Administrative

Procedures Act, 5 U.S.C. § 701 *et seq*., and the federal common law of public nuisance.

Jurisdiction in this Court also vests pursuant to 28 U.S.C. § 1332 as this is a civil action where

the matter in controversy exceeds the value of $75,000 and is between the Plaintiff States and an

Illinois unit of government.

3.      Any immunity of the Corps to this action has been waived by Congress.  5 U.S.C.

§ 702.

4.      Venue is proper in this Court:  1) pursuant to 28 U.S.C. § 1391(b)(1) as this action

is not based solely on diversity and the District resides in the Northern District of Illinois and 2)

pursuant to 28 U.S.C. § 1391(e)(2) because the Corps is an agency of the United States and a

substantial part of the events and omissions giving rise to the claims against the Corps occurred

in the Northern District of Illinois and a substantial part of property that is the subject of the action against the Corps is situated in the Northern District of Illinois.

## PARTIES

5.     Plaintiff State of Michigan is a sovereign state.  It holds the navigable waters and aquatic resources of Lakes Michigan, Huron, Superior and Erie and connecting waters within its borders in trust for the public.

6.     Plaintiff State of Wisconsin is a sovereign state.  It holds the navigable waters and aquatic resources of Lakes Michigan and Superior and connecting waters within its borders in trust for the public.

7.     Plaintiff State of Minnesota is a sovereign state.  It holds the waters, wetlands, and aquatic resources associated with 140 miles of Lake Superior shoreline lying within its jurisdiction, as well as those connecting waters and water-related resources, in trust for the benefit of its citizenry.

8.     Plaintiff State of Ohio is a sovereign state.  It holds the navigable waters and aquatic resources of Lake Erie and connecting waters within its borders in trust for the public.

9.     Plaintiff Commonwealth of Pennsylvania is a sovereign state.  It holds the navigable waters and aquatic resources of Lake Erie and connecting waters within its borders in trust for the public.

10.     Defendant United States Army Corps of Engineers is an agency of the United States.  The Corps exercises control over navigational and water control facilities in the CAWS, including the Chicago Lock and the T. J. O'Brien Lock and Dam.  It has been granted, and asserts, broad authority pursuant to Section 126 of the 2010 Energy and Water Development Appropriations Act, Pub. L.111-85, 123 Stat. 2845 (Section 126), to take emergency action to

prevent the migration of Asian carp through the CAWS into the Great Lakes. Section 126 states that the Corps "shall implement" such measures by October 28, 2010. The Corps has also been directed by Congress to undertake a "feasibility study of the range of options and technologies available to prevent the spread of aquatic nuisance species between the Great lakes and Mississippi River Basins," Pub. L. 110-114, 121 Stat. 1121 (2007), which the Corps refers to as the "Great Lakes and Mississippi River Inter-Basin Study" or "GLMRIS".

11.     Defendant Metropolitan Water Reclamation District of Greater Chicago is a unit of local government created in 1889 by the Illinois Legislature for the purpose of protecting the quality of Lake Michigan water, collecting and disposing of sewage, reducing pollution of the Chicago area waterways, and reducing flooding. 70 ILCS § 2605/1 *et seq.* The District controls and manages various facilities that regulate the movement of water into the CAWS and between the CAWS and Lake Michigan including, but not limited to, the Wilmette Pumping Station, and the Chicago River Controlling Works. The District also operates wastewater and stormwater facilities that discharge into the CAWS, and under certain conditions, into Lake Michigan.

## BACKGROUND

12.     More than 100 years ago, Chicago area sewage and industrial waste discharged into the Chicago River flowed directly into Lake Michigan, polluting water intakes for Chicago's municipal water supply.

13.     To address that problem, Illinois enacted laws creating the District and providing for construction of a new canal, what is now known as the Chicago Sanitary and Ship Canal (Canal), connecting the Chicago River to the Illinois River and the Mississippi River Basin.

14.     The District also constructed and operated facilities to reverse the natural flow of the Chicago River away from Lake Michigan, using water diverted from Lake Michigan to dilute and flush its wastes downstream and ultimately into the Mississippi River Basin.

15.     This man-made connection of the Great Lakes Basin with the Mississippi River Basin, and the reversal of the natural flow of water (the diversion project), solved Chicago's immediate problem of contaminated water supplies, but simultaneously sowed the seeds of the present dispute by allowing fish and other biota, including invasive species, to migrate between the Great Lakes Basin and the Mississippi River Basin.

**Current Status of the Diversion
Project and Associated Infrastructure**

16.     In addition to its primary function as a means of managing wastewater discharges from within the District, the Canal serves as a means of navigation and is part of the CAWS connecting the Great Lakes with the Mississippi River.

17.     The CAWS, which is integral to the diversion project, consists of approximately 78 miles of canals and modified streams located within Cook and surrounding counties.  The CAWS consists of the Canal, the Chicago River, its two main branches (North Branch and South Branch), as well as the Calumet Sag Channel, and all the tributaries in an area extending from the metropolitan Chicago area to the Lockport vicinity.  It also includes, or is connected to, Lake Calumet and the Calumet, Grand Calumet and Little Calumet Rivers.

18.     As a result of the diversion project, the CAWS and the associated infrastructure created, operated and maintained by the District and the Corps, direct connections between the CAWS and Lake Michigan exist at five locations at or near the Lake:

(a)      The Wilmette Pumping Station, located where the North Shore Channel meets Lake Michigan.  It is owned, operated, and maintained by the District.  It includes a concrete channel, pumps, and a sluice gate.

(b)      The Chicago River Controlling Works in Downtown Chicago where the Chicago River joins Lake Michigan.  The control structure includes a concrete wall separating the river from Lake Michigan, sluice gates, and a navigation lock.  The Corps is responsible for maintenance and operation of the lock.  The District is responsible for operation and maintenance of the remainder of the structure and the sluice gates.

(c)      The Thomas J. O'Brien Lock and Dam is located on the Calumet River and controls the flows of the water between Lake Michigan and the Little Calumet River and, thereby, the Calumet-Sag Channel.  The navigational lock and dam are operated and maintained by the Corps.  The sluice gates are operated by the District.

