UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF MICHIGAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 10 CV 4457 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**CITY OF CHICAGO'S RESPONSE TO**
**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION…………………………………………………………............ 1

STATEMENT OF FACTS………………………………………………………….. 2

ARGUMENT………………………………………………………………………... 6

I.    The Balance Of Equities Does Not Tip In Plaintiffs' Favor And An Injunction Would    7
      Not Be In The Public Interest…………………………………………………………...

II.   Plaintiffs' Are Unlikely To Succeed On The Merits Because The Political Question    11
      Doctrine Requires Their Claims To Be Dismissed…………………………………..

CONCLUSION………………………………………………………………………… 15

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Acierno v. New Castle County*, 40 F.3d 645 (3d Cir. 1994)…………………………..   6
*African-Amer. Slave Descendants Litig.*,
    304 F. Supp. 2d 1027 (N.D. Ill. 2004)………………...……...…………………..   2, 11
    471 F.3d 754 (7th Cir. 2006)…………………………………………………...   2
*Att'y Gen. of Oklahoma v. Tyson Food, Inc.*, 565 F.3d 769 (10th Cir. 2009)………….   6
*Baker v. Carr*, 369 U.S. 186 (1962)…………………………………………………...   2, 11-15
*Cal. v. Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. 2007)……………………   13-14
*Conn. v. Am. Elec. Power Co.*,
    406 F. Supp. 2d 265, 272 (S.D. N.Y. 2005)…………………………………………   13
    582 F.3d 309, 321 (2d Cir. 2009)……………………………………………………   11-13, 15
*Doninger v. Neihoff*, 527 F.3d 41 (2d Cir. 2008)…………………………………...   6
*Graham v. Medical Mutual of Ohio*, 130 F.3d 293 (7th Cir. 1997)……………………   6-7
*McIntyre v. Fallahay*, 766 F.2d 1078 (7th Cir. 1985)…………………………………   2
*Native Vill. of Kivalina v. Exxonmobil Corp.*, 663 F. Supp. 2d 863 (N.D. Cal. 2009)..   11-13
*Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981)………………………………..   10
*Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008)…………..   6-7

<u>STATUTES</u>

Aquatic Nuisance Prevention Act § 1202(i)(3)(C), 16 U.S.C. 4722(i)(3)…………….   14
District of Columbia Appropriations Act, 2005 (2005 Act), Pub. L. No. 108-335, §
    345, 118 Stat. 1352………………………………………………………………..   14
Energy and Water Development and Related Agencies Appropriations Act, 2010,
    Pub. L. No. 111-85, § 126, 123 Stat. 2853 (2009)………………………………...   14
National Invasive Species Act of 1996, 16 U.S.C. 4713, *et seq.*.................................   13
Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, 16 U.S.C.
    4701, *et seq.*..........................................................................................................   13
Water Resources Development Act of 2007 (2007 Act), Pub. L. No. 110-114, §
    3061(b)(1)(A) and (d), 121 Stat. 1121………………………………………………   14

## INTRODUCTION

Plaintiffs' request for a preliminary injunction should be denied because it would, among other things, have immediate, substantial, and unreasonable impacts on the public health, safety, and general welfare of the people of Chicago.  Plaintiffs seek injunctive relief that would immediately and substantially curtail the use of important navigational and water control infrastructure in the City of Chicago and surrounding region.  The City relies upon this infrastructure – namely the Chicago River Controlling Works ("CRCW"), O'Brien Lock and Dam ("OL&D"), and Wilmette Pumping Station ("WPS") – to protect and promote the public health, safety, and general welfare of its citizens.  Although Plaintiffs state that they would allow the locks and sluice gates to continue operating "as needed for public health and safety," they cast this exception so narrowly that it would only include use of the infrastructure for "emergency response" purposes or to "prevent flooding."  (*See* Br. in Support of Mot. for Prelim. Inj. 32-34.)  Plaintiffs do not specify what exactly they mean by "emergency response" or how it might govern all of the various scenarios under which the Chicago Police and Fire Departments pass through the locks on a daily basis.  In any event, the public health and safety of the people of Chicago depends upon more than just "emergency response" services and "flood prevention."  In addition to its impacts on public health and safety, Plaintiffs' requested relief would significantly impair the general welfare of the people of Chicago, and the City's longstanding efforts to promote public use and access to the CAWS.  The City recognizes that Asian carp represent a significant threat to the Great Lakes ecosystem and that all reasonable means should be employed to keep them from entering the Great Lakes.  Plaintiffs' requested relief, however, would simply impose unreasonable and unnecessary risks and burdens upon the City and its citizens.