(d)      Indiana Harbor in Indiana.  The Calumet Sag Channel connects to the Grand Calumet River, which enters Lake Michigan at Indiana Harbor.

(e)      Burns Harbor in Indiana.  The Calumet Sag Channel connects to the Little Calumet River, which enters Lake Michigan at Burns Harbor.

19.      Under normal conditions, the combined flow of water entering the system through diversion, stormwater runoff, and discharges of treated wastewater flows south through the Canal to the Lockport Powerhouse and Lock, located one mile upstream and lakeward from the junction of the Canal with the Des Plaines River.

20.      The Lockport Powerhouse is operated by the District and the navigational lock is operated by the Corps.

21.     In addition, the District operates the Lockport Controlling Works two miles upstream and lakeward from the powerhouse and lock to manage stormwater flows and, on occasion, divert them into the Des Plaines River.

22.     As a direct result of the diversion project and the associated infrastructure created, operated, and maintained by the District and the Corps, there are multiple water connections through which fish and other biota can move from the waters of the Illinois and Des Plaines Rivers below Lockport and into Lake Michigan.  These water connections include, but are not necessarily limited to, the following:

       (a)     The lock at Lockport.

       (b)     Sluice gates in the Lockport Dam.

       (c)     The O'Brien Lock.

       (d)     Sluice gates in the O'Brien Dam.

       (e)     The Chicago Lock.

       (f)     Sluice gates in the Chicago River Controlling Works.

       (g)     The sluice gate at Wilmette Pumping Station.

23.     In addition, because of the creation and operation of the Canal, the North Shore Channel and the Calumet-Sag Channel by the District and the Corps, there is the potential for fish to migrate from the Canal into Lake Michigan as a result of:

       (a)     Reversals of water flow into Lake Michigan at the Wilmette Pumping Station, the Chicago River Controlling Works, Chicago Lock, and the O'Brien Lock and Dam under certain stormwater flow conditions.

(b)     Direct passage through the Grand Calumet River into Lake Michigan at Indiana Harbor, if and when a temporary cofferdam recently installed in that river as part of an ongoing environmental cleanup project at the Harbor is removed.

(c)     Direct passage through the Little Calumet River into Lake Michigan at Burns Harbor, Indiana.

24.     Furthermore, portions of the Canal located north of Lockport closely parallel two other nearby waterways – the Des Plaines River and the obsolete Illinois and Michigan Canal (I&M Canal).  As recently as 2008, the Des Plaines River flooded into the Canal.  This drainage system may also allow water flow between the I&M Canal and the Canal.  Consequently, fish present in either that segment of the Des Plaines River or the I&M Canal may, under certain conditions, migrate into the Canal north of Lockport and then into Lake Michigan

25.     In sum, the diversion project, the CAWS and associated infrastructure as created, maintained, and operated by the District and the Corps provide a conduit for the movement of fish and other biota between the Illinois River and the Great Lakes at multiple locations on the shore of Lake Michigan.

**Asian carp**

26.     Several species of carp native to Asia have been imported to the United States for various reasons, including experimental use in controlling algae in aquaculture and wastewater treatment ponds.  Two species of Asian carp are of particular concern here:

(a)     Silver carp (Hypophthalmichthys molitrix), which can grow to lengths of three feet and weights of 60 pounds, feed almost continuously.  In the presence of motorboats, silver carp may jump up to ten feet in the air.

(b)     Bighead carp (Hypophthalmicthys nobilis) which can grow to lengths of five feet and weights over 100 pounds and also feed almost continuously.

27.     Both silver and bighead carp readily adapt to varying environmental conditions, reproduce prolifically, and spread rapidly.

28.     Since their escape from ponds in the lower Mississippi River basin, both silver and bighead carp populations increased exponentially. They have rapidly migrated through, and become established in, rivers in the Mississippi River Basin, including the Illinois River.

29.     By aggressively consuming available nutrient sources, silver and bighead carp have substantially disrupted and in some areas largely displaced native fish populations in these rivers, impairing recreational and commercial fishing.

30.     Because of their large size and extreme jumping behavior, silver carp have injured boaters and caused property damage, thus impairing recreational boating.

31.     As a result of their rapid spread, bighead and silver carp populations have established reproducing populations in the Illinois River.

32.     By 2009, silver carp were observed in the Canal, slightly south of the Lockport Dam and Lock.

33.     Beginning in 2009, the Corps undertook a program of environmental surveillance for silver and bighead carp using environmental DNA (eDNA) methods developed by the University of Notre Dame. In this method, samples of water are collected, filtered, and their contents analyzed for the presence of genetic material that has been emitted or secreted by those species.

34.     In December 2009, the eDNA testing method was examined in detail by a four member team of experts. This Quality Assurance audit team was led by the Environmental

Protection Agency with an observer from the Corps also present. In their Summary, the Quality

Assurance team confirmed that the genetic markers utilized by the eDNA testing method

detected only the target fish species, endorsed the eDNA testing field and laboratory protocols,

acknowledged that the methods used during testing minimized the possibility of reporting false

positive results, and concluded: "Our team believes that the eDNA method [the Corps is] using is

sufficiently reliable and robust in reporting a pattern of detection that should be considered

actionable in a management context. We have a high degree of confidence in the basic PCR

method [the Corps is] using for detecting Silver and Bighead carp environmental DNA."

35.     A series of eDNA sample results from the Des Plaines River, the Canal, and other

connecting waterways indicate that Asian carp are present in the Canal north (above and

upstream) of the Lockport Lock, in the North Shore Channel, in the Calumet-Sag Channel in the

vicinity of the O'Brien Lock, in the Calumet River and in Calumet Harbor which is in Lake

Michigan itself.

36.     In December, 2009, a bighead carp was recovered from the Canal north of the

Lockport Lock.

37.     In June, 2010, a bighead carp was recovered from Lake Calumet, north of the

O'Brien Lock and Dam and approximately six miles from Lake Michigan.