Not only should Plaintiffs' preliminary injunction be denied because of the risks and burdens imposed on the City and its residents, but it should also be denied because Plaintiffs are unlikely to succeed on the merits of their underlying claims. The question of how to respond to the potential invasion of Asian carp into the Great Lakes falls within the purview of the political question doctrine, which provides the Court with an "independent basis" for dismissing this action. The political question doctrine is "based primarily on the . . . principle of separation of powers" and it "restricts judicial review that might interfere with other branches of the federal government." *Afr.-Am. Slave Descendants Litig.,* 304 F. Supp. 2d 1027, 1053-54 (N.D. Ill. 2004) (*modified and aff'd, in part; rev'd in part and remanded*, 471 F.3d 754 (7th Cir. 2006)) (citing *Baker v. Carr,* 369 U.S. 186, 210 (1962) and *McIntyre v. Fallahay*, 766 F.2d 1078, 1081 (7th Cir. 1985)). Both the legislative and executive branches of the federal government have been and continue to be involved in addressing the Asian carp threat, and judicial review at this time would interfere with those efforts.

## STATEMENT OF FACTS

A significant portion of Chicago lies along either Lake Michigan or Chicago's inland waterways. Within the City of Chicago, there are twenty-six miles of lakefront, twenty-eight miles of the Chicago River system, and fourteen miles of the Calumet River system. (Declaration of N. Chueng, attached as Ex. 1, ¶ 2.) There are thousands of households and businesses, and dozens of schools, parks, and other public spaces along the CAWS. (Chueng Decl. ¶ 3.) In addition, Lake Michigan is the sole source of municipal drinking water for the City and dozens of surrounding municipalities, and key pieces of the City's drinking water infrastructure are in Lake Michigan and along the lakeshore. (Declaration of P. Mulvaney, attached as Ex. 2, ¶¶ 2-3.)

The Chicago Police Department's ("CPD") Marine and Helicopter Unit is the primary agency that conducts law enforcement and homeland security patrols, and responds to marine distress emergencies in and along Lake Michigan and the CAWS. (Declaration of S. Georgas, attached as Ex. 3, ¶ 2.) CPD's Marine Operations consists of eight watercraft, which are docked in both Lake Michigan and the Chicago River during the warmer months, and docked solely in the Chicago River when ice is present in Lake Michigan. (Georgas Decl. ¶ 5.) On average, CPD personnel pass through the navigational locks at least several times per day to perform both their emergency response and patrol duties. (*Id.*)

Based on critical infrastructure threat assessments conducted by local, state, and federal agencies, several high-profile homeland security targets are located on and along Lake Michigan and the CAWS. (*Id.*) During 2009, CPD's Marine Operations personnel completed 7,314 site inspections of these critical facilities and targets. (*Id.*) In keeping with the goals of patrol missions, CPD performs its homeland security and law enforcement patrols at regular, but non-repetitive intervals, and initiates its patrol missions quickly and without advance notice to the public. (*Id.* ¶ 9.) While it is possible to move CPD's marine personnel and some equipment over land, rather than through the locks, to allocate resources between Lake Michigan and the CAWS, such over land transfers would significantly increase emergency response times and slow down patrol missions. (*Id.*)

The Chicago Fire Department's ("CFD") Air Sea Rescue Division docks and maintains both of its emergency response watercraft in Lake Michigan. (Declaration of M. Fox, attached as Ex. 4, ¶ 2.) CFD has one 96-foot fireboat ("E58") and one 33-foot fire/rescue boat ("6-8-8"), both of which respond to emergencies in and along Lake Michigan and the CAWS. (*Id.*) E58 is docked in Lake Michigan in order to be in close proximity to critical municipal infrastructure

along the lakeshore. (*Id.*) 6-8-8 is also docked in Lake Michigan because it responds to numerous emergency calls in the lake involving watercraft, persons, or aircraft in distress, especially between April 1st and November 1st. (*Id.*) In order to respond to emergencies in, along, or near the CAWS, CFD's watercraft must pass through the locks at either the CRCW or the OL&D. (*Id.* ¶ 3.) Due to E58's large size, it cannot be transferred from Lake Michigan to the CAWS over land rather than through the locks. (*Id.*) E58 is CFD's only boat capable of delivering large quantities of water directly from the lake or inland waterways when land-based hydrant water supplies are compromised or inaccessible to land-based fire crews. (*Id.* ¶ 2.)