38.     The migration of Asian carp, through the Canal and connecting waters into Lake

Michigan, presents a grave threat of environmental and economic harm to all of the Great Lakes,

as recognized by the Corps, the United States Fish and Wildlife Service (USFWS), and the State

of Illinois, through its Department of Natural Resources (Illinois DNR).

39.     For example, the Corps has acknowledged:

Asian carp have the potential to damage the Great Lakes and confluent large
riverine ecosystems by disrupting the complex food web of the system and

causing damage to the sport fishing industry. Two species of Asian carp, bighead carp (Hypophthalmichthys nobilis) and silver carp (H. molitrix), have become well established in the Mississippi and Illinois River systems exhibiting exponential population growth in recent years. Certain life history traits have enabled bighead and silver carp to achieve massive population numbers soon after establishing. Currently, the Illinois River is estimated to have the largest population of bighead and silver carp in the world. The prevention of an inter-basin transfer of bighead and silver carp from the Illinois River to Lake Michigan is paramount in avoiding ecological and economic disaster.

40.     A 2004 United States Fish and Wildlife publication similarly stated:

Bighead and silver carp are in the Illinois River, which is connected to the Great Lakes via the Chicago Sanitary and Ship Canal. Asian carp pose the greatest immediate threat to the Great Lakes ecosystem. . . . Bighead and silver carp could colonize all of the Great Lakes and sustain high-density populations. High densities would likely result in declines in abundance of many native fishes.

*   *   *

Great Lakes sport and commercial fisheries are valued at $4.5 billion dollars annually, without including the indirect economic impact of those industries. Degradation of those fisheries would have severe economic impacts on Great Lakes communities that benefit from the fisheries. Waterfowl production areas are also at risk from Asian carp. Hunters spend more than $2.6 billion annually on their sport in the Great Lakes, so reduction of waterfowl populations there would decrease the economic value to communities that benefit from hunting.

41.     The Illinois Department of Natural Resources similarly stated:

Asian carp could have a devastating effect on the Great Lakes ecosystem and a significant economic impact on the $7 billion fishery. Once in Lake Michigan, this invasive species could access many new tributaries connected to the Great Lakes. These fish aggressively compete with native commercial and sport fish for food. They are well suited to the water temperature, food supply, and lack of predators of the Great Lakes and could quickly become the dominant species. Once in the lake, it would be very difficult to control them.

## Actions and Decisions of the District and the Corps

42.     Faced with the mounting threat that the existing configuration of the CAWS and

continued, routine operation of the locks, sluice gates and other structures in the CAWS could

introduce Asian carp into the Great Lakes through the CAWS, the Corps, in cooperation with

other federal and state agencies, has undertaken well-intentioned – but insufficient – efforts to prevent that occurrence.

43.     The Corps has primarily relied on an electrical "Dispersal Barrier System," comprised of underwater steel cables charged with electricity that is intended to deter the passage of invasive species.

44.     The first element of the Dispersal Barrier System – now referred to as "Barrier I" – is located slightly north of the Lockport Dam, and approximately 25 miles from Lake Michigan.  It began operation in 2002.

45.     Authorized by Congress in 1996, Barrier I was conceived as an experimental means of deterring the movement of other aquatic invasive species that had infested the Great Lakes – such as zebra mussels and the round goby – from Lake Michigan through the Canal into the Illinois and Mississippi River basins.

46.     In 2004, the Corps began construction of a second electrical barrier – now referred to as "Barrier IIA" – located approximately 1,300 feet downstream from "Barrier I."

47.     Although construction of Barrier IIA was completed in 2006, it was not activated until early 2009, and even then, initially at approximately 25 percent of its electrical capacity.

48.     In August, 2009, after positive results of eDNA testing for Asian carp closer to Lockport Dam were reported, the Corps increased the electric settings on Barrier IIA somewhat. Those settings, however, still remain below their full design capacity.

49.     Moreover, the Corps has determined that Barrier IIA cannot be operated continuously and must be periodically turned off for maintenance.

50.     In fact, the Corps turned off Barrier IIA between December 2 and December 4, 2009 for such maintenance.  At the same time, to mitigate the risk that Asian carp would pass

through that segment of the Canal, a multi-agency, Asian Carp Rapid Response Workgroup, coordinated by the Illinois DNR, and supported by staff and resources of various federal and state agencies, including, among others, the Michigan Department of Natural Resources, applied a fish poison – rotenone – to an approximately 5.7 mile-long portion of the Canal south of the Barrier System.

51.     Although many of the fish killed as a result of the rotenone application apparently sank to the bottom of the Canal, the Illinois DNR reported that thousands of other fish that floated to the surface and were recovered included, as noted above, at least one bighead carp. When found on December 3, 2009, that carp was located approximately 500 feet north of the Lockport Lock and Dam.  The Illinois DNR noted that "[B]iologists with the workgroup believe there is a high probability that additional Asian carp were killed during the toxicant application but may not be found . . . [and that because of cold water temperatures] 'far more fish are sinking to the bottom of the waterway than will float to the top.'"

52.     The Corps has announced plans for a third element of the Dispersal Barrier System – designated "Barrier IIB" to be located between Barriers IIA and I – but it has not yet been completed.

53.     Information available to the District and the Corps demonstrates that even when completed, the Dispersal Barrier System cannot prevent the migration of bighead and silver carp through the Canal into Lake Michigan.  Among other things:

(a)     The Dispersal Barrier System is experimental.

(b)     The Corps has acknowledged that the Barrier can be by-passed through the movement of water from carp-infested waters of the immediately adjacent Des Plaines River and Illinois and Michigan Canal, by means of flooding or cross-

connections. While the Corps is currently planning to construct fences on a strip of land between those waterways to reduce those risks, they have yet been completed.

(c)     eDNA collected for the Corps indicates that Asian carp are present at multiple locations lakeward of the Barrier System, in the Canal, the Calumet-Sag Channel, the North Shore Channel, the Calumet River, and in Calumet Harbor in Lake Michigan.

(d)     On June 22, 2010, one bighead carp was caught in Calumet Lake lakeward of the Dispersal Barrier System.