In order for CFD to maintain its current emergency response capabilities on both sides of the locks in the event of a complete lock closure, CFD would require a duplicate set of watercraft, resources, and personnel along the CAWS. (*Id.* ¶ 8) CFD estimates that it would cost approximately $10 million to acquire another fireboat similar to E58 and approximately $350,000 for a fireboat similar to 6-8-8. (*Id.*) These estimates do not include additional personnel costs, which would total approximately $2.75 million annually for both watercraft. (*Id.*) CFD does not currently have an estimate of the cost or timeframe to add new docking and land support facilities for its watercraft in the CAWS, but CFD estimates that there would be substantial costs required to acquire shore rights and permits, and construct these facilities. (*Id.*)

The Metropolitan Water Reclamation District of Greater Chicago ("MWRD") currently uses the sluice gates at the WPS, CRCW, and OL&D to divert water from Lake Michigan into Chicago's inland waterways as necessary to maintain water quality in those waterways. (Mulvaney Decl. ¶ 4.) Water quality in Chicago's inland waterways is affected by, among other things, surface runoff, industrial discharges, MWRD's discharge of non-disinfected effluent from its sewage treatment plants, and combined sewer overflows ("CSOs"). (*Id.* ¶ 6.) CSOs occur

4

when excess stormwater in the combined sewer system causes the sewers to discharge stormwater and untreated sewage into the CAWS. (*Id.* ¶ 9.) MWRD uses the sluice gates to bring Lake Michigan water into the CAWS, and thereby avoid stagnant water conditions and dilute the potentially detrimental impacts from runoff, effluent discharges, and CSOs. (*Id.* ¶ 7.) Not allowing MWRD to utilize these discretionary water quality diversions would very likely lead to stagnant water conditions, odor nuisances, and an increased concentration of non-disinfected and untreated sewage discharge in the CAWS. (*Id.* ¶ 8.)

An increased concentration of non-disinfected and untreated sewage in the CAWS could pose potential health risks for boaters, fishermen, or others who come into contact with water in the CAWS. Sewage potentially contains the following human pathogens: salmonella, shigella, norovirus, E. coli O157:H7, cryptosporidium, and giardia. (Declaration of K. Ritger, M.D., attached as Ex. 5, ¶ 3.) These pathogens can cause, among other things, diarrhea, vomiting, abdominal cramps, and fever. (*Id.* ¶ 4.) Shigella has a low infectious dose and norovirus spreads easily from person to person. (*Id.*)

The City has spent approximately $74.5 million over the past twelve years on infrastructural improvements along the Chicago River, largely to improve and encourage public access. (Chueng Decl. ¶ 4.) In addition, the Chicago Park District has spent approximately $31.5 million over the past several years on improvements to Chicago's riverfronts and its riverfront parks. (Declaration of R. Foster, attached as Ex. 6, ¶ 3.) Over the next five years, the City plans to invest more than $17 million on additional improvements along Chicago's inland waterways. (Chueng Decl. ¶ 5.) In addition to public investments in the riverfronts, the City is also required by the Chicago Zoning Code to review proposals for private development within 100 feet of the Chicago River. (*Id.* ¶ 6.) Within this context, the City has reviewed more than 27

waterfront projects since 1998, creating nearly 3.5 miles of riverwalk trails, river overlooks, public plazas, and other riverbank improvements. (*Id.*) Examples of private developments that underwent this review process include Whole Foods, Trump Tower, and Wrigley Innovations Center. (*Id.*) Stagnant water conditions, odor nuisances, and increased sewage concentrations in the CAWS would likely discourage public use, and public and private investments along the CAWS. (*Id.* ¶ 7.) This would undermine the City's past and projected efforts to improve and encourage public access to Chicago's inland waterways and to enhance the attractiveness of those waterways as a natural and recreational resource. (*Id.*)

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 376 (2008). In order for Plaintiffs to be awarded this extraordinary remedy, they must establish that: 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in their favor; and, 4) an injunction is in the public interest. *Id.* at 374. Not only must Plaintiffs show that they meet these elements, but they must make a heightened showing since the injunctive relief they seek is mandatory in nature. *See Att'y Gen. of Oklahoma v. Tyson Food, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009); *Doninger v. Neihoff*, 527 F.3d 41, 47 (2d Cir. 2008); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994). The Seventh Circuit has stated that "mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued." *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quoting *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)).