(e)     The rapid migration of Asian carp through the Illinois and Des Plaines River toward Lake Michigan, the timing and spatial distribution of eDNA detections of Asian carp, and the physical recovery of actual Asian carp beyond the Lockport dam, including one in Lake Calumet within six miles of Lake Michigan, all strongly support the inference that multiple Asian carp have migrated through the CAWS beyond the Dispersal Barrier System.

54.     During the December 2009 shutdown of Barrier IIA and associated rotenone application and dead fish recovery effort, the United States Coast Guard temporarily restricted navigation in the Canal.

55.     The Corps also kept the O'Brien Lock closed between December 1 and December 7, 2009. During that time the Asian Carp Rapid Response Workgroup used fishing nets to collect fish in a segment of the Calumet-Sag Channel near the O'Brien Lock. Although no Asian carp were found among the several hundred fish netted in that process, the fishing effort could not and did not recover all fish present in that area, and thus did not establish that no Asian carp were present.

14

56.     By ordering the reopening of the O'Brien Lock on December 7, 2009, the Corps re-established a direct, unobstructed water connection at that point through which bighead and silver carp present in the Calumet-Sag Channel – including those previously detected through the Corps' own eDNA testing – can migrate into Lake Michigan.

57.     In fact, on January 19, 2010, the Corps announced that eDNA testing of samples collected in December, 2009, revealed the presence of silver carp in Calumet Harbor and in the Calumet River north (lakeward) of the O'Brien Lock.

58.     In addition, as described in paragraphs 18-25 above, there are several other locations within the CAWS and associated infrastructures maintained by the District and the Corps, through which Asian carp present in the Illinois and Des Plaines Rivers and the Canal can migrate into Lake Michigan.

59.     Since the Corps announced, in November, 2009, that Asian carp eDNA had been detected in the CAWS lakeward of the Dispersal Barrier System, the Plaintiff States and other interested parties have repeatedly urged the Defendants to promptly take additional, comprehensive action to minimize the risk that Asian carp will migrate through the CAWS into Lake Michigan.  Those requests have included, but are not limited to the following:

(a)     In a letter dated December 2, 2009, the Attorney General of the State of Michigan asked the Corps, the District and Illinois to take immediate, coordinated action to abate the threat, including, among other things, continued applications of fish poison and changes in lock and water control operations to prevent the passage of fish into Lake Michigan.  Michigan also requested that the Corps, in coordination with State and local officials develop and implement plans to physically separate the carp-infected waterways from Lake Michigan.

(b)     On December 21, 2009, the State of Michigan filed in the United States Supreme Court, a Motion to Reopen and For a Supplemental Decree in Original Nos. 1, 2 and 3, or in the alternative, for leave to file a new complaint, together with a Motion for Preliminary Injunction.  Michigan sought to compel the Corps and the District to immediately take all available measures within their respective control, consistent with the protection of public health and safety, to prevent the migration of Asian carp into Lake Michigan, including, but not limited to:  (i) closing and ceasing operation of the locks at the O'Brien Lock and Dam and Chicago Controlling Works; (ii) limiting the opening of sluice gates; (iii) installing interim barriers in the Little Calumet and River; and (iv) eradicating Asian carp in the CAWS.  Michigan also requested a permanent injunction requiring the Corps and the District to expeditiously develop and implement plans to permanently and physically separate carp-infested waters of the Illinois waterway from the Great Lakes.

(c)     The States of Wisconsin, Minnesota, New York, Ohio and Pennsylvania filed responses in the Supreme Court supporting the relief requested by Michigan.

(d)     On February 4, 2010, Michigan filed a Renewed Motion for Preliminary Injunction, reiterating the requests for preliminary injunctive relief summarized above.

(e)     On February 19, 2010, the States of New York, Minnesota and Wisconsin filed their Brief Support of Michigan's Motion to Reopen and Renewed Motion for Preliminary Injunction.

(f)     On February 18, 2010, the Attorney General of Michigan submitted to the United States, written comments on the Draft Asian Carp Control Strategy Framework issued by the Asian Carp Regional Coordinating Committee.  In those comments,

Michigan again urged that the Corps and the District take additional, comprehensive action to minimize the risk of Asian carp migration into the Great Lakes, including minimizing the opening of locks and sluice gates, installation of screens or grates in sluice gates, systematically addressing each of the pathways into the Lakes, and installation of block nets or other temporary barriers to fish passage in the Little Calumet River. Michigan reiterated the need to accelerate evaluation and planning for permanent hydrologic separation of the carp-infested waters of the Illinois basin from the Great Lakes.

(g) On May 19, 2010, following the release of a Revised Asian Carp Control Strategy Framework, and a press release announcing a plan for applying the fish toxicant rotenone in one segment of the Calumet Sag Canal, the Attorneys General of the Plaintiff States wrote a letter to Commander and Division Engineer Major General Peabody of the Corps, copied to the District, again requesting relief in the form of more comprehensive and effective measures to prevent Asian carp migration into Lake Michigan, including closure of the locks and sluice gates except as needed to protect public health and safety, applying rotenone in all areas where Asian carp eDNA had been detected, installation of screens in all sluice gates, installation of a block net in the Little Calumet River, and expediting the Corp's proposed schedule for evaluating permanent separation of the Chicago waterway from the Great Lakes.

60. Defendants have repeatedly and unjustifiably refused or neglected to abate the nuisance by taking the additional actions requested by the Plaintiff States.

61. In its January 5, 2010 Opposition to Michigan's initial Motion for Preliminary Injunction in the Supreme Court, the United States, on behalf of the Corps, while asserting broad

authority to take action to prevent the migration of Asian carp into Lake Michigan, announced

the Corps' decision, reflected in a Declaration from General Peabody, to reject most of the relief

requested by Michigan and the other Plaintiff States.  Among other things, the Corps:

      (a)     refused to temporarily close the O'Brien and Chicago locks,

      (b)     failed to provide for the immediate application of rotenone in locations in

the CAWS lakeward of the Dispersal Barrier System that had tested positive for Asian

carp eDNA,

      (c)     failed to comprehensively address all of the five pathways in the CAWS

through which the Corps acknowledged that fish could potentially enter Lake Michigan

by failing to provide for any temporary barrier to fish passage in the Little Calumet River,

and

      (d)     failed to sufficiently accelerate evaluation of permanent separation of the

CAWS from the Great Lakes Basin.