The Seventh Circuit defines a mandatory preliminary injunction as "an injunction requiring an affirmative act by the defendant." *Id.* at 295. The Plaintiffs seek a preliminary

order enjoining the Defendants to "take all available measures within their respective control…to prevent the migration of bighead and silver carp through the CAWS into Lake Michigan." (Mot. for Prelim. Inj. 2.) Plaintiffs then list nearly a dozen affirmative acts that they want Defendants to undertake, including: various means to capture, kill, or monitor Asian carp; closure of the locks and sluice gates; installation of grates, screens, block nets, or other physical barriers to fish passage; and, preparation of a feasibility study on the permanent physical separation of the CAWS from Lake Michigan. (*Id*. at 2-4.) Plaintiffs are asking this Court to fashion, impose, and oversee an order that would require a wide range of affirmative acts by Defendants. Therefore, Plaintiffs' requested relief is of the type that must be "cautiously viewed and sparingly issued." *Graham v. Med. Mutual* at 295. Since Plaintiffs are unable to establish the elements for a preliminary injunction, especially in light of the heightened scrutiny given to requests for mandatory relief, their Motion for Preliminary Injunction should be denied.

## I.     The Balance Of Equities Does Not Tip In Plaintiffs' Favor And An Injunction Would Not Be In The Public Interest.

Plaintiffs' requested relief would, among other things, have immediate, substantial, and unreasonable impacts on the public health, safety, and general welfare of the people of Chicago. In balancing the equities and determining whether Plaintiffs' proposed injunction is in the public interest, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC* at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The public consequences to be considered should include the injunction's potential impacts on the public health, safety, and general welfare of the people of Chicago. Plaintiffs' proposed injunction would, among other things, impose restrictions on essential police and fire services; present public health concerns; and, undermine

the City's longstanding efforts and significant investments to promote public use and access to its rivers and riverfronts.

Although the Plaintiffs would allow the locks and sluice gates to continue operating "as needed for public health and safety," Plaintiffs espouse a very narrow view of what "public health and safety" entails, and would only allow the locks and sluice gates to be used for "emergency response" purposes and to "prevent flooding." (*See* Br. in Support of Mot. for Prelim. Inj. 32-34.) Plaintiffs do not specify what exactly they mean by "emergency response" or how it might govern all of the various scenarios under which the CPD and CFD pass through the locks on a daily basis. At best, such a narrow construction of Plaintiffs' proposed "public health and safety" exception would mean that CPD could not use the locks to perform critical law enforcement and homeland security patrols. In addition, MWRD would be unable to use the sluice gates to enhance water quality in the CAWS, which would likely pose public health concerns and undermine the City's significant efforts and investments to promote public access to the CAWS. At worst, the "public health and safety" exception could be interpreted so narrowly as to impose restrictions on CPD and CFD's emergency response operations, or MWRD and the U.S. Army Corps of Engineers' (the "Corps") flood control efforts.

As described above, the CPD and CFD have significant marine assets that rely upon the navigational locks at the CRCW and OL&D on a daily basis to protect public health and safety. The City's concerns in this respect are twofold. First, under Plaintiffs' proposed injunction, it is likely that CPD and CFD would be prohibited from using the locks to do anything other than emergency response. Therefore, CPD would not be able to use the locks to perform law enforcement or homeland security patrols, which are essential to preventing emergencies and protecting critical infrastructural assets like the City's drinking water supply infrastructure in and

along Lake Michigan.  Second, depending upon the interpretation of the Plaintiffs' proposed "public health and safety" exception, CPD and CFD could face restrictions on their use of the locks when responding to emergencies that could hamper their operations or increase response times.

In the near-term, people residing, visiting, or working in Chicago would be subjected to any elevated risk that would accompany these restrictions on CPD and CFD's use of the locks. The City might be able to make some adjustments in the mid- to long-term, but any operational, personnel, or infrastructural adjustments will take substantial time and impose substantial monetary costs on the City.  Given the complexity of this case and the potential for this litigation to be prolonged, a preliminary injunction would likely impose significant risks and costs on the City and its citizens, and these risks and costs should weigh in this Court's balancing of the equities and assessment of the public interest.