62.     In its January 5, 2010 Opposition to Michigan's initial Motion for Preliminary

Injunction, the District also rejected most of the relief requested by Michigan and the other

Plaintiff States.  In particular, as reflected in the Affidavit of District Executive Director Richard

Lanyon, the District insisted that it must be able to continue unrestricted operation of sluice gates

at the Wilmette Pumping Station and Chicago River Controlling Works not only for flood

control, but also navigation and discretionary diversion purposes.  It further asserted that it had

no means to prevent fish passage through the sluice gates when they are opened.

63.     Despite the Corps' public disclosure, on January 21, 2010, that silver carp eDNA

had been detected in the Calumet River and Calumet Harbor, lakeward of the O'Brien Lock, the

Corps again decided to continue opening the O'Brien Lock.  Nor did the Corps take any action at

that time to apply rotenone in the Calumet River, Calumet Harbor, or anywhere else in the CAWS.

64.     On February 8, 2010, the Asian Carp Regional Coordinating Committee (RCC), of which the Corps and the United States Fish and Wildlife Service are lead members, and in which the District is identified as a participant, issued its "Draft Asian Carp Control Strategy Framework" (Draft Framework).

65.     The Draft Framework acknowledged that:

(a)     The migration of Asian carp through the CAWS may be "the most acute AIS [aquatic invasive species] threat facing the Great Lakes today,"(p.1) and could "cause great economic damage to the Great lakes commercial, sport and tribal fisheries collectively valued at more than $7 B[illion] annually…"(p.4);

(b)     "[F]ollowing the introduction of Asian carp into the Great Lakes basin, controlling their spread throughout these areas would be nearly impossible"(p.5); and

(c)     ". . . [W]e cannot wait for perfect certainty and must act preemptively with comprehensive measures to prevent carp from becoming established in the Great lakes or their tributaries" (p.1).

66.     Unfortunately, the Draft Framework neither systematically addressed each of the pathways through which Asian carp threaten to move through the CAWS into Lake Michigan, nor provided for the use of all available means to minimize the risk of such migration.  In particular, it presumptively rejected temporary closure of locks and sluice gates.  Instead, the Draft Framework indicated that the Corps was considering actions which it labeled "Modified structural operations" that it would implement on or before April 30, 2010."  The identified options for Modified Structural Operations included:

- Closing both sets of lock gates between lockages, or

- Reducing the frequency of lock openings by closing the locks 1) one week a month, or 2) three to four days a week or 3) every other week, or

- "no action" and to continue to operate the locks as normal.

67.     The Draft Framework also indicated that, with respect to any permanent solutions, it did not intend, until 2012, to complete even an interim version of an "Inter-Basin Feasibility Study" that would consider, among other things, the possibility of indefinite lock closure and "ecological separation."

68.     In its February 26, 2010, Opposition to Michigan's renewed Motion for Preliminary Injunction filed in the Supreme Court, the United States, on behalf of the Corps, again rejected the relief sought by the Plaintiff States. Among other things, the February 24, 2010 supplemental Declaration of General Peabody asserted that there was insufficient evidence that Asian carp were present in the CAWS beyond the Dispersal Barrier System and again rejected even the temporary closure of the Chicago and O'Brien Locks.

69.     In its February 24, 2010 Opposition to Michigan's Renewed Motion for Preliminary Injunction, the District again opposed significant aspects of the relief sought by the Plaintiff States. While the District asserted that it was at that time only opening sluice gates "for reversals to the Lake" as necessary to prevent flooding, it continued to oppose limitations on its "discretionary diversions" of Lake Michigan water through sluice gates at the Chicago River Controlling Works and O'Brien Lock and Dam. The District stated that it proposed to install trial bar screens to be inserted in some, but not all of the sluice gates it controls.

70.     On May 5, 2010, the Asian Carp Regional Coordinating Committee issued its Revised "Asian Carp Control Strategy Framework." That document, like the February 8, 2010

version that preceded it, rejected or failed to adequately address most of the additional measures requested by the Plaintiff States. For example, the May 2010 Framework again presumptively rejected even temporary lock closure as a means of minimizing the risk of Asian carp migration. While acknowledging that "locks may impede some carp migration through the Chicago and Calumet Rivers into Lake Michigan," it then dismissed that option, noting that the locks "by themselves are not effective for preventing carp establishment in the Great Lakes" and that "if the USACE were to close the locks and take measures to make the locks more watertight, there are other ways that fish could get into the lake . . . " (p. 8). The Framework also stated the Corps evaluation of "modified structural operations," originally scheduled to be completed by April, would instead be completed in June, 2010. The revised Framework did not propose to complete even an initial evaluation of permanent "ecological" separation, as part of the planned "Inter-Basin Feasibility Study" until 2012.

71. On May 20, 2010, the Corps temporarily closed the O' Brien Lock while it, in conjunction with the Illinois Department of Natural Resources and the USFWS, conducted a second application of rotenone poisoning in a 2.5 mile segment of the Calumet-Sag Channel, but then reopened the lock several days later, emphasizing in public statements that no Asian carp were among the fish killed and recovered in that operation.

72. By ordering the reopening of the lock on May 25, 2010, the Corps effectively denied relief requested by the Plaintiff States, and again re-established, at the O'Brien Lock, a direct water connection through which Asian carp present in the Canal system could migrate into Lake Michigan. While the O' Brien and Chicago locks are not designed as barriers to fish passage and may allow some water to pass through them, it is indisputable that when the locks

are closed they are far less likely to allow the passage of fish than when they are opened, and thus, closure reduces the risk of Asian carp migration.