The other potential public health and safety impact from Plaintiffs' proposed injunction stems from MWRD's inability to make discretionary diversions of Lake Michigan water into the CAWS to promote water quality in Chicago's inland waterways.  As discussed above, prohibiting MWRD from making discretionary water quality diversions will very likely lead to stagnant water conditions, odor nuisances, and increased concentrations of non-disinfected and untreated sewage in the CAWS.  (Mulvaney Decl. ¶ 8.)  Untreated sewage released during CSOs has not undergone any sort of treatment or processing to remove human pathogens that may be present in the human waste component of that sewage.  (*Id.* ¶ 9.)  The effluent from MWRD's sewage treatment plants, on the other hand, has undergone treatment, but has not been disinfected.  (*Id.* ¶ 10.)  Therefore, an increased concentration of untreated sewage and non-disinfected effluent in the CAWS would likely result in an increased concentration of human

pathogens in the CAWS. (*Id.* ¶¶ 9-10.) These pathogens could pose potential health risks for boaters, fishermen, or others who come into contact with water in the CAWS. Since these pathogens can be spread through contaminated water or from person to person (Ritger Decl. ¶¶ 3-4), they could also pose potential health risks to the population at large. The risks and costs associated with an increased concentration of sewage and related human pathogens in the CAWS should be weighed by this Court in its assessment of the balance of equities and the public interest.

The City articulates a final harm that would result from decreased water quality in the CAWS. If there are stagnant water conditions, odor nuisances, and increased sewage concentrations in Chicago's riverways, this would likely negatively affect the City's significant investments in its riverfronts. (Chueng Decl. ¶ 7.) There are over eighty miles of riverfront property in the City of Chicago.[1] (*Id.* ¶ 2.) By not allowing MWRD's continued operation of the sluice gates to promote water quality in the CAWS, Plaintiffs' proposed injunction would have substantial impacts on the adjoining properties. One of the essential and important functions of local government is to promote the general welfare through land-use planning, regulation, and investment. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 68 (1981) (stating "[t]he power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities."). The City has embarked on an ambitious program to promote public use and access to its inland waterways, and this, in turn, has encouraged private investment in and along those waterways. (*Id.* ¶ 6.) In making these public investments and utilizing its land-use planning authority, the City has sought to reintegrate its inland waterways back into the

---

[1] There are forty-two miles of the Chicago and Calumet River systems in Chicago and each mile of river abuts two miles of riverfront property – one on each side.

public life of Chicago. The Plaintiffs' proposed injunction would likely undermine and reverse those efforts. Although the monetary value of the City's past and projected investments is very significant in and of itself, it does not fully capture the harm to the general welfare that would result if water quality in the CAWS is not adequately maintained. Plaintiffs' proposed injunction would have immediate, substantial, and unreasonable impacts on the public health, safety, and general welfare of the people of Chicago, and thus, their Motion for Preliminary Injunction should be denied.

**II.    Plaintiffs' Are Unlikely To Succeed On The Merits Because The Political Question Doctrine Requires Their Claims To Be Dismissed.**

The question of how to respond to the potential invasion of Asian carp into the Great Lakes falls within the purview of the political question doctrine, which provides the court with an "independent basis" for dismissal of this action. *Slave Descendants Litig.,* 304 F. Supp. at 1053-54, 1063. The political question doctrine is "based primarily on the . . . principle of separation of powers" and it "restricts judicial review that might interfere with other branches of the federal government." *Id.* In regards to the political question doctrine, the Supreme Court has identified six separate and independent factors, each of which provide a sufficient basis for the court to dismiss the Plaintiffs' complaint. *Id.*; s*ee also Conn. v. Am. Elec. Power Co. (AEP),* 582 F.3d 309, 321 (2d Cir. 2009). Four out of the six factors justifying dismissal are present in this case: two, three, four, and six.