73.     On June 3, 2010, the Corps released a report entitled "Interim III, Modified Structural Operations, Chicago Area Waterways Risk Reduction Study and Integrated Environmental Assessment."  (Interim III.)  The only new interim measure proposed in the Report was the installation of screens in some of the sluice gates at the O'Brien Lock and Controlling Works.  In an accompanying press release issued the same day, and in the Report, the Corps stated that it did not intend to even temporarily close the O'Brien and Chicago Locks, except intermittently, on a "case by case basis in support of fish management efforts such as spot pisicide application, or intensive commercial fishing efforts by the … USFWS and …IDNR."  In attempting to justify that decision, the Corps stated:

> …USACE has insufficient information to conclude that Asian carp are actually present above the fish barrier.  In addition, USACE does not currently have evidence that there is an imminent threat that a sustainable population of Asian carp may establish itself if the locks are not closed. [Interim III p. 52]

The Corps also asserted that an "Expert Risk Analysis Panel" convened by the USFWS "concluded there is no individual or combination of lock operation scenarios [sic] will lower risk of Asian carp establishing self-sustaining populations in Lake Michigan to an acceptable level."

74.     However, examination of the Report shows that the Corps assertions were at best, seriously misleading, in that:

(a)     The Corps, not the Expert Panel, defined the five alternatives the panel was asked to consider.

(b)     The panel members were asked to assess the probability of Asian carp becoming established in the Great Lakes if each of the alternatives, standing alone, were implemented.

(c)     The only alternatives presented involved short-term lock closure; the longest period of closure considered (designated Alternative 5) was arbitrarily limited to two months.

(d)     The Report noted that a majority of the expert panel believed that there would be an "unacceptable," "medium to high" risk that Asian carp would be established in the Great Lakes under each of the scenarios, including "no- action" (i.e. no change in current lock operations).

(e)     The Report noted that, with respect to Alternative 5, at least some members of the Expert Panel concluded that extended closure could lower the risk of Asian carp establishment:

A few of the experts felt a long-term closure might lower the risk of Asian carp establishment in the Great Lakes.  Other experts felt that while the two month closure might reduce Asian carp migration during the closure period, once the locks were reopened, there would be no long term risk reduction associated with Asian carp migration.  (p. 51)

(f)     In sum, the responses of the Expert Panel to the Corps' questions actually suggest that continuing the current operation of locks presents an "unacceptable" risk that Asian carp will become established in the Great Lakes.  Moreover, at least some panel members found that so long as the locks were closed, the risk of Asian carp establishment would be reduced.  It was only by arbitrarily limiting the alternatives the Panel was allowed to consider to intermittent, short term lock closure, that the Corps could even attempt to claim that lock closure would not achieve any reduction in risk.

23

75.     Further, the Report indicates that the Corps then re-defined an even narrower set of alternatives that were not presented to the Expert Panel.  Each of those three alternatives was further constrained by the Corps pre-determined assumption that navigation through the locks must continue with minimal disruption, and that any consideration of more extended lock closure must be indefinitely deferred pending further evaluation of the impacts of lock closure (p. 51-52), presumably as part of the long-term "Great Lakes and Mississippi River Inter-Basin Study" even an interim version of which pertaining to the CAWS is not scheduled until 2012.

76.     In a letter dated June 8, 2010, General Peabody, on behalf of the Corps, replied to the May 19, 2010 letter from the Attorneys General of five Great Lakes states, including the Plaintiff States.  Of the five additional short term actions specifically requested in the States' May 19th letter to reduce the risk of Asian carp migration, the Corps indicated that only one – installation of screens in sluice gates – was actually being implemented.  The Corps reiterated and referred to the conclusions in its June 3, 2010 Interim III Report.  While stating that the Corps "agrees" that the issue of potential permanent solutions to the hydrologic connection of the CAWS to the Great Lakes in the GLMRIS "merits a focused study on an aggressive schedule," the Corps did not propose, let alone commit itself to any acceleration of its previously announced schedule, as urged by the Plaintiff States.

77.     Despite the Corps' and the District's repeated suggestions  in recent months that eDNA data failed to establish the presence of Asian carp in the CAWS north of the Dispersal Barrier System and that the non-detection of Asian carp in previous conventional (netting and electrofishing) monitoring efforts somehow proved that no Asian carp were present lakeward of the Barrier, indisputable confirmation of the presence of Asian carp came on June 23, 2010 when the RCC announced that it had caught a live Bighead carp as a result of one of its netting

operations in Lake Calumet immediately north and lakeward of the O'Brien Lock and approximately six miles from Lake Michigan. Notably, there are no physical barriers between the location where the carp was caught and Lake Michigan.

78. Despite confirmation of the live Asian carp caught in Lake Calumet, and the Plaintiff States' repeated requests to close the O'Brien and Chicago Locks to minimize the risk of such migration, in a press release issued by the RCC on June 23, 2010, Colonel Vincent Quarles of the Corps' Chicago District, made it clear that the Corps intended to continue to operate the locks.

79 This statement from Colonel Quarles is consistent with statements he made in the press release issued June 3, 2010 that addressed findings and conclusions of the Corps with regard to "modified structural operations." In this press release, Colonel Quarles stated: "In the end the analysis showed that using measures such as temporary lock closures will do very little to reduce the risk of Asian carp migration."

80. It is clear from the statements issued by Colonel Quarles in the June 3 and June 23 press releases, that the Corps has elected to continue the "no change in operation" option regarding lock operations outlined in the Draft and Revised Frameworks and the Interim III Report, and that it will not temporarily close the locks as requested by the Plaintiff States, except possibly for the limited purpose of temporarily supporting its sampling operations.

81. Despite the capture of a live Bighead carp in Lake Calumet, near Lake Michigan, the previous eDNA detections of Asian carp at locations both sides of the O'Brien Lock (including the Calumet River and Calumet Harbor), and the repeated requests by the Plaintiff States to eradicate Asian carp and apply rotenone wherever they have been detected in the CAWS, neither the Corps nor any other member of the RCC has to date applied rotenone

anywhere lakeward of the O'Brien Lock, or installed a block net to impede their passage into Lake Michigan.

82.     Despite the mounting evidence of Asian carp migration through the CAWS toward Lake Michigan, the District has not, to date, installed screens in all the sluice gates it controls, nor committed itself to maintaining such screens in place whenever the sluice gates are opened.