The second *Baker* factor is present when there is "a lack of judicially discoverable and manageable standards for resolving . . . [the claim]." *Baker*, 369 U.S. at 217. While this case is likely to be "large, complicated, . . . [and] difficult . . ." this is not the concern implicated by *Baker. Native Vill. of Kivalina v. Exxonmobil Corp.,* 663 F. Supp. 2d 863, 873-74 (N.D. Cal. 2009) (quoting *Alperin v. Vatican Bank,* 410 F.3d 532, 552 (9th Cir. 2005)). Instead, dismissal

11

based on *Baker* arises when a court lacks "the legal tools to reach a ruling [or relief] that is 'principled, rational, and based upon reasoned distinctions.'" *Kivalina* at 873-74. The Second Circuit in *AEP*, 582 F.3d at 326-30, found that the adjudication of other environmental nuisances cases would provide guidance for judicial handling of global warming litigation, but stated that in that particular case, the court was not called upon to assess and balance "the kind of broad interests that a legislature or a President might consider in formulating a national emissions policy." However, those are the sorts of considerations involved in this case. Developing a response to the threatened invasion of the Great Lakes by Asian carp, part of a decades-long migration of the species northward since their initial importation into the southern United States in the 1970s, involves wide-ranging policy choices and weighing of environmental, technological feasibility, economic practicability, commercial development, public health and safety, and other costs and benefits that is more appropriately undertaken by the political branches of government, and concerning which federal common law nuisance cases – involving identifiable polluters and specific injuries, among other criteria – can provide little guidance. (*See* App. to MWRD's Resp. to Mot. for Prelim. Inj. Dennison Afft. ¶ 14 in Orig. Nos. 1-3 before U.S. S. Ct. (citing Cindy S. Kolar et al., *Bighead Carps: A Biological Synopsis and Environmental Risk Assessment*, American Fisheries Society Special Publication 33, 2007, at 34-37, 46-48).)

In addition, in order to provide the requested relief – an injunction – the court would have to determine how "reasonable" the Corps and the MWRD's actions were. *Kivalina* at 874. Accomplishing this would require the Court to "balance the utility and benefit of the alleged nuisance against the harm caused." *Id.* The Court would be required to look at the Corps and the MWRD's prior alternatives and then speculate on the impact, benefits and risks of each

12

alternative. *Id*. at 874-75. In the standard environmental nuisance case, the "polluters" and sequence of events can be identified, the injury is specific, and the harm is to a discrete and identifiable area. *Id.* at 875-76. However, the limited ability to identify each of the abovementioned factors in relation to Asian carp, would prevent the court from being able to "offer [the Plaintiffs]' relief in a reasoned fashion . . . .'" *Id.* at 873-74.

The third *Baker* factor is present when it is impossible for the court to decide the case "without [making] an initial policy determination of a kind clearly for nonjudicial discretion." *Baker* at 217. This factor will again turn on the judiciary's ability to make an "initial decision as to what is unreasonable in the context of" protection against invasive species. *Cal. v. Gen. Motors Corp.,* No. C06-05755 MJJ, 2007 WL 2726871, *8 (N.D. Cal. 2007). To determine what is unreasonable the court must "balance the competing interests of reducing [the risk posed by Asian carp] and with the interest of advancing and preserving economic and industrial development." *Id.* (citing *Conn. v. Am. Elec. Power Co.,* 406 F. Supp. 2d 265, 272 (S.D. N.Y. 2005), *vacated and remanded in AEP*, 582 F.3d 309)). This balancing is the equivalent of the judiciary making an "initial policy determination" which should be left to the political branches. *Gen. Motors Corp.* at *8. Further support for leaving Asian carp policy with the political branches comes from the fact that they have already chosen to act. Both Congress and the executive branch of the federal government have been engaged in devising and implementing a response to the possible invasion of the Great Lakes by Asian carp for some time, including passage of the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, 16 U.S.C. 4701, *et seq.*, and the National Invasive Species Act of 1996, 16 U.S.C. 4713, *et seq.*, and, beginning in 1996, installation and upgrades involving three electric dispersal barriers to keep invasive species out of the Chicago Ship and Sanitary Canal ("CSSC") and initiation of