## COUNT I

## Public Nuisance

83.     Plaintiffs re-allege and incorporate by reference paragraphs 1-82, above.

84.     At common law, a condition, action, or failure to act that unreasonably interferes with a right common to the general public is a public nuisance.  A condition, action, or failure to act is unreasonable when it is of a continuing nature and the actor knows it has a significant effect upon the public right.  Restatement (Second) of Torts § 821B (1979).  The attorney general of a state may bring an action for injunctive relief to prevent or abate such a public nuisance.

85.     The waters and aquatic resources of Lake Michigan and the other Great Lakes are held in trust for the benefit of the public by the Plaintiff States and other Great Lakes states, within their respective jurisdictions.  The public rights in those waters and resources include, but are not limited to, fishing, boating, commerce, and recreation.

86.     As the United States, through the Corps and the United States Fish and Wildlife Service, have properly acknowledged, the migration of Asian carp through the CAWS into Lake Michigan, and thereby other Great Lakes and connected rivers and waterbodies, such that a reproducing population is established, will cause enormous and irreversible harm to the use and enjoyment and the other public rights in those waters.

87.     If Asian carp enter and become established in Lake Michigan and other connecting waters of the Great Lakes, the resulting harms to public rights will include, among other things:

       (a)     Substantial damage to and displacement of existing fish population.

       (b)     Significant impairment of existing recreational and commercial fishing activity in the Great Lakes, which has an estimated economic value of $7 billion.

       (c)     Significant threats to the health and safety of persons operating motorized boats in the vicinity of silver carp.

88.     The substantial and unreasonable nature of the harm that will be caused by the District's and the Corps' failure to prevent the migration of Asian carp into Lake Michigan is further illustrated by the fact that such an introduction of harmful invasive species is contrary to federal statute.  For example:

       (a)     The Lacey Act, 18 U.S.C. § 4, prohibits the interstate transport of injurious wildlife species.  Pursuant to that statute, the United States Fish and Wildlife Service (USFWS) has issued a final rule listing silver carp as such an injurious species. 72 Fed. Reg. 37459 (July 10, 2007) (codified at 50 C.F.R. § 16.13(2)(v)).  A similar listing for bighead carp remains under review.

       (b)     The Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, as amended by the National Invasive Species Act 16 U.S.C. § 4701 *et seq*. requires that the Aquatic Nuisance Species Task Force, which includes the USFWS and the Corps, to take action to minimize the risk of certain introductions of aquatic nuisance species:

Whenever the Task Force determines that there is a substantial risk of unintentional introduction of an aquatic nuisance species by an identified pathway

and that the adverse consequences of such an introduction are likely to be
substantial, the Task Force shall, acting through the appropriate Federal agency,
and after an opportunity for public comment, carry out cooperative,
environmentally sound efforts with regional, State and local entities to minimize
the risk of such an introduction. 16 U.S.C. § 4722(c)(2).

89.     As noted above, the present risk that Asian carp have and will migrate into Lake

Michigan exists precisely because the District created and implemented the diversion project and

because the District and the Corps are maintaining and operating the infrastructure of that project

in a manner that allows those fish to migrate from the Illinois River into Lake Michigan.

90.     By creating and maintaining conditions through which these injurious species are

likely to enter the Great Lakes, the District and the Corps will cause severe and foreseeable

injury to public rights.

91.     In sum, to the extent that the actions and omissions of the District and the Corps

allow Asian carp to migrate into Lake Michigan, they have created and are maintaining a

continuing public nuisance.

## COUNT II

### Judicial Review of Unlawful Agency Action

92.     Plaintiffs re-allege and incorporate by reference paragraphs 1-91, above.

93.     Pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 702 the Court has jurisdiction to review "agency action" by the Corps as defined in 5 U.S.C. § 551(13).

94.     Under 5 U.S.C. § 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

95.     5 U.S.C. § 706(1) provides that a court may: "compel agency action unlawfully withheld or unreasonably delayed . . . ."

96.     5 U.S.C. § 706(2) provides, in part, that a court may: "[h]old unlawful and set aside agency actions, findings and conclusions found to be – (a) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . ."

97.     5 U.S.C. § 551(13) provides that "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act. . . ."

98.     5 U.S.C. § 551(6) provides that "'order' means the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing. . . ."

99.     5. U.S.C. § 551(11)(A) provides that "'relief' includes the whole or part of an agency . . . grant of money, assistance, license, authority, exemption, exception, privilege, or remedy . . . ."

100.     Here, the Corps has, in several respects, acted unlawfully, or failed to act in accordance with law.  Such unlawful agency action includes, but is not necessarily limited to, the following:

(a)      The Corps has continued operate and maintain structures in the CAWS in a manner that contributes to the migration of Asian carp through the CAWS to Lake Michigan and continues to do so despite evidence that Asian carp are in the CAWS.  For example, despite the discovery of a live Asian carp in Calumet Lake and receiving multiple reports from its own contractor that eDNA samples of water collected from the CAWS north of the Dispersal Barrier System indicate that Asian carp have migrated to those locations, the Corps has repeatedly ordered the opening and/or continued operation of the O'Brien and Chicago Locks, maintaining direct water connections through which Asian carp may pass into Lake Michigan.

(b)      The Corps ordered the design, construction, and operation of the system it refers to as Dispersal Barrier IIA as its primary means of deterring the migration of invasive species between the Canal and the Great Lakes, despite the fact that this system is incapable of preventing all migration of Asian carp into Lake Michigan.

(c)      The Corps has denied requests for additional relief made by the Plaintiff States, including:

(i) applying rotenone to eradicate Asian carp wherever they are detected by eDNA or other means in the CAWS beyond the Electrical Barrier system;

(ii) permanently installing screens in all sluice gate its controls;

(iii) installing block nets or other physical barriers in the Illinois segment of the Little Calumet River; and

(iv) sufficiently expediting the development and implementation of plans to permanently separate the Asian carp-infested waters of the CAWS, and otherwise failed to take action to develop and implement effective, environmentally sound efforts to minimize the risk of introducing Asian carp to Lake Michigan through the CAWS.

101.    The Corps' orders, denial of requests for relief, and failure to act are reviewable by this Court pursuant to 5 U.S.C. § 704.