comprehensive studies to develop further measures in response to the Asian carp threat. Aquatic Nuisance Prevention Act § 1202(i)(3)(C), 16 U.S.C. 4722(i)(3); District of Columbia Appropriations Act, 2005 (2005 Act), Pub. L. No. 108-335, § 345, 118 Stat. 1352; Water Resources Development Act of 2007 (2007 Act), Pub. L. No. 110-114, § 3061(b)(1)(A) and (d), 121 Stat. 1121. In 2009, the Corps and other federal, international, state and local entities formed an Asian Carp Rapid Response Working Group to coordinate and take action to reduce the vulnerability of the Great Lakes to the migration of Asian carp through the CSSC and nearby bodies of water. (App. to Mem. for the United States in Opp'N on Mot. for Prelim. Inj. 23a in Orig. Nos. 1-3 before U.S. S. Ct.) Finally, in Section 126 of the Energy and Water Development and Related Agencies Appropriations Act, of 2010, Congress granted the Secretary of the Army temporary emergency authority to undertake "such modifications or emergency measures as [he] determines to be appropriate, to prevent aquatic nuisance species from bypassing the [dispersal barrier] and to prevent aquatic nuisance species from dispersing into the Great Lakes." Energy and Water Development and Related Agencies Appropriations Act, 2010, Pub. L. No. 111-85, § 126, 123 Stat. 2853 (2009). Thus, federal policy-making in both Congress and the executive branch is well underway, and judicial intervention at this time would involve both a review of prior policy-making by the political branches with respect to Asian carp and involvement in that policy-making in the future. *See Gen. Motors Corp.* at *8 (finding additional support for conclusion that policy decisions in the area of global warming should be left with the political branches based on the fact that the political branches had already chosen to act by enacting legislation that addressed air pollution).

The fourth *Baker* factor is present since it is "impossib[le] [for the court to] undertak[e] [an] independent resolution without expressing [a] lack of the respect due coordinate branches of

government," and the sixth *Baker* factor is present since there is a great "potential[] of embarrassment from multifarious pronouncements by various departments on one question." *Baker* at 217. Both factors are found when a "'judicial resolution . . . would contradict prior decision taken by a political branch . . . [and] would seriously interfere with important governmental interests.'" *AEP,* 582 F.3d at 331 (quoting *Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir. 1995)). In this case, Congress has taken action and has given the executive branch authority to deal with the potential threat the Asian carp pose for the Great Lakes, as set forth above. Granting the motion for an injunction would show a lack of respect by the judiciary for the manner in which the legislative and executive branches have chosen to address the potential threat of Asian carp in the Great Lakes. Also, it would create multifarious pronouncements by two branches of government on how to respond. Therefore, the Plaintiffs' claims are not likely to succeed on the merits because the political question doctrine requires that the claims be dismissed, and thus, the Plaintiffs' Motion for Preliminary Injunction should be denied.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction should be denied because the balance of equities does not tip in their favor, it would not be in the public interest, and their claims are unlikely to succeed on the merits. Plaintiffs seek a preliminary injunction that would severely limit the use of navigational and water control infrastructure that the Chicago region has relied upon for decades. If granted, the preliminary injunction would immediately and indefinitely impose substantial and unreasonable risks and burdens on the City, its residents, and those who work in or visit Chicago. The immediate public health and safety impacts of the proposed injunction should weigh heavily in the Court's balancing of the equities and assessment of the public interest. Furthermore, the injunction's potential effects on the general welfare and the

City's substantial investments and efforts to revitalize its inland waterways are no less worthy of the Court's consideration. Finally, this complex issue has been and continues to be addressed by the legislative and executive branches of the federal government. Judicial intervention at this time would interfere with those substantial and ongoing efforts. Because this is, ultimately, a political question to be addressed by the political branches, Plaintiffs are unlikely to succeed on the merits of their claims, and that provides separate grounds to deny their Motion for Preliminary Injunction.


Dated: August 4, 2010.                              Respectfully submitted,

                                                    MARA S. GEORGES
                                                    Corporation Counsel
                                                    City of Chicago

                                          By:    s/ Graham G. McCahan
                                                 Assistant Corporation Counsel


DIANE M. PEZANOSKI (ARDC # 6190003)
Deputy Corporation Counsel
MORT P. AMES (ARDC # 6228750)
Senior Counsel
GRAHAM G. MCCAHAN (ARDC # 6286825)
Assistant Corporation Counsel
City of Chicago Department of Law
Aviation, Environmental, Regulatory and Contracts Division
30 North LaSalle Street, Suite 1400
Chicago, Illinois 60602
(312) 744-6996 / 744-6904 / 744-1438
dpezanoski@cityofchicago.org
mames@cityofchicago.org
graham.mccahan@cityofchicago.org