102.    Additionally, those agency actions are not in accordance with laws in that they:

(a)     Contribute to the maintenance of a common law public nuisance.

(b)     Contribute to the threatened interstate movement of injurious species prohibited by the Lacey Act. 18 U.S.C. § 42

(c)     Violate the mandatory duties imposed by the Nonindigenous Aquatic Nuisance Prevention and Control Act. 16 U.S.C. § 4722(c)(2).

## Request for Relief

Accordingly, the Plaintiff States request that the Court:

1.    Enter a Preliminary injunction enjoining the Defendants to immediately take all available measures within their respective control, consistent with the protection of public health and safety, to prevent the migration of bighead and silver carp through the CAWS into Lake Michigan, including, but not necessarily limited to, the following:

(a)     Using the best available methods to block the passage of, capture or kill bighead and silver carp that may be present in the CAWS, especially in those areas north of the O'Brien Lock and Dam.

(b)     Installing block nets or other suitable interim physical barriers to fish passage at strategic locations in the Calumet River between Lake Calumet and Calumet Harbor.

(c)     Temporarily closing and ceasing operation of the locks at the O'Brien Lock and Dam and the Chicago River Controlling Works except as needed to protect public health and safety.

(d)     Temporarily closing the sluice gates at the O'Brien Lock and Dam, the Chicago Controlling Works, and the Wilmette Pumping Station except as needed to protect public health or safety.

(e)     Installing and maintaining grates or screens on or over the openings to all the sluice gates at the O'Brien Lock and Dam, the Chicago River Controlling Works, and the Wilmette Pumping Station in a manner that will not allow fish to pass through those structures if the sluice gates are opened.

(f)     Installing and maintaining block nets or other suitable interim physical barriers to fish passage as needed in the Little Calumet River to prevent the migration of bighead and silver carp into Lake Michigan, in a manner that protects public health and safety.

(g)     As a supplement to physical barriers, applying rotenone at strategic locations in the CAWS, especially those areas north of the O'Brien Lock and Dam where

bighead and silver carp are most likely to be present, using methods and techniques best suited to eradicate them and minimize the risk of their movement into Lake Michigan.

(h)     Continue comprehensive monitoring for bighead and silver carp in the CAWS, including resumed use of environmental DNA testing.

2.     Enter a preliminary injunction requiring the Corps to expedite the preparation of a feasibility study, pursuant to its authority under Section 3601 of the Water Resources Development Act of 2007, developing and evaluating options for the permanent physical separation of the CAWS from Lake Michigan at strategic locations so as to prevent the transfer of Asian carp or other invasive species between the Mississippi River Basin and the Great Lakes Basin.  Specifically, the Corps should be required to:

(a)     Complete, and make available for public comment, within six months, an initial report detailing the progress made toward completion of the evaluation.

(b)     Complete, and make available for public comment, within twelve months, a second, interim report detailing the progress made toward completion of the evaluation.

(c)     Complete, and make available for public comment, within eighteen months a final report detailing the results of the evaluation and recommendations for specific measures to permanently physically separate the CAWS from Lake Michigan at strategic locations to prevent the migration of bighead carp, silver carp or other harmful invasive species between the CAWS and the Great Lakes.

3.     Enter an Order:

(a)     Declaring that to the extent the conditions at facilities constructed, maintained, or operated by the Corps and the District in connection with the CAWS will

allow the migration of bighead or silver carp into Lake Michigan, those conditions and facilities constitute a public nuisance or are otherwise unlawful.

(b)     Granting a Permanent Injunction requiring the District and the Corps to take all appropriate and necessary measures to expeditiously develop and implement plans to permanently and physically separate carp-infested waters in the Illinois River basin and the CAWS from Lake Michigan so as to prevent the migration of bighead carp, silver carp, or other harmful aquatic invasive species into Lake Michigan.

4.     Grant the Plaintiff States such other relief as the Court determines just and proper.

Respectfully submitted,

MICHAEL A. COX
Attorney General of Michigan

S. Peter Manning
Division Chief


  /s/ Robert P. Reichel
Robert P. Reichel (P31878)
Louis B. Reinwasser (P37757)
Daniel P. Bock (P71246)
Assistant Attorneys General
Environment, Natural Resources,
And Agriculture Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI  48909
(517) 373-7540 (phone)
(517) 373-1610 (fax)

reichelb@michigan.gov

Attorneys for State of Michigan

J.B. VAN HOLLEN
Attorney General of Wisconsin


 /s/  Cynthia R. Hirsch
CYNTHIA R. HIRSCH
Assistant Attorney General
State Bar #1012870
Attorneys for State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3861
(608) 266-2250 (Fax)

hirschcr@doj.state.wi.us

Attorneys for State of Wisconsin

LORI SWANSON
Attorney General of Minnesota

STEVEN M. GUNN
Deputy Attorney General

 /s/ Peter J. Shaw
Peter J. Shaw
Assistant Attorney General
Illinois Atty. Reg. No. 6297606
Minnesota Atty. Reg. No. 0390720

445 Minnesota St., #1200
St. Paul, MN 55101-2130
(651) 757-1211 (Voice)
(651) 296-1410 (TTY)

peter.shaw@state.mn.us

Attorneys for State of Minnesota

RICHARD CORDRAY
Attorney General of Ohio


  /s/  Lee Ann Rabe
Lee Ann Rabe
Dale T. Vitale
David M. Lieberman
Jeannine R. Lesperance
Assistant Attorneys General
Office of the Attorney General
30 East Broad Street
Columbus, OH  43215

LeeAnn.Rabe@ohioattorneygeneral.gov

Attorneys for the State of Ohio

THOMAS W. CORBETT, JR.
Attorney General of Pennsylvania


  /s/  J. Bart DeLone
J. Bart DeLone
Senior Deputy Attorney General
16th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 783-3226

jdelone@attorneygeneral.gov

Attorneys for Commonwealth of
Pennsylvania

Dated this 19th day of July, 2010


ENRA/cases/2009/Asian Carp/USDC/ILND/Complaint Affidavits Appearance/Complaint 7.19.10 FINAL