```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   STATE OF MICHIGAN, et al.,     )
                                    ) Docket No. 10 C 4457
 4               Plaintiffs,        )
                                    ) Chicago, Illinois
 5          v                       ) September 7, 2010
                                    ) 10:00 a.m.
 6   UNITED STATES Army Corps of    )
     Engineers, et al.,             )
 7                                  )
                 Defendants         )
 8

 9     TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
                          VOLUME 1A
10            BEFORE THE HONORABLE ROBERT M. DOW, JR.

11   PRESENT:

12   For Plaintiff
        State of Wisconsin:     CYNTHIA R. HIRSCH
13                              Wisconsin Department of Justice
                                17 West Main Street
14                              Madison, Wisconsin  53703

15   For Plaintiff State of
      Michigan:                 ROBERT P. REICHEL
16                              LOUIS B. REINWASSER
                                DANIEL BOCK
17                              Michigan Department of Attorney
                                   General
18                              525 West Ottawa Street
                                Lansing, Michigan  48933
19
     For Plaintiff State of
20    Minnesota:                DAVID P. IVERSON
                                STEVEN M. GUNN
21                              Minnesota Attorney General's Office
                                445 Minnesota Street, Suite 900
22                              St. Paul, Minnesota  55101

23   For Plaintiff             JOHN B. DELONE
     Commonwealth of           Pennsylvania Office of
24    Pennsylvania:                Attorney General
                                15th Floor, Strawberry Square
25                              Harrisburg, Pennsylvania  17120
```

```
 1
       PRESENT:  (Cont'd)
 2
       For Plaintiff State of      LEE ANN RABE
 3        Ohio:                    Office of the Attorney General
                                   State of Ohio
 4                                 30 East Broad Street
                                   Columbus, Ohio  43215
 5
       For Defendant United States MAUREEN E. RUDOLPH
 6        Army Corps of Engineers: MATTHEW M. MARINELLI
                                   Department of Justice
 7                                 Environmental and Natural
                                     Resources Division/NRS
 8                                 601 D Street, NW
                                   Washington, DC  20004
 9
                                   ANN DANSON NAVARO
10                                 U.S. Army Corps of Engineers
                                   U.S. Department of Justice
11                                   (Special Attorney)
                                   550 Main Street
12                                 Suite 10032
                                   Cincinnati, Ohio 45202
13
       For Defendant Water
14        Reclamation District:    RONALD M. HILL
                                   BRENDAN G. O'CONNOR
15                                 LISA LUHRS DRAPER
                                   Metropolitan Water Reclamation
16                                 District of Greater Chicago
                                   100 East Erie
17                                 Chicago, Illinois  60611

18     For City of Chicago:        MORTIMER P. AMES
                                   GRAHAM G. MC CAHAN
19                                 City of Chicago, Law Department
                                   Corporation Counsel
20                                 30 North LaSalle Street
                                   Suite 1020
21                                 Chicago, Illinois  60602

22     For Coalition to Save
          Our Waterways:           DAVID L. RIESER
23                                 McGuire Woods LLP
                                   77 West Wacker Drive
24                                 Suite 4400
                                   Chicago, Illinois  60601-7567
25
```

```
 1   PRESENT:  (Cont'd)

 2


 3

     For Wendella:            STUART P. KRAUSKOPF
 4                            KURT A. KAUFFMAN
                              The Law Offices of Stuart P.
 5                               Krauskopf
                              414 North Orleans Street
 6                            Suite 210
                              Chicago, Illinois  60654
 7


 8


 9


10


11   Court Reporter:          Lois A. LaCorte
                              219 South Dearborn  Room 1918
12                            Chicago, Illinois 60604
                              (312) 435-5558
13


14


15


16


17


18


19


20


21


22


23


24


25
```

1    THE CLERK:  10 C 4457, State of Michigan v U.S. Army

2  Corps.

3    THE COURT:   Good morning again everybody.

4    (Chorus of "Good morning, your Honor.")

5    THE COURT:  Let's see, I think we have at least one

6  motion that we still need to take up here, so why don't I find

7  out, make sure everybody is here.  Everybody could do a self

8  roll call here.   I see Mr. Reichel.

9    MR. REICHEL:   Robert Reichel.

10    THE COURT:  Okay, and that's for the plaintiffs.  Go

11  ahead.

12    MR. REINWASSER:  Good morning, your Honor, Lou Reinwasser

13  from the State of Michigan, for the plaintiffs.

14    MR. DELONE:  Bart Delone from the Commonwealth of

15  Pennsylvania, your Honor.

16    MR. GUNN:  Steven Gunn from the State of Minnesota, your

17  Honor.

18    MR. BOCK:  Dan Bock from the state of Michigan.

19    MS. RABE:  Lee Ann Rabe from the state of Ohio.

20    THE COURT:   Okay, good morning.  So, Mr. Reichel, all

21  the plaintiffs are here who are going to be here?

22    MR. REICHEL:   Yes, they will be here.  We are waiting

23  for counsel from Wisconsin, but we can proceed in their

24  absence.

25    THE COURT:   Okay, very good, thank you.  And then for

1    the original defendants?

2        MS. RUDOLPH:   Good morning, your Honor, Maureen Rudolph

3    on behalf the of federal defendant Corps of Engineers.

4        THE COURT:  Good morning.

5        MR. MARINELLI:  Good morning, your Honor, Matt Marinelli

6    for the Corps of Engineers.

7        THE COURT:  And to you good morning.

8        MS. NAVARO:  Good morning, Ann Navaro for the Corps of

9    Engineers.

10       THE COURT:  Okay, very well.  Good morning to all three

11   of you.

12       MR. HILL:  Good morning, your Honor, Ron Hill, Lisa

13   Draper, and Brendan O'Connor on behalf of the Metropolitan

14   Water Reclamation District.

15       THE COURT:  Okay, very good, good morning to all of you.

16       And then for the intervenors.

17       MR. RIESER:  David Rieser on behalf of the Coalition to

18   Save Our Waterways along with Kristin Sculli from my office.

19       THE COURT:  Okay, very good, good morning.

20       MR. KRAUSKOPF:  Good morning, Stuart Krauskopf and Kurt

21   Kauffman on behalf of Intervenor Wendella.

22       THE COURT:   Okay, good morning.

23       MR. AMES:  Good morning, your Honor, Mort Ames and Graham

24   McCahan on behalf of the City of Chicago.

25       THE COURT:   Okay, good morning.  And then, sir, we have

1  got another proposed intervenor on the horizon here.

2      MR. RASTETTER:  I am Bill Rastetter on behalf of Grand

3  Traverse Band of Ottawa and Chippewa Indians.

4      THE COURT:  Okay, very good.  Good morning, sir.  I got

5  through my roll call and everybody is here.

6      The motion that we need to take up, earlier this morning

7  at 9:30 the motion for leave to intern on behalf of the new

8  proposed intervenor was noticed, and I heard from Mr. Rieser a

9  potential opposition that I'm going to let him take under

10  advisement with his client.

11      If anybody else has any basis for opposing that motion,

12  we will take up a schedule on that later because the proposed

13  intervenor is not seeking to intervene for purposes of

14  participation in the preliminary injunction hearing, so there

15  is no urgency to resolving that.

16      The second motion is Wendella's motion to request use of

17  the court's video conference equipment.  That motion -- there

18  is, one of the experts that Wendella would like to call is --

19  it's Professor Ficetola, did I say that right?

20      MR. KRAUSKOPF:  Good enough.

21      THE COURT:  Close enough, okay.  And he is in Italy.  I

22  had never gotten a request like that before, and so we

23  consulted with Chief Judge Holderman, who is essentially, he

24  is in charge of the video equipment in the sense that there

25  isn't a lot of video equipment to go around here.  I have

1    often said it's not like Mayer Brown. When I was back at Mayer

2    Brown, if I wanted video equipment, I snapped my fingers and

3    video equipment appeared.  It doesn't happen that way here.

4    So you have to request permission kind of writ large to use

5    the court's video equipment.

6         And so we've cleared that hurdle.  Judge Holderman has

7    given us permission to use the video equipment, and the

8    question is there is a motion then asking in this case for the

9    equipment to be used, and the proposal is that it be used for

10   40 minutes.  I understand from Mr. Krauskopf that it's no more

11   than 20 minutes of direct, and I'm assuming then an equal

12   amount of time for cross.  It sounds like, you know, it's not

13   like a red light is going to go on and the witness will

14   disappear at the end of 40 minutes, but we are trying to

15   apportion the use of that equipment, and so we essentially

16   have it for roughly 40 minutes.

17        Is there any objection to that motion?

18        (No response)

19        THE COURT:   And what I worked out with Judge Holderman

20   then is that witness will appear on the video screen at 10:30

21   tomorrow, and there is no way around that.  That TV there, and

22   we did a dry run of this this morning a little after 8:00.

23   Lois and I were sitting in the courtroom and suddenly the TV

24   went on and a tech person from Italy appeared, and they

25   pressed a button and showed that they were in Milan, nice view

1　out the window of Milan there.　And we called Joe Novak right

2　away, who is our tech person, to make sure that the tech

3　people were communicating with each other, and from my

4　perspective it looked fine, but more importantly, from Joe's

5　perspective it works well.　So that's what we will be able to

6　do.

7　　　　At 10:30 tomorrow then, Dr. Ficetola, maybe that's not

8　quite right, but he will appear on the screen.　His direct

9　will take -- wherever we are, we're going to have to interrupt

10　whatever we are doing to accommodate that.　I think that's

11　4:30 in the afternoon Italy time so it will work pretty well

12　for him too I think.

13　　　　So with that piece of business out of the way then, I'll

14　grant the motion and that's what we will do tomorrow, okay?

15　　　　Anything else you guys want to take up preliminarily this

16　morning?

17　　　　MR. RIESER:　Your Honor, excuse me, David Rieser for the

18　Coalition.　Both myself and Mr. Krauskopf had motions with

19　respect to the witnesses that are being proffered by the

20　states.

21　　　　THE COURT:　Okay.　Well, let me give you my two cents

22　worth on that then.

23　　　　MR. RIESER:　Thank you, your Honor.

24　　　　THE COURT:　Let me ask first of all, are you going to

25　call both those witnesses or just Dr. Lodge?　That was a

1    little unclear to me.

2         MR. REICHEL:   Just Dr. Lodge, your Honor.

3         THE COURT:   Okay, very good.  So with respect to Dr.

4    Newcomb, obviously, she still has an affidavit and that's

5    something that I will address in a second here.

6         Okay, I think I previewed this a bit here, but I have

7    looked at the motions pretty carefully and the responses and

8    replies.  I'm going to read you an excerpt from a Seventh

9    Circuit opinion.

10        "When the gatekeeper and the fact finder are one and the

11   same, that is, the judge, the need to make such decisions

12   prior to hearing the testimony is lessened.  That is not to

13   say that the scientific reliability requirement is lessened in

14   such situations.  The point is only if the court can hear the

15   evidence and can make its reliability determination during,

16   rather than in advance of, the trial.

17        "Thus, when the fact finder and gatekeeper are the same,

18   the court does not error in admitting the evidence subject to

19   the ability later to exclude it or disregard it if it turns

20   out not to meet the standard of reliability established in

21   Rule 702."  That's In Re Salem. It's a Seventh Circuit case

22   from 2006.  I think that's an opinion by Judge Wood.

23        I have followed that opinion in the past in bench trial

24   situations, and I think if that applies in a bench trial a

25   fortiori it would apply in a preliminary injunction setting.

1    That's not -- I have looked at the motions carefully, and

2   I have looked at Dr. Lodge's affidavit.  Now, I'm aware that

3   the affidavit that Dr. Lodge submitted was nine months old,

4   and I'm assuming that what he is going to say today will be an

5   update on his research and his conclusions.  There isn't any

6   question that Dr. Lodge is qualified as an expert in this

7   area, and no one is saying to the contrary.  I think

8   essentially what the purport of the motion is that the science

9   is under developed and that under the traditional Daubert

10  criteria, testability, rate of error, general acceptance, it's

11  at least the position of the movant that it's not up to

12  standard.

13    And I think the question for the court then is whether

14  notwithstanding the fact that it hasn't been tested by others

15  and it may not have been peer reviewed, and maybe we will

16  learn more about that today, but none of those things are, as

17  I have written in a prior opinion, the sine qua non, the

18  Seventh Circuit basically says, and the Supreme Court has said

19  in the Kumho Tire opinion, that those factors are useful and

20  the court ought to look at them, but if there are other

21  indicia of reliability, the court can find that the opinion is

22  reliable on that basis as well.

23    I think certainly when Dr. Lodge was initially retained

24  in this -- it's not even this dispute, to study this matter,

25  he was retained by the Army Corps of Engineers, and there have

1    been various statements by the Army Corps of Engineers, and I

2    understand the context isn't quite the same as a peer reviewed

3    journal, but various statements by the Army Corps of Engineers

4    that have expressed some confidence in his work.

5        Whether the work at the end of the day satisfies the

6    reliability and relevance standards is something I'll just

7    have to sort out after I hear it, and that's particularly true

8    because the affidavit is nine months old and I assume there

9    will be something more to it.

10        So I think -- and I don't think this should come as a

11    surprise to all of you who were in court last week, but

12    essentially, I'm going to take advantage of the Seventh

13    Circuit's guidance here that in a bench trial or a preliminary

14    injunction or any setting where you don't have a jury, the

15    judge can hear it and then decide later.

16        I'm certainly cognizant of the Daubert standard.  That's

17    a big part of what I did in practice at Mayer Brown is write

18    Daubert motions, and I'm very comfortable applying it, and the

19    case where I previously followed this pattern was a bench

20    trial, and after the bench trial I credited some of it and

21    disregarded other parts of it, but I think the only way I'm

22    going to be able to intelligently do that in this case with

23    respect to Dr. Lodge is hear his testimony and then sort it

24    out later.

25        So that's how we will proceed today, is that Dr. Lodge

1   will be allowed to testify, he will be subject to

2   cross-examination, and I will reserve the right later to

3   disregard anything that doesn't meet the Rule 702 standard.

4       And since Dr. Newcomb is not going to be called as a

5   witness then, I'll just sort that out later. I will comment,

6   though, that there were some things in Dr. Newcomb's affidavit

7   that probably went beyond her area of expertise. Certainly,

8   Rule 703 allows experts to rely on other people's work, and

9   what often happens in that case is you will read a body of

10  literature and you will synthesize that, filtering it through

11  your own scientific knowledge, expertise, experience, whatever

12  the case may be.

13      My understanding is Dr. Newcomb is not a biologist, but

14  she has a PhD, and so to the extent -- is she a biologist?

15      MR. REICHEL:   (Nodding head).

16      THE COURT:   She is a biologist, so that's what it means

17  to have a PhD in that field.

18      MR. REICHEL:   That's correct, your Honor.

19      THE COURT:   Okay, but she has not done extensive work on

20  eDNA, for example.

21      MR. REICHEL:   No, that's correct. We haven't asserted

22  that.

23      THE COURT:   And I think -- that's right. So I think

24  what I need to do is look at the various conclusions that she

25  purports to draw by filtering the various materials that she

1   has read, some of which I haven't read, but are in the record,

2   and determine for myself whether the opinion that she is

3   purporting to offer rests on some sort of knowledge that she

4   possesses.  And obviously, I'll study her CV, I'll study the

5   various connective reasoning that she uses to draw those

6   conclusions, and I can sort all that out again with the

7   benefit of the briefing that I already have.  Okay, good

8   enough?

9          MR. RIESER:   Thank you, your Honor.

10         THE COURT:   Okay, thank you.

11         So I think we're ready to proceed then, Mr. Reichel.

12         MR. REICHEL:  Thank you, your Honor.

13         THE COURT:   And just for planning purposes, I think we

14  will go to about 12:30 today.  I don't know how many of you

15  guys, you know, what time you all got here, what time you all

16  had breakfast, but I think for those of us who had the rest of

17  the call this morning, I think that will be a good point to

18  stop.

19         We will only break for an hour, and then we will carry

20  on, we will pick from wherever we are with Dr. Lodge, and if

21  we are done with Dr. Lodge, we will go to the next witness,

22  okay?

23         And my understanding, Ms. Rudolph, your witnesses are not

24  available until tomorrow?

25         MS. RUDOLPH:  No, that is not correct, your Honor.

1       THE COURT:   Oh, you do have some?

2       MS. RUDOLPH:    Correct.

3       THE COURT:   Okay, fantastic.  Then we'll proceed -- you

4  guys will have to work out how to order the defense case.  The

5  only thing I'm going to dictate is that the guy from Italy

6  comes on at 10:30 tomorrow morning, okay?

7       MS. RUDOLPH:  Very well.

8       THE COURT:   Okay, Mr. Reichel, the floor is yours, sir.

9       MR. REICHEL:    Thank you, your Honor.

10      As the court noted, the plaintiffs have submitted a

11  number of written materials, exhibits in support of our

12  initial motion, as well as some supplemental materials in

13  support of our reply.  And they include, among other things,

14  as the court has noted, actually two affidavits from Dr. Tammy

15  Newcomb, who is a fisheries biologist, and again, I'm not

16  going to repeat what's stated in her affidavit, but her

17  affidavit addresses a variety of topics, including the

18  biological characteristics of these fish, the characteristics

19  of the Great Lakes ecosystem, and the threat that Dr. Newcomb

20  concludes that the potential migration that these fish pose to

21  aquatic and other resources of the Great Lakes.  And she also

22  addresses, based upon her professional training and

23  experience, certain specific recommendations as to measures to

24  address that threat.

25      She has, because her affidavits are, were prepared quite

1  recently, they cover the substance of the testimony that we

2  would offer if we were to call her as a witness here.

3      So given the court's stated and understandable preference

4  not to have people merely call their affiants and have them

5  repeat what they have said in writing, we have concluded that

6  it's not essential to present her testimony live.

7      THE COURT:   Okay.  I appreciate that, Mr. Reichel, and I

8  hope that everybody else heard what he just said because I

9  don't want people repeating their affidavits.  That's not

10  going to help me.  I have read the affidavits, I have the

11  affidavits, I can continue to read the affidavits, but I

12  appreciate that judgment call on your part, sir.

13      MR. REICHEL:   Thank you, your Honor.  And again, just

14  similarly, we have also submitted two affidavits from Dr. John

15  Taylor of Wayne State University, who has expertise in

16  logistics supply change management, has done some reviews of

17  transportation related economic impacts of some aspects of the

18  relief that plaintiffs are seeking here particularly as they

19  relate to temporary closure of locks in the area.

20      So for purposes of today's hearing, we, as the court is

21  already aware, we want to supplement the written submissions

22  with the testimony of Dr. David lodge, who as the court has

23  already noted, you have had an opportunity to review the

24  affidavit or declaration that was submitted on the same

25  subject several months ago on behalf of the United States in

1 the Supreme Court, and as the court has anticipated, there

2 have been further factual developments since that time, which

3 would be among the primary subjects of what we expect his

4 testimony to include here this morning as well as to address

5 some of the issues that have arisen specifically in the course

6 of this litigation as they relate to questions about the

7 scientific reliability of the methods that he and his team

8 have employed involving environmental DNA, or eDNA, as well as

9 what inferences may or may not be scientifically legitimate

10 from those data.

11     So that is why we are presenting here today, and for that

12 reason we have subpoenaed Dr. Lodge.  Just to be clear,

13 neither the State of Michigan nor the other plaintiffs have

14 retained him, but we have subpoenaed him to ask him to testify

15 or to require him to testify here today.

16     So with that, the plaintiffs would call Dr. David Lodge.

17     THE COURT:  Okay, very good.  And just before Dr. Lodge

18 comes up, Exhibit 14 is his prior affidavit that was submitted

19 to the Supreme Court not by you.

20     MR. REICHEL:  That's correct.

21     THE COURT:  And Exhibit 21 I think is the other one I

22 looked at, which was an excerpt of his testimony before a

23 congressional committee?

24     MR. REICHEL:  That's correct, your Honor.

25     THE COURT:  Okay, and that's what I have got in the

1  record previously stated from Dr. Lodge?

2      MR. REICHEL:  Yes.

3      THE COURT:  Okay, very good.  I just wanted to make sure

4  that I had covered the whole nine yards, at least as I could

5  have before today.

6      MR. REICHEL:  That is exactly correct, your Honor.

7      THE COURT:  Okay, very good.  So, Dr. Lodge, I see Dr.

8  Lodge, he can come forward.

9      MR. REICHEL:  Thank you, your Honor.

10      THE COURT:  Go ahead, Mr. Reichel.

11      And when you get up here, if you could just remain

12  standing for a second and Lois will swear you in, okay?

13      (Witness sworn)

14      THE COURT:  Thank you, please be seated.

15      Before you start, I will remind everybody that I apprised

16  you at the very beginning of this litigation that I know Dr.

17  Lodge and the circumstances by which I was acquainted with Dr.

18  Lodge, and as I said before, I don't think it has any bearing

19  on my ability to judge him impartially, but no one has said

20  anything to the contrary, so I'm comfortable proceeding.

21      MR. REICHEL:  Thank you, your Honor.

22      THE COURT:  Go ahead, Mr. Reichel.

23      DAVID M. LODGE, PLAINTIFFS' WITNESS, DULY SWORN.

24          DIRECT EXAMINATION

25  BY MR. REICHEL:

1      Q.   Dr. Lodge, could you please state your full name for

2  the record.

3      A.   My name is David Michael lodge.

4      Q.   Just to confirm what I apprised the court, you were

5  served with a subpoena requiring you to testify here today by

6  our office, is that correct?

7      A.   That's correct.

8      Q.   And again, has either the State of Michigan or any

9  of the co plaintiff states, have they retained you or hired

10  you as an expert in this matter?

11      A.   No.

12      Q.   Dr. Lodge, some of this material is already stated

13  in your affidavit.  For purposes of continuity, I would like

14  to briefly review a few things.

15      Could you first describe what your educational background

16  is, sir?

17      A.   I have a DPhil, which is the Oxford University's

18  equivalent of a PhD, which I earned in 1985, and I served two

19  and a half years after that as a postdoctoral research fellow

20  at the University of Wisconsin and subsequently became an

21  assistant professor at the University of Notre Dame, where I

22  have been ever since subsequently being promoted to associate

23  and then full professor.

24      Q.   So you are by training a biologist, sir, is that

25  correct?

1          A.    My training is as a biologist, as an ecologist, in

2     particular and I have done extensive research over the years

3     essentially since my professional career began on invasive

4     species in particular and aquatic ecosystems.

5          Q.    And during the course of your scientific career,

6     have you published any articles in peer reviewed journals?

7          A.    I have published along with many collaborators and

8     co-authors on the order of at least 150 articles.

9          Q.    Have you published any books dealing with, among

10    other things, invasive species?

11         A.    I have edited and contributed to at least an edited

12    volume of a journal and two books that dealt with

13    environmental issues broadly, and in particular the most

14    recent book to which I contributed and edited was on the

15    economics and ecology of invasive species.  That book was

16    published by Oxford University Press.

17         Q.    And you're currently a professor at the University

18    of Notre Dame, and I see that you're associated with something

19    called the Center for Aquatic Conservation.  Can you explain

20    what that is?

21         A.    That's a center that the University of Notre Dame

22    established just a few years ago, on the order of four years

23    ago, in order to put my colleagues and I at the University of

24    Notre Dame in a better position to be doing research that

25    would inform urgent and important natural resource management

1    and policy issues.

2         Part of the forming of that center was to encourage

3    partnerships with external organizations, including government

4    agencies, non-governmental organizations, and other relevant

5    stake holders and parties including the private sector.

6         Q.   And is there also -- do you supervise a laboratory

7    at the University of Notre Dame?

8         A.   So I, yes, also like all active scientists, I have a

9    laboratory that includes a number of graduate students and

10   post docs and research assistant professors and undergraduate

11   researchers, technicians, and so forth.

12        Q.   Going back to the year 2008, Dr. Lodge, did you have

13   occasion to enter into a cooperative agreement with the United

14   States Army Corps of Engineers, that is, either you or I

15   should say the Center for Aquatic Conservation?

16        A.   Yes, I led us in a collaboration that was formalized

17   ultimately in 2008 as a cooperative agreement using as a

18   vehicle for funding something called a Cooperative Ecosystem

19   Studies Unit by which the U.S. Army Corps of Engineers

20   provided financial support for the research that we have been

21   working on and that has developed over time.

22        Q.   Were you, were you or your team given funding to

23   assess the risks of the transfer of invasive species through

24   the Chicago Sanitary and Ship Canal?

25        MR. RIESER:  I'm sorry, we are having a lot of trouble

1   hearing Dr. Lodge on this side of the room.  I'm hoping he can

2   keep his voice up.

3          THE COURT:  Okay, thank you for pointing that out.

4          MR. RIESER:  I'm sorry for interrupting.

5          THE COURT:  No, that's okay, it's important that

6   everybody be able to hear.  Dr. Lodge, maybe you could -- I'm

7   not sure, our sound system in this room gives us fits all the

8   time,  but if you could maybe talk a little louder, that might

9   be helpful.  Thank you.

10         THE WITNESS:  I have been told I mumble.

11         THE COURT:  Okay, very good.

12  BY MR. REICHEL:

13     Q.   Would you like me to repeat the question, Doctor?

14     A.   Please.

15     Q.   My question was did you or our team at the Center

16  for Aquatic Conservation, were you asked to do an assessment

17  of the risks of transfer of invasive species through the

18  Chicago Sanitary & Ship Canal?

19     A.   Yes, through a series of conversations with

20  representatives of the Army Corps of Engineers, we arrived at

21  a set of topics that, that centered around risk assessments of

22  species movement through the Chicago Sanitary & Ship Canal.

23  We, through this series of conversations we identified areas

24  of interest to the Army Corps of Engineers to which we had

25  relevant expertise, and initially that was focused on a broad

1    assessment of which species might move not only northward but

2    also southward through the Canal and therefore might pose an

3    economic or environmental or human health risk to either the

4    Great Lakes Basin or the Mississippi Basin.

5         Q.    And from that initial focus did you and your team in

6    your cooperative agreement with the Corps, were you asked to

7    look at or assess the threat posed by the dispersal of bighead

8    and silver carp through the Chicago Sanitary & Ship Canal?

9         A.    Yes, that was one component of the work that we

10   originally outlined and became over time more and more of

11   focus because it was of urgent interest to the Army Corps of

12   Engineers, but originally, it was one of many species that we

13   were looking at.

14        Q.    Just to put this in context, Dr. Lodge, we have

15   projected up on the screen here a map.  Are you familiar with

16   this map?

17        A.    Yes, that map was constructed from preexisting maps

18   by our collaborators at the Nature Conservancy.

19        Q.    Let me just pause you there.  I have asked you about

20   your collaborators.  You have mentioned that you work with a

21   group of other scientists.  Let me ask you now specifically

22   about the work that you began doing in 2008 in connection with

23   the Corps.

24        Could you identify for the court the team that worked

25   with you on this project?

1         A.    There have been four principal leaders of our

2    efforts of research since 2008 in collaboration with the Army

3    Corps of Engineers.  Besides me, the other three collaborators

4    are Dr. Christopher Jerde, who has a PhD in biology and is a

5    specialist in statistics and data analysis and modeling of

6    species dispersal.

7         The second person who became more and more involved as

8    the research developed toward the eDNA direction is Dr. Andrew

9    Mahon, who has a PhD in biology and also postdoctoral research

10   experience.  Both Dr. Jerde and Dr. Mahon have published

11   extensively in their areas of expertise.  And the fourth

12   member of the team is Lindsey Chadderton, Mr. Lindsey

13   Chadderton, who is the Director for Aquatic Species Research

14   in the Nature Conservancy.  He comes from a background of

15   managing invasions and surveillance of invasions, particularly

16   a rich experience working for the Department of Conservation

17   in New Zealand.

18        Q.    And again, so just to put this, directing your

19   attention again to this first image that we have up on the

20   screen, does this depict the general spatial location of the

21   Chicago Sanitary Ship Canal or what is sometimes referred to

22   as the Chicago Area Waterway System?

23        A.    Yes.  We typically refer to this whole system as the

24   Chicago Area Waterway System.  Different parts of it go by

25   different names by different people.  So it can be confusing

1    as we talk about different parts of it, but yes.

2         Q.    Okay.  And so you indicated earlier that one of the

3    tasks that you were asked to -- that you undertook to work

4    with the Corps on was identifying species, not specifically

5    Asian carp, or I should say bighead carp and silver carp,

6    identifying species that have the potential or the risk of

7    dispersing either northward or southward through this waterway

8    system?

9         A.    Yes.

10        Q.    And did you or your colleagues eventually provide

11   the Corps with a list of maybe some of those species that you

12   believe presented that risk?

13        A.    Yes, through a series of discussions with

14   representatives of the research arm of the Corps and the

15   Chicago District and others in the Corps, we collaboratively

16   decided how to conduct that risk assessment, how to come up

17   with a list of species, and how to begin to do a preliminary

18   risk assessment of those species that could either move

19   northward or southward through the canal with a particular

20   focus on, on the electric barriers and the mechanisms and

21   approaches that the Corps and others have taken to prevent

22   movement.  Only later did we begin to focus on bighead and

23   silver carp.

24        Q.    Turning to bighead carp and silver carp

25   specifically, which I may, just so you're clear about the

1   terminology I'm using, if I refer to Asian carp in my

2   questions, I would like you to understand that to refer to

3   bighead carp and silver carp.

4       A.   Yes, understood.

5       Q.   Thank you.  With respect to these Asian carp

6   species, did you or your colleagues attempt to model or to

7   assess the rate at which those species were dispersing through

8   the Illinois waters that are connected to the Chicago Area

9   Waterway System?

10      A.   Yes.  We were prompted to model the dispersal or

11  statistically analyze the dispersal of Asian carp northward

12  through the river and canal system by a series of discussions

13  and meetings that we had with the Army Corps of Engineers and

14  other management agencies involved when in the course of those

15  discussions it became clear that there was some sense that the

16  invasions by these species had stalled going northward.

17      So we were prompted to investigate more carefully what

18  the evidence was or was not for the rate of spread of these

19  species northward.

20      Q.   Okay.  Now, with respect to dispersal, modeling

21  dispersal, what sort of data did you and your colleagues look

22  at in trying to assess that?

23      A.   We used primarily the data that is publicly

24  available on the USGS, that is, the United States Geological

25  Survey web site, which includes records for the occurrence of

1    many invasive species throughout North America.  So that's

2    primarily what we used and then augmented those data as

3    possible with the sitings of individuals of Asian carp as they

4    occurred in the recent past.

5        Q.   Just for clarity, I'm putting up in the course of

6    this testimony some demonstrative exhibits.  We have had some

7    copies made.  I'm going to ask my co-counsel to distribute

8    them to other counsel in case they can't see the screen here.

9        THE COURT:   Okay,that's terrific, and anybody who does

10   want to see the screen, you're welcome to move in a position

11   that you can.

12   BY MR. REICHEL:

13       Q.   Dr. Lodge, do you recognize this image that's

14   displayed on the projector here?

15       A.   Yes, the graph on the right is identical to a graph

16   which we put in a report to the Army Corps of Engineers that

17   summarized our initial study of risk assessment of species

18   moving through the Chicago Sanitary & Ship Canal.

19       The only differences between this and the figure that

20   appeared in the report were simply improvements to make it

21   more legible for presentations that I have given over the last

22   year or so.

23       Q.   And again, if I understand your testimony, this,

24   what you and your colleagues did was start with data or

25   databases of actual observation of these species in the

1    environment and in this case in the Illinois River systems?

2         A.   Yes.  So on that graph, for example, the vertical

3    axis is the typical used measurement for navigation or other

4    analyses involving the river miles, those would be the miles

5    that a fish would have to swim or a barge would have to

6    navigate in order to get from point to point.

7         The horizontal dash lines are different control

8    structures in the canal.  And the dark dots represent the

9    known most northward locations of bighead carp and the grey

10   dots the same thing for silver carp, again, as recorded by the

11   USGS in their publicly available online data set.  The upper

12   dots for both species include or are based on more recent data

13   from the management agencies' efforts in the very recent past

14   to capture and see fish in the waterway.

15        Q.   And could you explain to the court what those lines

16   are that you and your colleagues have placed there?

17        A.   Those lines are regression lines, just the result of

18   a very, very standard statistical approach to trying to take a

19   collection of information, the occurrence of fish in this

20   case, and our purpose is to see whether there appears to be a

21   continuous, an apparently continuous dispersal or movement of

22   the fish northward or whether in fact there is any evidence

23   that the movement northward is punctuated in time and space.

24        Q.   And I believe you testified just a moment ago, when

25   you say "punctuated," you indicated in the discussions that

1    you and your colleagues have had with representatives at the

2    Corps, some had expressed the view that the progress or

3    invasion of these species northward through the Illinois River

4    systems had stalled, was that the correct term?

5        A.    Yes, in a number of the meetings of various

6    committees and discussions that have been ongoing about the

7    Canal and the barrier and which we became a part of as we

8    engaged in this research with the Corps, we heard a lot of

9    discussion about invasions having stalled, and the importance

10   of that was that it led to a sense of, that there didn't need

11   to be so much concern about where the carp were because they

12   seemed to be stalled south, considerably south of the electric

13   barrier, so we felt it was important to assess the nature of

14   the evidence in support of that apparently widespread belief,

15   and that's what prompted us to do this analysis, which shows

16   clearly that there is no evidence of any stalling of the

17   invasion.

18       Q.    Okay.  And directing your attention to the left-hand

19   side near the bottom, there are the words "bighead and silver

20   carp likely at electric barrier less than or equal to 2007 to

21   2008."  Could you explain what you mean by that?

22       A.    What I mean by that is if you look, take the

23   opportunity to point at this little line up here, that says

24   "electric barrier," that's the location of the electric

25   barrier so one of the specific questions we were trying to

1    address here was when would bighead and silver carp likely

2    have been at the barrier.

3         And you can see that those two lines cross that electric

4    barrier dashed line for bighead carp around 2007 and for

5    silver carp around 2008, suggesting that the carp were likely

6    or there is, the evidence as it exists suggests that the carp

7    would have been, if you will, testing the electric barrier

8    earlier than had previously been assumed.

9         Q.   Dr. Lodge, based on your professional training and

10   experience as a biologist, are you familiar with the methods

11   that are commonly or traditionally used by biologists or

12   management agencies to assess or determine the presence of

13   fish?

14        A.   Yes, I have worked in a variety of research projects

15   over my career that involved fish.  We have employed in

16   various research projects and published information using nets

17   and electroshocking and other tools, have collaborated on

18   other projects where those tools were part of the ongoing and

19   day-to-day tools being used, so I'm very familiar with the

20   standard fisheries research tools.

21        Q.   And based upon your training and experience as a

22   biologist and the knowledge that you may have gained about

23   these particular species of Asian carp, what is your

24   understanding of the ability of the conventional methods that

25   you have just described, that is, netting and electroshocking,

1    the ability or sensitivity of those detection tools in

2    determining the presence of these species near the leading

3    edge of a so-called invasion front?

4          A.    First of all, those, those fisheries biologists who

5    have extensive field experience working particularly with

6    these species, which I do not, but those biologists who do

7    have such experience, and I'm thinking, for example, of Dwayne

8    Chapman with the USGS, have repeatedly pointed out that these

9    fishes, both silver and bighead carp are particularly

10   difficult to catch with traditional tools.

11         I think more -- equally important is the fact that the

12   traditional tools, electrofishing and netting, even with

13   extensive efforts, even with extraordinary efforts, catch only

14   a small proportion of even fish that are easy to catch.

15         If we look at one particular published study recently, a

16   study done by Greg Sass and colleagues published in 2010 in

17   the Journal of Biological Invasions, it's one of the few

18   studies in which there has been an attempt to do a mark

19   recapture study of Asian carp.  A mark-recapture study is a

20   standard long used tool to try to estimate population size.

21         For purposes of answering this question, though, the

22   important thing about the Greg Sass, et al. study is that they

23   devoted extraordinary efforts to catch fish in the LaGrange

24   pool of the Illinois River and were only be able to capture

25   less than 1 percent of the carp that they estimate were in the

1   pool.

2       So an important message here is that the traditional

3   tools even when they're employed with considerable effort will

4   catch at best a very small proportion of the fish present in a

5   waterway.  That's true for any fish.  It's especially true for

6   Asian carp.

7       Q.   In light of that fact, Dr. Lodge, and given the fact

8   that in your collaboration with the Corps of Engineers you

9   were being asked to assess the risk of their migration, if you

10  will, through the Chicago Sanitary & Ship Canal, what action

11  did you and your colleagues take to address the limitations on

12  these traditional sampling methods?

13      A.   Well, we certainly in discussion about how the

14  surveillance programs could be improved, I mean, we first

15  pointed out that in fact the effort that was being devoted by

16  the management agencies with traditional tools was focused in

17  areas where the fish were already known to exist, whereas if

18  you're really trying to design a surveillance program to

19  detect the invasion front, that is, the leading edge of an

20  invasion, one should be putting more effort with whatever

21  tools you have, be putting that effort more in advance of

22  where you know they are if the goal, as it was, was to detect

23  the invasion front.

24      So first was just simply providing advice based on

25  experience to shift the effort of traditional tools further

1    north, not to devote as much effort as was being devoted to

2    areas where the fish already occurred, where everyone agreed

3    the fish already occurred.

4         Secondly, we proposed, after conducting a series of

5    preliminary trials in my laboratory at Notre Dame, we proposed

6    the use of sampling water and detecting DNA of the fishes in

7    the water as a possibly more sensitive tool to detect the

8    presence of both silver and bighead carp.

9         Q.   On that score, Dr. Lodge, before we get into that,

10   and I'll have a number of questions about the environmental

11   DNA method, but more generally speaking, in your experience as

12   a biologist, are there other situations that you're aware of

13   where scientists have used samples of genetic material in the

14   environment, collected from the environment as a means of

15   trying to indirectly or directly detect the presence of

16   particular species?

17        A.   There is an increasingly rich literature and history

18   of using what is variously called indirect DNA based methods

19   or environmental DNA methods or a variety of other terms, but

20   there is a rich history of literature for 20 years or more on

21   using techniques to collect not the organisms themselves but

22   rather what the organisms leave behind and using DNA to

23   ascertain which species that left behind material came from.

24        Q.   Dr. Lodge, I have just put up, so the record

25   reflects, I just put another diagram on the projector here for

1    demonstrative purposes. Can you tell the court what this is?

2         A.    So these are just two examples of recent studies

3    demonstrating the usefulness of indirect methods based on DNA

4    of ascertaining the presence of organisms.

5         The paper on the bottom is a review paper.  By that what

6    a scientist means is that this is a study not based on primary

7    data collection, but rather a paper which synthesizes

8    previously published papers to integrate what has been learned

9    to -- and to point the way toward future advances.

10        So this is a particularly valuable paper recently

11   published, 2009, as it says up there, which includes a table

12   which summarizes a large number of examples of studies which

13   have used these indirect DNA based methods to detect the

14   presence of organisms, organisms from most of the applications

15   for terrestrial organisms, but there are several for aquatic

16   organisms.

17        One of the papers that is covered in that review paper is

18   the paper listed at the top of that slide, the paper by

19   Ficetola, et al.  That paper by Ficetola and co-authors

20   published in 2008 is the paper which was the immediate impetus

21   for our ideas about using indirect DNA based methods to detect

22   the occurrence of Asian carp in the Chicago Area Waterway.  So

23   that paper describes a successful application of the technique

24   which we then later had the opportunity to employ in the

25   Chicago Area Waterway.

1      Q.   Dr. Lodge, as was noted earlier, several months ago

2  you prepared and signed a declaration, a sworn statement, a

3  statement that was filed on behalf of the United States in

4  another piece of litigation in the Supreme Court where you

5  talked about some of the work that you had done, do you recall

6  that?

7      A.   Yes.

8      Q.   And I believe in that statement you characterized

9  the, your team's use of environmental DNA as a means of

10 detecting the presence of so-called Asian carp as novel.  Do

11 you recall saying that?

12     A.   Yes, I have referred to it as novel.

13     Q.   Could you explain what you mean by that and in what

14 sense is it novel?

15     A.   It's novel in the sense of almost any published

16 scientific paper which reflects an incremental improvement in

17 established methods.  It's novel, specifically in our case

18 it's novel because we altered slightly the techniques that

19 Ficetola and his co-authors used in order to be able to sample

20 larger volumes of water over a much more extensive geographic

21 area appropriate to the questions in the Chicago Area Waterway

22 than the question on which Ficetola and his co-authors

23 focused.

24     Q.   Apparently, the court will have the opportunity to

25 hear testimony by Dr. Ficetola, but just in the interest of

1    continuity, could you briefly describe for the court, you

2    don't need to go into great detail, but the nature of the

3    research that Dr. Ficetola and his co-authors did, I mean,

4    what the setting was, what species they were looking for?

5        A.    Ficetola is -- from what I can gather from his

6    paper, Ficetola and his co-authors were interested in just

7    testing the feasibility of using these indirect DNA based

8    methods to detect bullfrogs, American bullfrogs, which are an

9    invasive species in France.  To do that they took advantage of

10   apparently preexisting information about a variety of ponds in

11   which bullfrogs, some of which bullfrogs occurred in

12   abundance, some of which they were quite confident the

13   bullfrogs didn't occur, and in between.

14       So nine ponds, a gradient of bullfrog abundance, they

15   took three samples of water, 15 milliliters each, rather a

16   small sample compared to what we did later in the Chicago area

17   waterway.  They extracted all the DNA from that 15 milliliters

18   of water without any filtration and then used standard tools,

19   as we have done, to detect the presence in their case of DNA

20   from American bullfrogs.

21       Q.    And so how did the approach that you and your

22   colleagues developed in this setting with respect to Asian

23   carp, how did that differ from the approach taken by Ficetola

24   and his colleagues?

25       A.    There are several differences, all of which I would

1    regard as incremental either improvements or just adaptations

2    for the different question and scale on which we were working.

3         Again Ficetola, et al., took a very small number of

4    samples, 15 -- a small number of small volume samples, we have

5    taken a very large number over the last couple of years of

6    2-liter samples of water.

7         In order to manageably extract the DNA from such large

8    sample volumes as we are using, we have filtered the water.

9    Ficetola did not filter the water.  Again, I regard that as a

10   relatively minor change.  And we also have adopted a whole

11   battery of quality assurance/quality control approaches in our

12   approach that are not mentioned in Ficetola's paper.  We have

13   done that because of the importance and management relevance

14   of the work that we were doing.  There are some other changes.

15        Q.    No, that's fine, I just wanted in a general sense.

16        I have another demonstrative slide, this one headed

17   Procedures For eDNA Analysis.  Do you know who prepared this,

18   Dr. Lodge?

19        A.    Yes, this is a simple schematic that we have used in

20   many presentations over the last couple years to communicate

21   the general approach that we are using in what we referred to

22   as eDNA.

23        Q.    Before we go on to -- this is a series of steps, I

24   think this has been discussed before, but just so the record

25   is clear, in the case of Ficetola and his colleagues looking

1    for evidence of American bullfrogs or in the case of you and

2    your team looking for evidence of Asian carp, what -- how is

3    it, I mean, if the organism in question is not physically

4    present at the time the sample is collected, how is its

5    genetic material ending up in the environment or in the water

6    column?

7         A.   In the same way that forensic scientists are using

8    the DNA left behind by humans, criminal suspects, for example,

9    in many situations we are using that same approach with the

10   understanding that all organisms to some degree or another

11   leave some DNA behind in sloughed off tissue.

12        In the case of Asian carp, we suspect perhaps the most

13   important source of DNA might be in cells from the intestinal

14   lining which are shed with feces from the fishes, could be in

15   the slime of the fishes, could be in tissues in fast turnover,

16   tissue in the gill.  Regardless of where it comes from, it is

17   no surprise that DNA is left behind by organisms.

18        Again, if we go back to that review paper from

19   Beja-Pereira in 2009, there is this long history of taking

20   advantage of the fact that organisms leave bits of tissue

21   behind from which at least for a time DNA persists and is

22   detectable using standard tools such as we have used.

23        Q.   Okay, and just walking through this, you have

24   already explained that you and your colleagues collect a water

25   sample of 2 liters, is that correct?

1     A.    We have relied on the arbitrarily determined volume

2     of 2-liter samples.

3     Q.    And then you talked about filtering.  Is that just

4     to collect the genetic material if it's present?

5     A.    That is the collect the particular material, which

6     will contain DNA if there are cells from the target organisms

7     present or if there is DNA which has adsorbed or adhered to

8     particulate matter in the water.

9     That is a point of difference with what Ficetola, et al.

10    did.  They extracted DNA from the entire water sample so

11    conceivably they were extracting more DNA than was present in

12    a water sample than we are for a given volume.

13    Q.    What's the next step?

14    A.    The next step there is simply to extract all the DNA

15    that was trapped on the filters that we used.

16    Q.    And the technique that you and your colleagues used

17    in that regard, is that one that is to your knowledge and your

18    colleagues' knowledge, is that one that's commonly employed by

19    scientists working in this area?

20    A.    Aquatic scientists use filters all the time for a

21    variety of purposes.  There is nothing special about the

22    filters we have used or the techniques we have used to filter

23    except that we have been extraordinarily careful to avoid

24    contamination.

25    Q.    And the next step?

1       A.   The next step is using polymerase chain reaction,

2   commonly abbreviated PCR.  This is a standard molecular

3   biology tool.  It has been standard for about 20 years,

4   discovered by Kary Mullis in 1983 and adopted very rapidly and

5   is used by every molecular biology laboratory on the planet

6   for a variety of purposes.

7       In our, for our goals we have used it to duplicate or

8   multiply any copies of DNA from either silver or bighead carp

9   in our sample.

10      Q.   And why are you doing that?

11      A.   So we are doing that because this increases our

12  ability to detect whether, if there is DNA from either silver

13  or bighead carp in the sample that was trapped on the filter,

14  we multiply the numbers of that so that it becomes abundant

15  enough to detect.

16      Q.   Detect in the sense of what, comparing it to other

17  known references?

18      A.   Detect in the sense of, with -- yes, with standard

19  samples, with positive controls, which we use routinely, and

20  with respect to -- well, yes, I mean, that's the best I can

21  say.

22      Q.   And again, use PCR with species specific primers, I

23  expect the court is going to hear other testimony and

24  discussion about the term "primer," so in the interest of

25  being clear on this, could you explain to the court in this

1    context what you mean and you understand the term "primer" to

2    mean?

3         A.    In the standard use of PCR, which is what we have

4    done, one of the ingredients in a PCR reaction is primers, one

5    what is referred to as a forward primer, one a backward

6    primer, one applies to each strand of double-stranded DNA.

7         So you have to have two primers, one forward, one

8    backward to start a reaction which duplicates any DNA from

9    silver or bighead carp which would be present.  Primers are

10   designed to be species specific.

11        Q.    So in other words, there would be a primer that

12   would be specific to bighead carp?

13        A.    Yes, that is, any DNA that is duplicated in a PCR

14   reaction with the primers that we have chosen will be DNA only

15   from the target species, either in our case silver carp for

16   one set of primers or bighead carp for a different set of

17   primers.

18        Q.    Are primers set up or designed, as you have said, in

19   a way that they will in effect target, if that's the right

20   term or amplify, enable you to amplify genetic material of a

21   certain size or length?

22        A.    Yes, the primers, the combination of these two

23   primers for each species, one forward primer, one backward

24   primer ends up if there is any DNA from the target species

25   present, it will duplicate a certain fragment of that DNA,

1  again, if such fragment is present to begin with.  It will

2  just make more copies of it.

3      That fragment, which is duplicated and which you end up

4  with many copies of at the end of the PCR reaction, is longer

5  than the primers.  So in our case, our primers were designed

6  to duplicate in a PCR reaction a fragment of DNA, which we

7  routinely refer to as a marker or a diagnostic fragment of

8  DNA, of about 200 base pairs in length for silver carp and

9  about 300 base pairs in length for bighead carp.

10     Q.    Without getting too much into the technical detail,

11  when you talk about base pairs, is that a commonly understood

12  term among geneticists or people who are working with this?

13     A.    That is everyday parlance for any molecular

14  biologist.

15     Q.    Okay.  And again, there may be further testimony on

16  this subject, you have mentioned that your methods were set

17  for markers of a particular length for those two species.

18  When you reviewed, Doctor, the paper published by Ficetola and

19  his colleagues, did they identify what marker length or what

20  fragment of genetic material from the American bullfrogs they

21  were targeting?

22     A.    In their paper they identify their primers, they

23  provide a description of the primers, just a sequence of As

24  and Ts, and they state in their paper that the fragment that

25  is duplicated, this species specific fragment of in their case

1   bullfrog DNA that is duplicated was, 79 base pairs in length.

2       Q.   So in other words, the fragments that were targeted

3   by the work, the tests that you and your colleagues did, were

4   actually longer than those that Dr. Ficetola and his

5   colleagues did in the species that they studied, is that

6   correct?

7       A.   Yes, Ficetola's 79 base pairs compared to our length

8   for silver of about 200 base pairs and for bighead about 300

9   base pairs.

10      Q.   So as you -- you have described earlier that you and

11  your colleagues looked at the application of these techniques

12  to the detection, of indirect detection of bighead and silver

13  carp.  Again, this work that you just described, was that,

14  when was that developed, in 2009 or 2008 approximately?

15      A.   Our development of these primers and the species

16  specific DNA fragments that those primers duplicate was done I

17  believe beginning in late 2008 and then first formally

18  proposed to the Army Corps, if I remember correctly, in early

19  2009.

20      Q.   And as you adapted and refined this method for that

21  purpose, could you -- how, did you start in the field, did you

22  start in the laboratory?  Could you briefly describe the

23  principal steps you and your colleagues used in adapting this

24  method?

25      A.   Yes.  Before ever proposing this to the Army Corps

1    of Engineers, we wanted to gain some confidence that it would

2    in fact work.  So we started in the laboratory with a variety

3    of simple experiments, putting fish in containers in the

4    laboratory, seeing how long they had to be there before we

5    could detect DNA, seeing how long that DNA hung around after

6    we took the fish out, working, originally not with silver and

7    bighead carps but with common carps or other species just as

8    surrogates.

9         And then once we gained confidence from those laboratory

10   experiments that we could make -- the sort of approach that

11   Ficetola, et al. had prompted us to think about to make that

12   work, we then did, took some samples from real aquatic

13   environments including local rivers and ponds and ultimately

14   including parts of the Illinois waterway to see whether we

15   could make it work specifically with silver carp and bighead

16   carp, which we could, and at that point we proposed it

17   formally to the Army Corps as a potentially very sensitive new

18   tool in their surveillance toolbox.

19        Q.   Okay.  And I think as the court is aware, ultimately

20   the Corps provided you and your colleagues funding to actually

21   implement the use of this method in the field, is that

22   correct?

23        A.   Yes, the Corps has provided several additions to our

24   original cooperative agreement referred to typically as

25   modifications of that original agreement to add resources in

1    order to expand the research, for example, in this case to

2    include environmental DNA surveillance.

3        Q.    And we will get into this in more detail, but since

4    you implemented, you and your colleagues implemented this

5    method, am I correct in understanding you provided a series of

6    reports to the Corps about, as the work progressed?

7        A.    We provided very regular reports, written reports,

8    for long stretches of time during our collaboration with the

9    Corps on a weekly basis.  In addition, we provided more

10   frequent and informal, but written reports via e-mail whenever

11   we got a result which was particularly -- well, when we got

12   positive results we let the Corps know immediately.

13       Q.    And in addition to those periodic or interim

14   reports, did you and your colleagues ultimately prepare a

15   report summarizing -- I want to go back to the original scope

16   of work that you had, that is, where you were asked to do this

17   risk assessment of invasive species.

18       Did you and your colleagues put together a report

19   addressing that and summarizing the other work that you had

20   done to date?

21       A.    Yes, the original scope of work, we summarized our

22   progress toward accomplishing those goals in a report which I

23   believe we provided a first draft of to the Corps, I believe

24   it was in April, 2009, and provided the Corps an opportunity

25   to provide feedback and reactions to that, with the eye that

1    we would revise it then to become a final report, which we did

2    and submitted that in July to the Corps.

3         Q.   Dr. Lodge, a moment ago you said 2009.  Did you mean

4    2009?

5         A.   I meant 2010, thank you.

6         MR. LODGE:  Your Honor, may I approach?

7         THE COURT:   Sure.

8    BY MR. REICHEL:

9         Q.   Dr. Lodge, I'm handing you a copy of what we have

10   marked for identification as Plaintiff's Proposed Exhibit

11   No. 1.  Can you identify what that is, please?

12        A.   Yes, this is the report that we were just referring

13   to.

14        Q.   Which has the heading Aquatic Invasive Species Risk

15   Assessment for the Chicago Sanitary & Ship Canal, is that

16   correct?

17        A.   Yes.

18        Q.   And were you one of the principal authors of this

19   report?

20        A.   Yes, this was very much, though, a collaborative

21   effort, as the list of authors indicates.  Dr. Christopher

22   Jerde led our efforts, led the work of our team toward

23   compiling this report and was very much involved in different

24   aspects of it.  Matthew Barnes is a graduate student in my

25   laboratory.  Joanna McNulty is the program coordinator. I

1    referred to Dr. Andrew Mahon earlier.  He has published many

2    papers on molecular biology.  Mr. Chadderton I referred to

3    earlier, and myself.

4         Q.   Directing your attention to the table of contents,

5    I'm not going to ask you to go through the entire document,

6    but this addresses under the heading (1) Risk Assessment of

7    Species Moving Through the Chicago Sanitary & Ship Canal, as

8    you discussed earlier, is that correct?

9         A.   Yes.

10        Q.   No.2 is Dispersal Modeling.  Is that something you

11   talked about earlier?

12        A.   Yes, the core of that was the graph we looked at

13   earlier.

14        Q.   And the third heading is Preliminary Study of eDNA

15   Surveillance.  And again, does this relate to the method

16   development that you just testified about in the last few

17   minutes?

18        A.   Yes, we developed this -- we did the experiments.

19   The sort of preliminary experiments that I referred to earlier

20   supported not only by the Army Corps of Engineers, the

21   preliminary work that laid the foundation for the application

22   of eDNA in the Chicago Waterway was supported by the

23   cooperative agreement from the Army Corps of Engineers to

24   which we have already referred and also by an ongoing project

25   funded by the Great Lakes Protection Fund, which had

1    originally supported Andy Mahon's research in which we were

2    developing other DNA-based tools to detect species in other

3    contexts.

4         But carp were an interest in both projects and that other

5    project provided us the financial support to develop the

6    primers for the carp.

7         Q.   And Dr. Lodge, you indicated that you're one of the

8    co-authors of this report.  To the best of your knowledge,

9    sir, in terms of the substance of the information provided,

10   does it or does it not accurately reflect, describe the work

11   that you and your colleagues performed on these subjects?

12        A.   It does, it does describe that work, although in

13   looking at it recently, I did note that on Page 3 we have got

14   the wrong dates at the bottom of the page, and as I said

15   earlier, our final version of this report was provided in July

16   of 2010.

17        Q.   As opposed to May?

18        A.   As opposed to May, which it says on Page 3.

19        Q.   But other than that, to the best of your knowledge,

20   this accurately describes the nature of the work that you did

21   and reported to the Corps for what's covered by this?

22        A.   Yes.

23        MR. REICHEL:  Your Honor, at this time I would move for

24   admission into evidence of this document as Plaintiff's

25   Proposed Exhibit 1.

1          MS. RUDOLPH: No objection, your Honor.

2          THE COURT:   Okay, very good.  No objection across the

3    board?

4          MR. RIESER:  I think I'm going to have to reserve

5    objection until we have had the opportunity A, to review it

6    and B, to cross-examine Dr. Lodge regarding it.

7          THE COURT:   Do I have a copy of this exhibit?

8          MR. REICHEL:  No, you do not, your Honor.  I wanted to

9    move for its admission.

10         THE COURT:   Okay, well, I will provisionally admit it

11   subject to any objections later, but, you know, that's the

12   advantage of a bench trial.

13         MR. REICHEL:  Your Honor, may I approach?

14         THE COURT:   Yes, certainly.

15         MR. REICHEL:  I should have --

16         THE COURT:   Thank you, sir.

17         MR. REICHEL:  --mentioned earlier that this was not among

18   the documents that was in the wealth of papers.  In fact, it

19   is publicly available in the sense that it was submitted by

20   Dr. Lodge and his colleagues to the Corps.  We only recently

21   obtained a copy.

22         THE COURT:   Okay.  Well, fair enough. And as I say, I

23   will provisionally admit it subject to any objections later

24   that could be surfaced after people have had a chance to

25   digest it, but for now you can carry on.

1      MR. REICHEL:  Thank you, your Honor.

2      THE COURT:  Thank you.

3      (Plaintiffs' Exhibit 1 received)

4  BY MR. REICHEL:

5      Q.   So again, you have testified, Dr. Lodge, that you

6  have provided over time from 2009 as you collected the field

7  work, and I don't think you indicated how long that's

8  continued, but you and your colleagues have collected numerous

9  water samples from the Chicago Area Waterway System, is that

10  correct?

11      A.   At this point, and we are, we have now concluded, we

12  believe, we have concluded our participation in the regular

13  surveillance program in the Chicago Area Waterway.  We have

14  taken, I believe, on the order of 1,500 samples from the

15  beginning through May of this year.

16      Q.   And we will go into this in a little more detail in

17  a moment, but with respect to the results of those samples

18  that have been made available to the public, would the most

19  recent sampling event or dates of the sampling have been in

20  May of this year, is that correct?

21      A.   Yes.  Yes, with a qualification.  We have -- we are

22  in fact in the middle of completing analyses of another set of

23  I believe on the order of 450 samples, which we agreed to take

24  because there was not yet the capability in the Army Corps to

25  pick up the regular surveillance program.

1     So we are still working through some samples collected I

2   believe in June which were -- no, I'm sorry, it was not June,

3   it was later than that, which were focused to the east of

4   where we had previously taken samples because the agencies

5   involved were keen to learn more about what was going on in

6   the Calumet region and eastward from there.

7     So we still have some samples that we were working on in

8   the interim before the Army Corps of Engineers itself picks up

9   this surveillance program.

10     Q.    While we are on that subject, I'm going to ask you

11   to elaborate. Is it your understanding, Dr. Lodge, that it is

12   the stated intention of the Corps to itself or have some

13   third-party undertake future analyses, if any, of DNA samples

14   for this project?

15     A.    Well, one of the most recent modifications or

16   additions to our cooperative agreement with the Corps was, had

17   as its expressed purpose to transition the regular eDNA-based

18   surveillance in the Chicago Area Waterway from our team at

19   Notre Dame and the Nature Conservancy to the Army Corps of

20   Engineers' Laboratory, Engineer Research and Development

21   Center, ERDC, which is the U.S. Army Corps' laboratory in

22   Vicksburg, Mississippi.  They have a genetics group there

23   which had early on expressed interest in learning how to do

24   the tool and applying the tool.

25     So we are in a process of transitioning the eDNA

1    surveillance to the Army Corps of Engineers and that process,

2    we adhered to that process and the agreement called for that

3    process to be concluded earlier this summer.

4        Q.    Are you aware of any laboratory other than your team

5    to date actually having processed any samples collected from

6    the Chicago Area Waterway System?

7        A.    There is one other laboratory that just recently is

8    beginning to take on, to learn how to do this, and that is a

9    commercial laboratory based in South Bend.  A new company has

10   been set up to, to do this, and we have been cooperating with

11   that company, and in fact, I am, full disclosure, a minor

12   partner in such a company in order to develop the capability

13   to apply this so that the incredible demand that we have had

14   from various government agencies and private sector parties to

15   do this work.

16       Q.    Just to clarify -- go ahead, please.

17       A.    Just to complete that answer, in addition, as part

18   of a new Great Lakes Restoration initiative funded project, we

19   are transitioning the ability to do this monitoring to any

20   federal or state agency in the Great Lakes region that is

21   interested, and we are in the early stages of transitioning

22   the capability also to a U.S. Fish & wildlife laboratory in

23   LaCrosse.

24       In addition, as part of this newly funded project, we

25   will be training whichever state agencies in the Great Lakes

1   region want to do this, also to train them to do it.  It is

2   our purpose to be doing research to develop such tools, not to

3   be in the routine surveillance business.

4        Q.    Understood.  But just to go back to this earlier

5   point, you had indicated that it was your understanding that

6   there was a plan in place to have an environmental or science

7   laboratory associated with the Corps of Engineers itself

8   undertake analysis of these samples, and my question

9   specifically is to your knowledge, has that laboratory yet

10  analyzed any such samples?

11       A.    We have been through some of the steps of what we

12  had described in scope of work as being the appropriate steps

13  toward transitioning, that is sampling together, blind

14  samples, comparing results, and so forth.

15       To date, that laboratory has not been able to

16  consistently duplicate our work and has acknowledged a, to use

17  their words, pernicious contamination issue.

18       Q.    Let me turn now, we have talked a lot about the

19  process here, but I would like to now talk about the results.

20  There has been a good deal of focus on that.  And we will go

21  through some of the specific results that you and your

22  colleagues have reported, but let me first ask you to

23  explain -- I believe you testified earlier that when you do

24  one of these tests and you do them for -- you do on a species

25  specific basis, bighead, silver, correct?  And so when you

1    report using your method a positive result, first of all, is

2    that specific to one or the other of those species?

3         A.   Yes.

4         Q.   And given the method as you have developed it and

5    applied it, what inference do you draw as a scientist from a

6    positive result in one of these samples -- let's just use

7    bighead as an example.

8         You have collected a sample from a water body, tested it

9    and reports, you get a positive result for bighead carp eDNA.

10   What inference do you as a scientist draw from that?

11        A.   The most plausible inference to be derived from that

12   is that in the not very distant past there has been at least

13   one bighead carp present in the vicinity.

14        Q.   When you say "the not very distant past," could you

15   bracket that time wise?

16        A.   Yes, based on some experiments that we have done

17   both in the beginning before we ever proposed using DNA to the

18   Corps and more recently from samples taken from the field, we

19   have ascertained that the signal that we are detecting, the

20   DNA sample that we are detecting disappears on the order of

21   hours to at most a couple of days from a sample.

22        So when I say "in the not too distant past," what I mean

23   is roughly a couple of days.  A fish, I would infer that a

24   fish has been present in the vicinity within a couple of days.

25        Q.   And in -- go ahead, I'm sorry.  Please, did you want

1    to complete that answer?

2         A.   Well, one also has to take into account movement or

3    the water, so to think about how much water would have moved

4    in a couple of days, so that would be a further qualification.

5         Q.   And so I believe you used a phrase -- in any event,

6    you mean in the vicinity of where the sample was collected?

7         A.   Yes, in the vicinity of where the sample was

8    collected or where the water was at the time it was sampled.

9    It is difficult, however, to, to detail further what I would

10   mean by "in the vicinity" because we do not have -- we have

11   not yet had the opportunity to do the experiments where one

12   could really detect how far away, under what circumstances DNA

13   from a fish might be detectable.

14        But given the rapidity with which the DNA sample degrades

15   and is decomposed, the 2-day window, one can guess that the

16   fish would not have been too far away.

17        Q.   And we will talk about this further, but in the

18   sampling that you have undertaken, you have testified that

19   sample -- I'm putting up another slide here.  Could you

20   identify -- it has the heading Reach Designations.  Could you

21   just explain to the court what it is.

22        A.   This is the same map that we looked at previously,

23   but now having had added to it designations of sections of the

24   waterway system which we refer to as reaches.  These are

25   arbitrarily defined sections of the waterway, defined in

1   collaboration with the Army Corps of Engineers.  These were

2   just simply for the purpose of reporting, to make it more

3   manageable in the reporting and interpretation of information,

4   to divide the waterway up into reaches.

5       Q.   And over the course of the -- first of all, if you

6   know, Dr. Lodge, from having worked on this project, in which

7   direction, generally speaking, or directions, does the water

8   in the Chicago Area Waterway System as depicted here, in which

9   direction does it tend to show?

10      A.   The water is flowing in general from Lake Michigan

11  into the waterway.

12      Q.   And water, for example, on the waterway where you

13  see, let's say, Electric Barriers, do you see that?

14      A.   Yes, the star --

15      Q.   Right.

16      A.   -- just to the right of the scale indicates the

17  Electric Barriers.

18      Q.   To your knowledge, would the general flow direction

19  in that stretch of the waterway be away from the lake?

20      A.   Yes, where there are rare occasions in the upper

21  waterway where the flow might be temporarily reversed, it's my

22  understanding that lower in the waterway the flow would be

23  predictably from the lake direction southward, southward and

24  westward.

25      Q.   Now, I would like to back up to -- I had asked you

1    before what inference you draw from a positive sample for one

2    of these tests.  You indicated, I believe, that it's most

3    plausibly, I'm paraphrasing this, but most plausibly explained

4    in your view by the relatively recent presence of a live fish

5    of that species in the vicinity, is that a fair statement?

6         A.   Yes.

7         Q.   Okay.  And could you explain why you draw that

8    inference?

9         A.   We draw that inference largely on the basis not of

10   any one positive result in isolation, but rather over time as

11   information as accumulated, as our results have accumulated,

12   to my mind a repeated pattern of positive results over time in

13   similar areas of the waterway strengthens the inference that

14   the DNA is likely resulting from living fish.  There are, of

15   course, some other possible explanations for the occurrence of

16   DNA in the water, just as in a forensic setting there would be

17   other possible mechanisms for DNA to have arrived at a crime

18   scene other than the suspect having been there, I suppose, but

19   the most plausible explanation, considering our results as a

20   whole, are that the results as a whole indicate the presence

21   of living fish.

22        Q.   All right.  The sampling results, as you testified

23   earlier, were reported in series as the results were confirmed

24   by your laboratory, correct.  In other words, you would

25   process a certain number of samples, go through your quality

1    control procedures, and then report the results, is that

2    correct?

3         A.   Yes, and we got faster as time went on and we

4    formalized our quality control procedures as we went along,

5    especially in response to the audit of our procedures in the

6    laboratory by the EPA.

7         Q.   Could you explain briefly what you just referred to,

8    the audit of your laboratory procedures by the EPA?

9         A.   So because of the management relevance of what we

10   were doing and the results we were reporting and the

11   widespread interest that they garnered and the criticism that

12   they garnered, we asked and the Army Corps, agreed to sponsor,

13   to cause, to motivate an audit of our laboratory and of our

14   procedures by the quality assurance team at EPA, and that

15   audit, the visit by that audit team, a team of experts, was

16   conducted in December of -- I believe in December of 2009.

17        Q.   I believe that process is described in some of your

18   prior statements, I'm not going to go through it in great

19   detail, but -- well, first of all, were the individuals who

20   participated in that audit team, were they independent of you

21   and your colleagues?

22        A.   Yes.

23        Q.   And did they, to your knowledge, review in detail

24   the procedures that you and your colleagues were employing?

25        A.   They reviewed in excruciating detail all the

1    laboratory procedures that we use.

2        Q.   And did they also have occasion to learn about the

3    sampling techniques and methods that you used?

4        A.   Yes, we described for them how we did the sampling

5    in great detail in the field, so they considered everything

6    from the field sampling to everything we did in the laboratory

7    including the provision during the visit of blind samples that

8    we analyzed during the visit and then reported the results to

9    them.

10       Q.   And did you ultimately obtain a copy of the report

11   that the audit team prepared?

12       A.   Yes.

13       Q.   Did the report make any recommendations for

14   improvements or modifications in your procedures?

15       A.   In general, the report was a very strong endorsement

16   of our procedures.  The report also included some

17   recommendations for improvements, particularly in our

18   reporting and quality control procedures, recommendations that

19   as the team, the audit team acknowledged did not undermine the

20   confidence in the results that we had reported previously, but

21   nevertheless would be helpful to implement in future, which we

22   have done.

23       Q.   Now, as these results were reported, they were

24   complied at different times, correct?  I have displayed here

25   eDNA Results for 2009.  Do you recognize that figure?

1      A.   Yes, this is a figure which summarizes our results

2   for 2009.  This depiction does not distinguish silver and

3   bighead carp, but it some summarizes the results for Asian

4   carp collectively for 2009 in a formal that early in this

5   process, earlier in this cooperative agreement we agreed on in

6   collaboration with representatives from the Army Corps of

7   Engineers, in particular Colonel Quarles and General Peabody.

8      Q.   Okay.  If you could, perhaps using your pointer, in

9   the upper left-hand corner there are some color-coded keys.

10  Could you briefly to the judge what those keys indicate?

11     A.   So what we are trying to indicate, first of all, is

12  indicate both where we found positive detections, that is,

13  found DNA from either silver or bighead carp, and it's also

14  important, of course, to indicate where we have sampled, but

15  where our results were negative, that is, we did not detect

16  any DNA from either species.  And the different colors in each

17  row indicate the number of sampling trips in which we got

18  either a negative or a positive result from one, two or three

19  or more.

20     Q.   I think this is implicit, but just to be clear, you,

21  your colleagues, the people who collected the samples in the

22  field visited various reaches of the waterway on different

23  dates and on those dates on a certain trip collected a series

24  of samples, correct?

25     A.   Yes.  When we began the formal surveillance program

1    in the Chicago area waterway, everyone agreed that the most

2    reasonable way to go about it was to start in the southern

3    reaches of the waterway, first of all, where everyone agreed

4    the fish already were, to see what the DNA signal looked like

5    from those reaches, and then gradually to move northward to

6    try to define where the invasion front was.  That was the goal

7    of the surveillance program, was to define the invasion front,

8    what is the northernmost or easternmost place in the waterway

9    where we have evidence that either silver or bighead carp

10   existed.

11        And because we could only manage a certain number of

12   samples in a given time, we did that iteratively.

13        Q.    Again, this figure here aggregates sampling results

14   from a series of trips in calendar year 2009?

15        A.    Yes, this summarizes everything we reported for

16   2009.

17        Q.    Now, did you also -- first of all, in reporting your

18   results, am I correct in understanding that you in your

19   reports to the agency, the Corps in particular, you would

20   specifically identify some sort of coordinate the exact

21   location of each sample?

22        A.    We provided in our reports, regular reports to the

23   Corps a table with more detailed results than are represented

24   here broken down, for example, by species.

25        Q.    So looking at the yellow category, maybe it's the

1    way this slide printed, I would like to direct your attention

2    to this area here, do you see where I'm indicating, where it

3    says Calumet River?

4         A.   Yes, the Calumet River north of the O'Brien Lock.

5         Q.   Should that be read as yellow?

6         A.   Yes.  In 2009 what that is indicating is that there

7    was one sampling occasion on which we found at least one

8    positive water sample for either silver or bighead.  In this

9    case it was silver.

10        Q.   Okay.  Again, the coding indicates that on that date

11   there was at least one date on which at least one positive

12   sample was detected in that reach, correct?

13        A.   Correct.

14        Q.   Do you recognize what I have just put up on the

15   screen here, sir?

16        A.   Yes, these are photographs, aerial photographs of

17   the same region of the map to which you were just referring.

18        Q.   Okay.  And the contrast may be a little bit poor,

19   but if I'm correct, would you agree there is a reference to

20   five separate sites, do you see that?

21        A.   Yes, each of those red triangles indicates the

22   location of one water sample in which we detected DNA from in

23   this case silver carp.

24        Q.   And just for orientation purposes, this area here --

25   are you familiar with where Calumet Harbor is?

1        A.    That is the Calumet Harbor area.

2        Q.    And so do you agree, sir, on this particular day,

3    December 8th of 2009, there were a group of four samples in

4    this range here and there was another positive sample down

5    here, at site II, do you see that?

6        A.    Yes.

7        Q.    And there is a reference there to TJ O'Brien Lock.

8    Could you indicate to the court approximately where the lock

9    is located?

10       A.    The O'Brien Lock is about right here.  This

11   rendition of this makes it difficult to see, but it's about

12   right here.

13       Q.    Have you and your team also -- strike that.  I'm

14   going to put up another graphic here.  This one has the

15   heading DNA Results for 2010.  Do you recognize this?

16       A.    Yes.  Again, it's a map which we have provided

17   previously to the Army Corps of Engineers and has been made

18   publicly available.

19       Q.    And again, does this aggregate data from multiple

20   sampling trips in 2010?

21       A.    Yes, this does for 2010 what the previous map did

22   for 2009.  In addition, this map also indicates in gray any

23   reach that had at least one positive result for 2009, so in

24   this case one can see where there is a yellow overlay, for

25   example, on a gray area, that means that we got positive

1   results both in 2009 and in 2010.

2        Q.    And again, in the upper left-hand corner the color

3   code corresponds to the number of independent sampling dates?

4        A.    Yes, same scheme as used on the previous map.

5        Q.    Okay.  Dr. Lodge, do you recognize what's depicted

6   here?  This is 27 May 2010 Samples Silver Carp Positives?

7        A.    Yes, this is the same kind of depiction for a

8   different area of the waterway, in this case the area of the

9   waterway including the Chicago River, the junction of the

10  Chicago River with Lake Michigan, and then a bit further

11  downstream in the lower photograph, a little bit further

12  downstream in the area of what I believe is called Bubbly

13  Creek.

14       Q.    And the picture, there are two pictures on this

15  slide.  The one at the top is --

16       A.    The one at the top is showing clearly the junction

17  of Chicago River with Lake Michigan, and the one at the bottom

18  is again a bit downstream from that.

19       Q.    And again, so this depicts the fact that on this

20  sampling date in these stretches of the river the samples

21  collected and analyzed by your team showed eight positive

22  detections for silver carp, is that correct?

23       A.    That's correct.

24       Q.    But again, if you, just looking at this sort of

25  simplified thing here, putting back up the DNA results for

1    2010, where are those eight results, where would they be?

2        A.    So those eight results are spread across these two

3    yellow blocks right here.  The lower photograph in the

4    previous slide includes the junction between these two

5    reaches.

6        Q.    Dr. Lodge, I had asked you earlier about inferences

7    that you draw as a scientist from the positive results, and I

8    believe you talked about looking -- I believe you used the

9    word "pattern," perhaps you didn't.

10        In drawing inferences as a scientist from this set of

11    data, have you attempted to summarize or explain how the

12    distribution of data over time and at different locations

13    supports inferences about whether or not live fish of the

14    targeted species were actually present?

15        A.    Yes, from the beginning of the project and

16    especially, of course, as we began to get positive results

17    higher and higher in the waterway or that is, closer and

18    closer to Lake Michigan, we were very concerned that we fully,

19    as fully as possible entertain any alternative explanations to

20    what I regard as the most plausible explanation, the presence

21    of live fish.

22        So we have had numerous meetings, discussions,

23    conversations, about other potential ways in which DNA could

24    be present without the presence of a living fish.

25        Q.    And I would like to turn to those in a moment, but

1    before we do that, I'm going to ask you to identify this

2    graphic I just put up on the screen here.  It has the heading

3    Data Interpretations, Strength of Evidence For Living Fish.

4          First of all, Dr. Lodge, who prepared this?

5          A.    So my team and I prepared this as a way to

6    communicate what, the way we regard the strength of evidence

7    for the presence of living fish.  This format has been used in

8    a variety of presentations and has been made available

9    previously.  I have updated this to reflect all our current

10   results from both 2009 and 2010.

11         Q.    When you say "presentations," would that have

12   included presentations to representatives of the Corps of

13   Engineers?

14         A.    I believe so.

15         Q.    So there is a lot of information here.

16         A.    Yes, the answer to that last question is definitely

17   yes.

18         Q.    Okay.  On the left-hand side you have Strength of

19   Evidence, Stronger and Weaker.  Maybe that's intuitively

20   obvious, but could you explain to the judge what you intend by

21   that?

22         A.    Well, I think again, as -- I mean, the appropriate

23   mind set of a scientist is skepticism.  So from the beginning

24   we have engaged as fully as we possibly could those, both the

25   ideas that we came up with in our own mind about what

1    alternative explanations might exist for the presence of DNA

2    and also those explanations offered by many other parties.

3         So this depicts a way that we began to think about this

4    to sort of formalize our way of thinking about this, and we

5    are simply trying to indicate with that arrow on the left-hand

6    side it's just a relative scale.  I don't regard any of this

7    evidence as weak, for example, but we are saying as more

8    evidence accumulates, the confidence in the interpretation

9    increases.

10        Q.   Okay, let's start from the top.  On the left-hand

11   side it has the legend eDNA Detections Confirmed by

12   Alternative Detection Methods.  Would you explain what you

13   mean by that.

14        A.   So what we mean by that is that in three cases,

15   those listed on the right, under Example Reaches, in this case

16   that's a comprehensive list, not just examples, after very

17   considerable effort using traditional tools, electroshocking

18   or netting or rotenoning, areas where we had previously found

19   positive eDNA results, from those same areas a fish was either

20   captured or seen and identified by experts independent from

21   us.

22        So for example, in Brandon Road pool in August of 2009,

23   we, the first indication that anyone had ever made publicly

24   available, first indication that I'm aware of that either

25   silver or bighead carp existed in Brandon Road Pool, which is

1    the pool below where the electric barrier is, the first

2    indication of the presence of Asian carp there was our

3    positive DNA results reported early on because we, remember,

4    we started our sampling, went from south to north.

5         After extensive electrofishing effort by the management

6    agencies and after conversations while they were in the midst

7    of doing this days long or I can't remember, perhaps a couple

8    weeks of electrofishing effort, we said, "Well, this area over

9    here is where we actually got the, took the water samples that

10   were positive."  They focused their effort there and indeed

11   turned up a silver carp, which was not recovered, was not

12   captured, but I think it was a Fish & Wildlife Service crew in

13   the boat that saw it and they identified it.

14        The second two examples involve the capture of bighead

15   carp.  So again, the first indication in Lockport Pool that

16   Asian carp existed was our positive DNA results.  And on the

17   basis of those, a very extensive effort culminating in

18   rotenoning, an extensive rotenoning effort in December of 2009

19   turned up one bighead carp that was recovered before it died

20   and sank in the canal in the Lockport pool.

21        The latest, the third example up there is the capture of

22   a bighead carp in Lake Calumet in the vicinity of the

23   waterway, which we looked at earlier, where we have repeatedly

24   gotten positive results for bighead and silver carp.  We had

25   not previously gotten positive results in Lake Calumet itself,

1   but in the area both south of and north of O'Brien Lock we had

2   detected one or the other fish.

3        So considering the movements of fishes, I regard all

4   three of these as examples where when motivated by our DNA

5   results, the management agencies launched extensive efforts to

6   in their minds validate our DNA results with traditional

7   methods and indeed, in these three cases they did so.

8        Q.   Okay.  Again, looking at the next couple of

9   categories, the next one down, Positive Samples Over Different

10  Years, what do you mean by that?

11       A.   So what we mean by that is in the waterway sections

12  that I list there are all areas in which we got at least one

13  positive sample in a reach in 2009 and in 2010.

14       Q.   Okay.  Hopefully, the rest are self-explanatory,

15  Repeated Trips With Positive Samples Within A Year and then

16  Multiple Positive Samples from a Single Trip.  Is one of the

17  examples you list there the Chicago River?

18       A.   Yes, in the Chicago River we got, as the earlier

19  aerial photograph that we looked at in the Chicago River

20  section, we got multiple samples in which we recovered silver

21  carp DNA, but all were from a single trip.

22       Perhaps it's important to add too that for most -- well,

23  we have not been to any of these sections very many times, I

24  think four, maybe five in the O'Brien Lock area, but because

25  our goal from the beginning was to define the invasion front

1   and we first wanted to get as broad a coverage of the entire

2   waterway as possible, we moved as rapidly as we could from

3   north to south, but, but recognizing the tension and

4   compromising, if you will, in recognizing the importance of

5   sampling again areas where we had positives in order to gain

6   confidence and particularly under the suggestions of the

7   management agencies to gain confidence in the fact that there

8   were repeatable results present there and the management

9   agencies also saw it as important that if they were going to

10  consider management actions that it would be important that

11  there be repeated samples there and that those positive

12  results be as close in time to any contemplated management

13  action as possible.

14       Q.   In that regard you testified a few minutes ago about

15  in the uppermost column, that is, observations of fish in

16  areas that were at or near where you had had positive eDNA

17  detections, Dr. Lodge, you're aware, are you not, that in I

18  believe it was approximately May 20th of this year a netting

19  and then a rotenoning effort was carried out in the Chicago

20  Sanitary Ship -- excuse me, the Cal-Sag Channel?

21       A.   Yes.  So there are, depending on what criteria one

22  uses, one could say that there are three other instances in

23  which extensive deployment of traditional tools were motivated

24  in the same way as the examples that I provide up here, but in

25  those other three cases no Asian carp was recovered.

1      I refer there to an effort early on in the I&M Canal, but

2   I would qualify that by saying that I believe our previous two

3   sampling efforts in the I&M Canal had actually not uncovered

4   any positive results, but we had found positive results at an

5   earlier time.

6      Then there is an effort in the Wilmette region, the North

7   Chicago River region in which an extensive netting, at least

8   netting, I'm not sure whether electroshocking was part of that

9   also.

10     Q.   Do you want to indicate just where?

11     A.   We are talking about this area up here, the North

12  Shore Channel area, below the Wilmette pumping station in

13  which we had gotten repeated silver positives.

14     In that case -- however, again, the placement, the

15  deployment wasn't really exactly in the area where we had seen

16  the positive hits.

17     And then the third example would be the extensive effort

18  of netting and again I believe electroshocking in the Calumet

19  River region down here this spring.  But again, it was, the

20  effort was in an area where we had previously gotten

21  positives, but the two previous sampling trips had provided

22  only negative results.

23     Q.   Let me just be clear on that just temporally.  So if

24  I understand your testimony, you're saying that the area where

25  this rotenone and netting operation occurred in May of this

1    year, these were a stretch of the river or reach of the river

2    where you had in the past positive samples, correct?

3         A.   Yes.

4         Q.   But had you -- what were the results of the most

5    recent eDNA sampling effort in that same area?

6         A.   The two sampling occasions that were closest in time

7    to the netting effort had produced no positive DNA results.

8         Q.   Dr. Lodge, you touched on this earlier and I want to

9    go back to it because it is I think quite significant in the

10   context of some of the disputed issues in this case, and that

11   is you have testified that in your view the most plausible

12   inference that you draw from a positive detection for either

13   species is the relatively recent presence of a live fish in

14   the vicinity, but you have also said that you and your

15   colleagues have considered other explanations, correct?

16        A.   Yes.

17        Q.   Okay.  Let me just walk through some of those that

18   have been publicly discussed.  One of them has been the

19   suggestion that it's possible that DNA or genetic material

20   from one or both of these species could have been transported

21   north of the -- or that is lakeward of the dispersal barrier

22   system in ballast water on a barge or vessel.  Are you

23   familiar with that hypothesis?

24        A.   Yes, we have considered this, pursued it as much as

25   we could, short of actually taking samples from ballast, which

1    we have suggested but have not had the opportunity to do.  We

2    have had meetings, members of my team, not I personally, but

3    members of the team have had meetings with barge operators,

4    joint meetings with the Coast Guard, for example, to discuss

5    their practices and how plausible such a mechanism might be to

6    transport water that might have DNA in it from south of the

7    waterway northward, and in light of those discussions and in

8    light of a U.S. Coast Guard provision, which I believe may

9    first have been voluntary, but then I think became mandatory,

10   that barges not transport ballast water from south in the

11   waterway to northward.

12        It seems very, very unlikely to us and to the navigation

13   industry representatives to whom we have talked that that's a

14   plausible explanation for DNA transport.  Remembering also

15   again the degradation rate of DNA would be another

16   consideration in that.

17        Q.    And with respect to I believe you testified earlier

18   that among the places that you and your team have had positive

19   detections for one of the Asian carp species are in a reach in

20   the vicinity of Wilmette or in the North Shore Channel, is

21   that correct?

22        A.    Yes, that's correct.  In fact, that area where we

23   have had repeated samples, the area to which we are referring

24   is up here, that area in which we have had repeated positive

25   results for silver carp is an area in which there is never any

1    barge traffic.  So at least in that area where there have been

2    repeated positive results for silver carp, it can't possibly

3    be the case that transport of bilge or ballast water is an

4    explanation.

5        Q.    I believe another alternative explanation for the

6    presence of genetic material from these species is discharge

7    from wastewater treatment plants or sewage treatment plants.

8    Are you familiar with that suggestion?

9        A.    Yes, and again, we have pursued this as much as we

10   could.  Without having the opportunity to take samples

11   directly from the effluent of the sewage treatment plants, we

12   have sampled in the waterway as close as possible to the

13   outflow from those plants.

14       There are four major sewage treatment plants in the

15   Chicago area, and we have sampled in the vicinity, as close as

16   we could, I believe in some cases multiple times and have

17   never gotten a positive in the samples taken closest to the

18   effluent of the sewage treatment plant.

19       Q.    Go ahead.

20       A.    It is also likely unlikely that one would still have

21   the DNA of a fish present after the extensive biological

22   processing that occurs in a sewage treatment plant and in fact

23   is part of the design of a sewage treatment plant is to

24   degrade compounds.

25       So it's first of all, just on first principles highly

1    unlikely that DNA would survive transport, survive the

2    duration and processing of a sewage treatment plant.

3        But again, the most direct answer I can provide for that

4    is we have taken samples repeatedly as close as possible to

5    those effluents and have never gotten a positive in the

6    samples closest to the effluent.

7        Q.    Another alternative hypothesis that has been

8    discussed publicly for the presence of bighead or silver carp

9    eDNA in the Chicago Area Waterway System is the theory that

10   it's possible that a bird or birds had eaten the remains of a

11   portion of one of these fish, digested it, and then excreted

12   that and that some genetic material would thereby enter the

13   water column.

14       Are you familiar with that hypothesis?

15       A.    Yes.  Again, I have had lots of conversations and

16   thinking and brainstorming about this, but again, without the

17   opportunity to directly test the plausibility of this, we have

18   to rely on indirect evidence and the literature of previous

19   studies of gut passage of DNA.

20       So I first of all say that it is possible, it has been

21   documented multiple times, for some DNA to survive gut passage

22   in, that is, DNA of something that was consumed, an organism

23   that was consumed can survive gut passage, but it's not much

24   of the DNA and it's -- so first of all, you could not possibly

25   be talking about large quantities of DNA, and considering the

1    dilution factors that we would be thinking about in any parts

2    of the waterway, the large volumes of water we are dealing

3    with, that would be one just on first principles Way of

4    thinking about it and I would conclude it's unlikely that that

5    could happen.

6          Secondly, I would say we would have to be thinking about

7    where in fact the gulls would find carp to eat and how likely

8    that is to happen and produce the pattern, the pattern

9    repeated in space and time that we see in the canal.

10          Our field team has, of course, with this possible

11   alternative explanation in mind has tried to observe the

12   occurrence of gulls, which would be the most likely suspect in

13   the waterway, and see no evidence of any repeated pattern of

14   the occurrence or abundance of gulls that would in any way be

15   consistent with the patterns that we see.

16          Having said that, I would certainly say that this could

17   benefit from some more observations and experiments, but on

18   first principles and on the observations that are available in

19   the field, and on the basis of the lack of evidence for this

20   that anyone who has promoted this idea has provided, I

21   conclude with some confidence that it's highly implausible as

22   an explanation  for the overall pattern of positive results

23   that we see.

24          Q.    Another hypothesis that has been mentioned publicly

25   is that the genetic material is present in the waterway above

1  the barrier as a result of the release of bait fish, that is

2  fish, juvenile fish of one or both of these species that would

3  have been collected or used by a fisher and then dumped or

4  released into the water.  Are you familiar with that

5  hypothesis?

6  　　　A.　　Yes, although I would put that in a different

7  category of explanations.  That's an explanation potentially,

8  an alternative explanation for how living fish might have

9  gotten north of the electric barrier.  But in that case we

10  would be talking about, there are living fish being present,

11  it's just a question of how they got there.  So that's not so

12  much an explanation for how DNA might be present without a

13  living fish being present.

14  　　　Q.　　And similarly, it has been suggested that it's

15  possible that fish or one of both of these species were the

16  product of what's referred to as a cultural release, that is,

17  intentional release by a human of a fish for some cultural or

18  other purpose.

19  　　　A.　　Yes, again, it's well documented in scholarly

20  papers, book chapters, and well-known for people who have

21  spent time in Asia, especially, that in some Asian cultures in

22  particular, that there is a practice of releasing out of a

23  respect for living organisms, a practice of occasionally

24  releasing.  This is sometimes referred to as prayer release

25  sometimes as ritual release.

1      It's also, of course, true that people for many reasons

2   occasionally release fish out of any number of motivations.  I

3   could speak for myself as a kid having moved a number of

4   organisms around, and I suspect others in the courtroom could

5   also.  So this wouldn't be limited to prayer release or

6   cultural release, but it is true -- the main point here is

7   that yes, of course, people could introduce fish north of the

8   barrier.

9      Again, that's a possible explanation for how living fish

10   could be present.  It's not getting at the reliability of eDNA

11   as the presence of living fish, it's just an explanation for

12   how living fish could be up there.

13      So I think that's possible explanation.  Again, I can't

14   really evaluate it except with respect to this.  It is an

15   unlikely explanation for the occurrence of silver carp.  It is

16   a potentially better explanation, though none of us can say

17   with great confidence how good an explanation, it's not a good

18   explanation for silver carp, possibly for bighead, but not

19   silver, because silver carp, and I take from Dwayne Chapman

20   and others who know the aquaculture industry and other fish

21   markets better than I, that silvers are not raised in the way,

22   in the numbers and frequency that bighead carp are, and they

23   are, they are rarely, if ever, available for anyone who might

24   be so inclined to release a fish for whatever reason.

25      So it's a possible explanation for big heads, but not for

1  silver, but again, it's a possible explanation for how living

2  fish could be above the barrier.

3  BY MR. REICHEL:

4      Q.   But it wouldn't negate -- they would be living fish?

5      A.   Living fish.

6      THE COURT:  Mr. Reichel, if you get to a logical

7  stopping point, we are probably at a good time to take a

8  break, any time in the next couple of minutes.

9      MR. REICHEL:  Let me just do one more on this line.

10     THE COURT:   Sure.

11     MR. REICHEL:  Actually, your Honor, I think where I'm at

12  right now is a logical stopping point.  I am approaching the

13  -- I do have unfortunately some additional questions, not

14  unfortunately, but in all candor I --

15     THE COURT:   That was my next question for you is how

16  much more on direct do you anticipate ballpark?

17     MR. REICHEL:  20 minutes to a half hour.

18     THE COURT:   Okay, very good.  Let's start up again at

19  1:30, and we won't put Dr. Lodge under oath again, we will

20  just remind you that you remain under oath and you will be so

21  when you come back, okay?

22     THE WITNESS:  Thank you, your Honor.

23     THE COURT:   Very good.  Okay, thanks a lot everybody.

24  See you at 1:30.   Thank you.

25         (Recess to 1:30 p.m.)

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   STATE OF MICHIGAN, et al.,    )
                                   ) Docket No. 10 C 4457
 4              Plaintiffs,        )
                                   ) Chicago, Illinois
 5        v                        ) September 7, 2010
                                   ) 1:30 p.m.
 6   UNITED STATES Army Corps of   )
     Engineers, et al.,            )
 7                                 )
                Defendants         )
 8

 9     TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
                           VOLUME 1B
10           BEFORE THE HONORABLE ROBERT M. DOW, JR.

11   PRESENT:

12   For Plaintiff
       State of Wisconsin:    CYNTHIA R. HIRSCH
13                            Wisconsin Department of Justice
                              17 West Main Street
14                            Madison, Wisconsin  53703

15   For Plaintiff State of
      Michigan:               ROBERT P. REICHEL
16                            LOUIS B. REINWASSER
                              DANIEL BOCK
17                            Michigan Department of Attorney
                                General
18                            525 West Ottawa Street
                              Lansing, Michigan  48933
19
     For Plaintiff State of
20    Minnesota:              DAVID P. IVERSON
                              STEVEN M. GUNN
21                            Minnesota Attorney General's Office
                              445 Minnesota Street, Suite 900
22                            St. Paul, Minnesota   55101

23   For Plaintiff           JOHN B. DELONE
     Commonwealth of         Pennsylvania Office of
24    Pennsylvania:            Attorney General
                              15th Floor, Strawberry Square
25                            Harrisburg, Pennsylvania  17120
```

```
 1
      PRESENT:   (Cont'd)
 2
      For Plaintiff State of     LEE ANN RABE
 3      Ohio:                    Office of the Attorney General
                                 State of Ohio
 4                               30 East Broad Street
                                 Columbus, Ohio  43215
 5
      For Defendant United States MAUREEN E. RUDOLPH
 6      Army Corps of Engineers:  MATTHEW M. MARINELLI
                                 Department of Justice
 7                               Environmental and Natural
                                   Resources Division/NRS
 8                               601 D Street, NW
                                 Washington, DC  20004
 9
                                 ANN DANSON NAVARO
10                               U.S. Army Corps of Engineers
                                 U.S. Department of Justice
11                                 (Special Attorney)
                                 550 Main Street
12                               Suite 10032
                                 Cincinnati, Ohio 45202
13
      For Defendant Water
14      Reclamation District:    RONALD M. HILL
                                 BRENDAN G. O'CONNOR
15                               LISA LUHRS DRAPER
                                 Metropolitan Water Reclamation
16                               District of Greater Chicago
                                 100 East Erie
17                               Chicago, Illinois  60611

18    For City of Chicago:       MORTIMER P. AMES
                                 GRAHAM G. MC CAHAN
19                               City of Chicago, Law Department
                                 Corporation Counsel
20                               30 North LaSalle Street
                                 Suite 1020
21                               Chicago, Illinois  60602

22    For Coalition to Save
        Our Waterways:           DAVID L. RIESER
23                               McGuire Woods LLP
                                 77 West Wacker Drive
24                               Suite 4400
                                 Chicago, Illinois  60601-7567
25
```

```
 1   PRESENT:  (Cont'd)

 2

 3

 4   For Wendella:              STUART P. KRAUSKOPF
                                KURT A. KAUFFMAN
                                The Law Offices of Stuart P.
 5                                 Krauskopf
                                414 North Orleans Street
 6                              Suite 210
                                Chicago, Illinois  60654
 7
     For Grand Traverse:        WILLIAM RASTETTER
 8                              Olson, Bzdok, & Howard P.C.
                                420 East Front Street
 9                              Traverse City, Michigan 49686

10

11

12
     Court Reporter:            Lois A. LaCorte
13                              219 South Dearborn  Room 1918
                                Chicago, Illinois 60604
14                              (312) 435-5558

15

16

17

18

19

20

21

22

23

24

25
```

 1          THE COURT:  Good afternoon, everybody.  Dr. Lodge, if

 2     you want to come back and resume the witness stand, that would be

 3     great.  Thank you.

 4          Okay, Mr. Reichel.  I'm sorry, I'm organizing all my

 5     paper here.

 6          MR. REICHEL:  Whenever you're ready to proceed, your

 7     Honor.

 8          THE COURT:  Okay, very good. We are ready to proceed

 9     then, Mr. Reichel.

10          MR. REICHEL:  Thank you, your Honor.

11          THE COURT:  Thank you.

12     BY MR. REICHEL:

13     Q.  Dr. Lodge, I have asked you a series of questions earlier

14     today about inferences that you draw from positive eDNA results.

15     Now, you have also testified that you and your team took several

16     hundred samples over the last few years and that obviously a

17     number of those were negative.

18          So let me ask you now in a general way as a scientist

19     and the person, the team that's developed the application of this

20     method, what inferences do you draw from a negative result from

21     an eDNA sample using the method that you have used here?

22     A.  Well, I think regardless of the surveillance method that's

23     employed, traditional tools or eDNA, a negative is always going

24     to be a more ambiguous result than a positive, that is, a

25     negative is always subject to detection limits and the evidence

1  in comparing the different traditional and eDNA tools as we have

2  discussed earlier today suggest that eDNA is a more sensitive

3  tool, that is, it has a more sensitive detection limit.  However,

4  a negative still does not, we can't have confidence necessarily

5  that a negative means absence, it simply means there is not

6  enough DNA for us to detect.

7  Q.  In the particular sample that you have collected?

8  A.  In the particular sample.

9  Q.  And now, you have testified that again, a number of samples

10  were taken at various locations or reaches within the Chicago

11  Area Waterway System, but despite that fact, would it be accurate

12  to say that that there was a substantial portion of the water

13  body contained within the Chicago Area Waterway System that has

14  not been sampled by your team at any point?

15  A.  Yes.  At the broadest scale, the areas in the east, most

16  eastern part of the waterway in Indiana have been sampled the

17  least.  I indicated earlier that we are in the process of

18  analyzing some samples from that region, but I would also say

19  more generally that it's a very large waterway and although we

20  have taken on the order of 1,500 samples to date, that is still

21  quite in some sense a spotty coverage for such a large waterway.

22  Q.  Just to back up, just so the judge understands, your comment

23  a moment ago about the eastern most areas, could you indicate

24  generally the region you're referring to?

25  A.  So we are talking about the areas over here.

1  Q.  So the record could reflect, you were circling an area that's

2  depicted, Grand Calumet River and Little Calumet River toward the

3  right-hand side, is that --

4  A.  Correct.

5         THE COURT:  And just so I can be clear, there is a line

6  that goes down from, does it say Calumet River right in the lake

7  there?  That line is the Indiana border, is that right?  Yes,

8  that one right there, is that the Indiana border?  Right there.

9  That kind of looks like -- that looks like Will County there, and

10  Will County goes to the border.  That's the Indiana border?

11         MR. REICHEL:  That's my understanding, your Honor.

12         THE WITNESS:  I believe that's correct also.

13         THE COURT:  Okay, I just want to make sure I have got

14  my geography down here.  Thank you.

15  BY MR. REICHEL:

16  Q.  Before we took a break, you had also testified about your

17  interpretation of the data collected at different times and

18  locations within the waterway system and inferences you drew

19  about that, the strength of inferences that you drew with respect

20  to the likely presence of live fish.

21         Let me just put a couple of other things up here and ask

22  you to identify them.  Do you recognize this, Dr. Lodge?

23  A.  Yes, this is a table that my team and I prepared to indicate

24  for each of the reaches in the upper CAWS region what the level

25  of evidence we have gathered from DNA analysis about the presence

1  of eDNA indicating the presence of fish.

2  Q.  So, for example, the left-hand column has these abbreviations

3  that correspond, correct, to the reach designations we talked

4  about earlier?

5  A.  Yes.

6  Q.  The next column is Sampling Dates?

7  A.  Yes.

8  Q.  And then the next one is the sampling result, either no

9  detection, positive detection, et cetera?

10  A.  Yes, that column is results by date by sampling episode.

11  Q.  And the right-hand column, Evidence of Presence, do these

12  descriptions relate to the right-hand column in that other

13  diagram you put up?

14  A.  Yes, so these descriptions relate directly to the diagram

15  that we looked at earlier about what we regard as the strength of

16  evidence for the presence of fish.

17  Q.  This looks a little bit similar, but do you recognize what

18  this is, Dr. Lodge?

19  A.  Yes, this is an abbreviated version of the same table we just

20  looked at.  What is missing from this table with respect to the

21  previous table is all the reaches in which we never got a

22  positive detection in, in either year in which we have taken

23  samples, 2009, 2010.

24  Q.  So the second table is essentially a subset of the preceding

25  one?

1  A.  This is a subset of the previous one focusing exclusively on

2  those reaches in which we have found at least one positive result

3  for at least one species at least one time.

4  Q.  And again, Dr. Lodge, so the record is clear, what you have

5  tabulated here or what are tabulated in these last two figures

6  are date that you did, you or your team reported to the Corps of

7  Engineers over time, is that correct?

8  A.  Yes, that's correct. These tables are updated versions of

9  tables that have previously been provided to the Corps.

10  Q.  Okay.  But for example, earlier I had shown you what was

11  provisionally admitted as Plaintiffs' Exhibit 1.  These tables

12  were not in that in that document, were they?

13  A.  Remind me what Exhibit 1 was.

14       MR. REICHEL:  I'm sorry.  May I approach, your Honor?

15       THE COURT:   Sure.

16       THE WITNESS:  No, the tables that we just looked at, I

17  believe they do not occur in here.  They were rather part of our

18  series of regular reports to the Army Corps of Engineers.

19  BY MR. REICHEL:

20  Q.  Right, so the document I just handed you, Dr. Lodge, has a

21  reference to the fact that you submitted these regular reports,

22  but it does not contain the data itself.

23  A.  Correct.

24       MR. REICHEL:  Your Honor, just in the interest of

25  completion or clarity of information we presented here, although

1   I initially described these as demonstrative, I think to assist

2   the court in reviewing the evidence what I propose to do is to

3   collectively mark this series of 12 slides or overheads that I

4   projected here to the witness as Plaintiff's Proposed Exhibit 2

5   to be offered into evidence.

6           THE COURT:  Okay, any objection to that counsel?

7           MS. RUDOLPH:  One minute, your Honor.

8           THE COURT:  Oh, sure, absolutely.

9           (Pause)

10          MR. REICHEL:  I guess I should say Plaintiff's Proposed

11   Group Exhibit 2.

12          THE COURT:  Right.

13          MR. RIESER:  I'll interpose the same objection.  Some of

14   this material is, within this group exhibit is, has been seen

15   before and has been part of a number of older reports.  Some of

16   this material is new and may be objectionable based on further

17   discussion with Dr. Lodge.

18          THE COURT:  Okay.

19          MS. RUDOLPH:  I'm sorry, your Honor, one moment, please.

20          THE COURT:  Sure, that's fine.  I don't know what you

21   guys have seen before and what you haven't, which is why I'm

22   inquiring at this point.

23          MS. RUDOLPH:  Your Honor, I think we would also like the

24   opportunity to check in with our experts and see if this also

25   reflects what has previously been submitted to the Corps of

1  engineers, but that's something we can get back to the court

2  later on.

3         THE COURT:   That's fair enough.  I mean, when we are

4  not in preliminary injunction mode, of course, I would have

5  everybody clear their demonstratives with each other and you

6  would have an opportunity to see exhibits and object to them.  I

7  think because we are a bit more on the fly here, given the press

8  of time, what I'll do is the same thing I did with the previous

9  one, which is to provisionally admit it subject to objection

10  later if you all after you have had a chance to review the

11  documents find something objectionable.  Obviously, because it's

12  a bench trial scenario, if there is a reason to strike the

13  exhibit later, I can do it, okay?

14         MR. RIESER:   Thank you, your Honor.

15         THE COURT:   It will be helpful to me to have these

16  collected in one place in the event that some or all of them are

17  admissible and useful.  I thank you for that, Mr. Reichel.

18         MR. REICHEL:   Thank you, your Honor.

19  BY MR. REICHEL:

20  Q.  Dr. Lodge, I would like to now turn to a subject broader than

21  just the eDNA data that we have been discussing here.

22         Having been involved in the subject of this potential or

23  the movement of these two species through Illinois waterways and

24  their detection, as you have testified earlier, in the Chicago

25  Area Waterway Systems, I would like to ask you to consider three

1  things.  First, the available information that you have testified
2  to earlier about the presence of populations of bighead and
3  silver carp in the Illinois waterways that are connected to the
4  Chicago Waterway System, number one; number two, the eDNA data
5  that you and your team have collected and analyzed; and third,
6  and you have touched on this earlier, the actual observation or
7  detection on three occasions that you talked about earlier of
8  individual numbers of bighead or silver, depending on the
9  circumstances, at the three locations you described earlier.
10          Looking at those data collectively, and based upon your
11  training and experience as a biologist who focuses on invasive
12  species, have you reached any conclusion as to whether or not the
13  conditions that exist today present a risk that additional
14  bighead or silver carp may migrate from the Chicago Area Waterway
15  System into Lake Michigan or other waters connected to it?
16          MR. RIESER:  I'm sorry, your Honor, I object.  It
17  contains a statement about additional fish migrating and there
18  isn't evidence of any fish migrating, simply the identification
19  of eDNA data.
20          MR. REICHEL:  Can I rephrase?
21          THE COURT:  You can rephrase the question because I
22  guess it's just the "into Lake Michigan" is where there is no
23  evidence at this point, right?  Is that the nature of your
24  objection?
25          MR. RIESER:  And the migration itself.

1          THE COURT:  Well, I'll sustain the objection as to the

2    "into Lake Michigan."  You can rephrase the question I'm sure,

3    though.

4          MR. REICHEL:  Thank you, your Honor.

5          THE COURT:  Sure.

6    BY MR. REICHEL:

7    Q.  Well, Dr. Lodge, let me turn to the focus of that objection.

8    Based upon the eDNA data that you have looked at, have you --

9    what inference, if any, do you as a scientist draw about whether

10   or not one or possibly more silver carp have entered Lake

11   Michigan from the Chicago Area Waterway System?

12   A.  We have rarely sampled in the lake itself.  Really, never has

13   the lake proper been a focus of sampling.  However, one of the

14   positive results which was displayed earlier, that in Calumet

15   Harbor, was in a location that is in a slip in Calumet Harbor and

16   open to Lake Michigan, so depending on one's definition of the

17   boundary of Lake Michigan, one could argue that that positive

18   result is in fact in Lake Michigan.

19          In addition, I would say are multiple positive hits of

20   silver carp in the area above O'Brien Lock in that same general

21   stretch of waterway and the capture of the bighead carp in Lake

22   Calumet demonstrate in the case of bighead carp, and I would be

23   tempted to say the same thing for silver carp, certainly positive

24   DNA results I would infer indicate the presence of living silver

25   carp in both cases, then we have species with access, unimpeded

1  access to Lake Michigan, that is, there is no physical barrier

2  between the location of the fish and Lake Michigan.

3  Q.  Going back to the question I posed earlier, let me try to

4  restate it in slightly different terms.

5         Based upon the available data that you have that we

6  talked about, have you formed an opinion as to whether or not

7  there is a risk under present conditions that individual bighead

8  and/or silver carp may migrate from the Chicago Area Waterway

9  System into Lake Michigan and connected waters?

10 A.  Yes, I think there is a risk, a very urgent and imminent risk

11 of invasion given the demonstrated presence of bighead carp with

12 unimpeded access to Lake Michigan and the indication from eDNA

13 that the same situation applies to silver carp.

14 Q.  And Dr. Lodge, as was noted earlier, you have previously

15 testified in a different forum, not in a court case, but before a

16 congressional committee that was dealing with the subject of

17 Asian carp, if you recall, in February of this year.

18        Do you recall that testimony, sir?

19 A.  Yes.

20 Q.  I'm not going to ask you to repeat it, but one of the topics

21 that you addressed at that time, sir, was I think under the

22 heading of Science Based Management Actions related to this

23 issue.  Do you recall testifying on that subject?

24 A.  I do.

25 Q.  Okay.  First of all, again, I think you touched on this

1 earlier in describing your professional work, but I believe as a

2 scientist, has part of your work in recent years related to

3 efforts to make available scientific information to decision

4 makers as to guide or provide information to decision makers

5 about options that may address issues involving invasive species?

6 A.  Yes, I think I referred earlier to one of the primary

7 motivations of the creation of the Center For Aquatic

8 Conservation and more broadly many research projects that I have

9 led or been involved in in recent years has been to tailor our

10 research questions in a way that is most relevant to natural

11 resource management and policy needs and to communicate those

12 results and to partner and collaborate and cooperate with all the

13 relevant stake holders to maximize the probability of our

14 information being used appropriately to make management and

15 policy decisions.

16 Q.  And from your perspective as a scientist and a specialist in

17 invasive species, given the risk that you testified to a moment

18 ago, what -- I believe you used the word "urgent."

19        What would you describe as the goal or goals of actions

20 that you believe would be urgently needed in this situation with

21 respect to the issue of potential invasion of the waters by these

22 species?

23 A.  Well, let me say first of all, there is a large body of

24 literature in which I have participated, authored or co-authored

25 by biologists and economists which recognize as a general

1 principle that preventing spread or preventing invasion in the

2 first place is a far more cost effective strategy for society

3 than waiting for invasions to happen.

4      One of the reasons this is true in general is that

5 invasions are unfortunately in our rich experience in the United

6 States and elsewhere, including the Great Lakes, invasions are

7 too often irreversible, that is, we simply don't have the

8 technology or even when we have the technology and know-how, we

9 often don't have the resources necessary to control or eradicate

10 an invasion.

11      So with that general well-established principle from the

12 literature in ecology and economics, there has been, I believe, a

13 shared goal by all the management agencies involved to prevent

14 the invasion of the Great Lakes by silver and bighead carps.

15      Given that principle and that goal, then the theory of

16 population biology, and a theory which is well validated

17 empirically, suggests that the mechanism to prevent an invasion

18 is to minimize the number of individuals and the number of times

19 that individuals have the opportunity to escape or release into

20 the environment that we are worried about.

21      So in practical terms, what that means is that if the

22 goal is to prevent invasion in the Great Lakes, then any step

23 that would minimize the number of individuals of silver or

24 bighead carp gaining access to Lake Michigan should be

25 considered.

1  Q.  So let me ask you a series of specific questions.  To the

2  extent that there today exists physical structures between

3  elements of the Chicago area waterway system and Lake Michigan,

4  let me give you a specific example, sluice gates in water control

5  structures such as the Chicago Lock and Dam and the Wilmette

6  pumping station and the O'Brien Lock and Dam, that under certain

7  conditions are open to allow water to pass in or out, would a

8  measure such as installing physical barriers such as grates or

9  screens over such openings, would that be a measure that could

10  reduce the risk of additional individuals of either species that

11  may be present south of those locations from, reduce the risk

12  that they would enter Lake Michigan?

13          MR. HILL:  Judge, I would like to object to that

14  question.  I'm not sure this witness is qualified to talk about

15  the grates and screens on the sluice gates.  He is not an

16  engineer, he is a biologist.

17          THE COURT:  Why don't we start by asking what he knows

18  about sluice grates and screens.

19          MR. REICHEL:  Fair enough.

20  BY MR. REICHEL:

21  Q.  Dr. Lodge, you are not an engineer, are you, sir?

22  A.  Correct.

23  Q.  Are you generally familiar with what I mean when I talk about

24  about a sluice gate?

25  A.  Yes.

1  Q.  Are you generally familiar with the concept of a metal screen

2  or grate with openings in it that while they would allow water to

3  pass would impede the passage of at least fish of a certain size;

4  are you familiar with that kind of structure?

5  A.   Yes.  While I am not familiar with the details of those in

6  the Chicago Area Waterway, I have certainly seen such structures

7  in power plants and so forth and am familiar with the concept and

8  the structures in general.

9  Q.  Given at least the general level of that familiarity, is it

10  your understanding that that kind of device would be an example

11  of a measure that could reduce the risk of additional individual

12  bighead or silver carp from transiting through such a sluice

13  gate?

14  A.   Yes, of course.

15  Q.   Similarly, you're aware obviously that at two locations,

16  Chicago Lock and Dam and the O'Brien Lock and Dam, that there are

17  currently a series of locks that are controlled and operated by

18  the Corps of Engineers, you're aware of that general fact?

19  A.   Yes.

20  Q.   And again, recognizing you're not an engineer, do you

21  understand that those locks have gates that open and shut?

22  A.   I'm sorry, back up a minute.  The Army Corps of Engineers

23  controls some of those structures and the Water Reclamation

24  District controls, my understanding, is the Wilmette.  I wasn't

25  sure which of those you specified.

Q.   Okay, let me be clear.  The question I'm asking now is limited, it does not refer to Wilmette.  It's referring to the actual locks, that is, the structures through which vessels, for example, may pass?

A.   Okay.

Q.   Are you aware, Dr. Lodge, that each of those sets of locks has gates in them that open and shut?

A.   Yes.

Q.   Again, applying the principle you described earlier, assuming that if the gates were in a shut position, do you believe that that would, or maintained in a shut position, I should say, do you believe that that would be an example of a measure that could reduce the risk that additional bighead and silver carp could migrate to the other side of the lock?

MR. RIESER:  Your Honor, I really have to object.  This is going way beyond what Dr. Lodge is expert in, doesn't, I think, he will readily admit he doesn't know about the gates, whether they open and shut, whether they even if shut would preclude the movement of Asian carp that has been cited by a number of different people, and it's way outside the area of his expertise.

And I'm sorry for objecting because I understand the latitude that you are providing, but I submit that this is beyond where the direction of his testimony or is what his expertise is.

THE COURT:  As I understand it, his expertise has to do

1  with the fish themselves.  He may not be an expert on the locks,

2  but he understands how big the fish are, and I suppose he could

3  make -- I'm going to overrule the objection.  Obviously, you can

4  cross-examine him on this.

5           MR. RIESER:  Sure.

6           THE COURT:   I certainly would acknowledge it goes to

7  weight for sure, and when I weigh this testimony, I'll weigh it

8  in light of his expertise, but I'm not convinced that he doesn't

9  know anything here that could be helpful to the trier of fact.

10          You can go ahead and answer the question.

11          MR. REICHEL:  Do you remember the question, Dr. Lodge?

12          THE WITNESS:  Yes.

13 BY THE WITNESS:

14 A.  Let me just say that fish cannot swim through physical

15 barriers.  whatever the nature of a barrier, if the openings are

16 smaller than the fish, then it seems highly unlikely, indeed

17 impossible, for a fish to swim through it.

18 Q.  And on the subject of physical barriers, are you familiar

19 with what's called a block net?  Do you know what that is?

20 A.  Yes.

21 Q.  And what do you understand that to be?

22 A.  Well, I mean in general, again, I may not be familiar with

23 the particulars of deploying it in the way that it has been or

24 considered, but it's a net simply designed to prevent the

25 movement of fish.  For example, in a rotenoning episode, if you

1 want to limit the movement of fish in preparation for applying a

2 poison, this has been used in some of the episodes, in addition,

3 such a thing could be used to prevent access to whatever area of

4 the waterway that you wanted in principle.

5 Q.  And again, this would fall within -- would this fall within

6 the general category of a physical barrier that you talked about

7 earlier?

8 A.  Yes.

9 Q.  I think you have alluded to this earlier and perhaps this is

10 self-evident, but I'll ask anyway.  You're aware that, and you

11 have testified that under at least a couple of occasions in the

12 last, less than a year, in certain segments of the Chicago Area

13 Waterway System, the fish poison rotenone was applied in a couple

14 stretches of the waterway, are you aware of that?

15 A.  Yes.

16 Q.  Okay.  And again, as a scientist, do you have knowledge as to

17 whether or not the application of rotenone can in the area where

18 it's applied, at least during the time that it's applied, can

19 that have the effect of killing bighead and silver carp?

20 A.  Yes.  Rotenone is a standard toxin that's been used for

21 generations of fisheries biologists to kill fish.

22 Q.  Dr. Lodge, you have also, going back to your congressional

23 testimony of earlier this year, you also testified at least

24 briefly on the subject of the potential impact from an ecological

25 perspective of the invasion or establishment of a reproducing

1  population of bighead or silver carp in the Great Lakes or

2  connected waters, did you not?

3  A.   Yes.

4  Q.   Now, you're aware, are you not, sir, that there have been --

5  there has been some -- strike that.

6        Based upon your review of the available information, to

7  you as a scientist, do you have the -- what is your

8  understanding, if any, as to whether or not there exists within

9  the Great Lakes, let me just start specifically with Lake

10 Michigan, there exists within Lake Michigan any portions of the

11 lake or waterways connected to it that have the potential to

12 support the continued presence of bighead or silver carp?

13 A.   Certainly, the best documented waterway that is connected to

14 Lake Michigan that supports abundant silver and bighead carp is

15 the Illinois River connected to the Chicago Area Waterway System.

16 Q.   And I guess let me ask you this, a different question.  If

17 bighead or silver carp enter Lake Michigan, just assume

18 hypothetically, I'll just state this as a hypothetical question,

19 from the Chicago Area Waterway System, to your knowledge as a

20 scientist are there any portions of the Lake Michigan or other

21 waterways connected to it other than the Illinois River that

22 would have the potential to support the continued presence of

23 bighead or silver carp?

24 A.   The best review of evidence and scientific knowledge about

25 the fish, which is encompassed in a book edited by Cindy Kolar

1  and Dwayne Chapman and others in 2007, identifies 22 rivers on

2  the U.S. side of the Great Lakes, these are all the Great Lakes,

3  that at least meet a rule of thumb, for lack of better

4  information about having an unimpeded link sufficient to support

5  reproduction of bighead and silver carp, the river closest to

6  southern Lake Michigan, closest to the connection between the

7  Chicago Area Waterway and Lake Michigan that meets at least that

8  criterion is the St. Joseph River, which has its mouth in

9  Michigan, but it runs also through northern Indiana.

10 Q.  Dr. Lodge, going back to the issue of the risk that you

11 described earlier of the potential for individual bighead and

12 silver carp to enter Lake Michigan or other connected waterways

13 from the CAWS, from a temporal standpoint, in other words, if

14 the, that risk continues over time, how does that to you as a

15 scientist affect your estimate of the risk that what you have

16 termed an invasion may occur?

17 A.  The more individuals that enter the lake, the more likely it

18 is that a population will become established.  What biologists

19 mean, what I mean when we say "established" is that Joe and Jane

20 Carp can find each other at the right time in the right place and

21 successfully reproduce and that those young will be produced in

22 sufficient numbers that they will survive long enough and

23 numerous enough to again reproduce.  So by "establish" we mean a

24 self-sustaining reproducing population.

25         What we would dearly like to know as biologists is

1  exactly what the relationship is in mathematical terms between

2  the number of individuals that were to gain access to an

3  ecosystem of concern, in this case Lake Michigan, and the

4  probability of this establishment happening.

5  　　　　We know that for very, very few species and

6  circumstances, and we certainly do not do not know it for either

7  silver or bighead carp in the Lake Michigan environment, what we

8  therefore have to fall back on is just what we know from theory,

9  that there is a positive relationship between the number of

10  individuals and the probability of a population establishing.  It

11  is unlikely to be a linear relationship, but it is positive.

12  　　　　So the only -- the most relevant management advice that

13  then emerges from that well established theory and empirical

14  evidence is that it is important to reduce the number of

15  individuals gaining access to the ecosystem of concern.

16  Q.  Dr. Lodge, you testified earlier that as part of the work

17  that you first did in connection with the Chicago Area Waterway

18  System for the Corps of Engineers, one of the things you were

19  asked to look at was the, was not limited specifically to bighead

20  and silver carp, but rather focused on the issue of the potential

21  for transfer of invasive species generally in either direction

22  through the Chicago Area Waterway System, do you recall that?

23  A.  Yes.

24  Q.  And I believe this, you touched on this in your congressional

25  testimony, but from a biological perspective as someone who has

1  devoted a substantial portion of his professional career to

2  issues of the impact of invasive species, particularly aquatic

3  invasive species, what conclusion or general management advice

4  would you offer with respect to the issue of whether or not there

5  is a need to create a separation between the Great Lakes Basin

6  and the Mississippi River Basin?

7  A.  When one considers the number of species that have already

8  used the canal system, the Chicago Area Waterway System, to

9  disperse, the numbers of species that are, if you will, poised or

10  geographically located so that they could use the canal system to

11  move either northward or southward into ecosystems where they do

12  not occur, then it seems more and more important, the more

13  species you consider, to explore the option of closing the

14  waterway to the movements of species.

15          There has been a strong consensus among experts and

16  stake holders for a number of years that in the long run, both

17  ecosystems or both watershed regions, the Mississippi watershed

18  and the Great Lakes watershed, would be best served by preventing

19  species from moving through the canal.  Examples that are

20  instructive include zebra mussels and quagga mussels, which in

21  fact use the canal to go southward.  They were first introduced

22  into the Great Lakes by ships and use the canal to very rapidly

23  escape Lake Michigan and colonize the Mississippi River Basin or

24  parts thereof and thence to colonize by other mechanisms Arizona,

25  regions of the Colorado River, California waterways.

1          So this waterway has been and is a conduit for the

2    movement of many species in the past, potentially of many more

3    species in the future, and therefore any considerations about the

4    management of the species with respect to damages to the

5    environment or the economy or human health from species, would be

6    most appropriate if it considered all those species, not just,

7    for example, silver or bighead carp.

8    Q.  In that regard with the concern, this broader concern about

9    the transfer of invasive species between the Great Lakes and

10   Mississippi Basin, are you aware, Dr. Lodge, that the Corps of

11   Engineers has announced its intense to conduct what I believe is

12   referred to as the Great Lakes/Mississippi Basin Interbasin

13   Study.  Are you familiar with that term or something like that?

14   A.  Yes, I have heard this referred to many meetings with the

15   Corps and other management agencies.  I'm aware this is an

16   important goal, mandate for the Corps.

17   Q.  Again, I don't know how conversant you are with the details,

18   but do you understand that the purpose of this study would be to

19   look at the feasibility and options for long-term management

20   actions to prevent the transfer of species in either direction

21   through the waterway system?

22   A.  Yes, of course, I mean, and that is one of the -- that's the

23   context in which we first became engaged with the Corps in a

24   cooperative agreement to take this broader, multi species risk

25   assessment approach of what implications the canal has and its

1 management has for the exchange of species that may cause harm to

2 human society.

3 Q.  Again, from a biologically informed perspective that you

4 bring to this issue, assuming that one is undertaking an

5 evaluation of options for such an inter basin separation, from a

6 time perspective do you believe that looking at it from a

7 biological perspective that it is important that that be

8 conducted sooner rather than later?

9 A.  As I have said, there are a number of species that have

10 already moved through the Canal system and caused great harm to

11 the environment and human economy, dispersed through the Canal.

12 So there are many species in the Great Lakes that are potentially

13 harmful and do not yet occur in the Mississippi Basin.  There are

14 many species, on the other hand, that occur in the Mississippi

15 Basin that do not yet occur in the Great Lakes.  And all those

16 species I'm referring to are non native to North America.

17        So there are many species that could, in fact, be moving

18 through the canal as we sit here undetected.  So in that sense,

19 it is urgent that a longer term and improved solution be found

20 for the management of the waterway.

21 Q.  So, for example, if, just asking to you assume that it was

22 projected that a period of up to five years from the present

23 would be taken to just complete an evaluation of options for

24 means to prevent, permanently prevent inter basin transfer, from

25 a biological perspective do you believe that between now and

1 | five years from now, is there a risk that additional invasive
2 | species may transit in either direction?
3 | A.  Yes, of course.  I can give you one example.  If we go back
4 | to zebra mussels that were first discovered in the Great Lakes in
5 | 1986, by 1992 or '93 they had already colonized the Mississippi
6 | down to New Orleans or near in the southern part of Mississippi
7 | Basin.
8 |          So once a population becomes established, it can
9 | increase rapidly.  It depends on the species and the environment.
10 | But certainly a lot of population growth and dispersal can happen
11 | in five or six years.
12 |          MR. REICHEL:  Thank you, Dr. Lodge, that's all I have at
13 | this time.
14 |          Nothing further at this time, your Honor.
15 |          THE COURT:   Okay, very good, thanks, Mr. Reichel.
16 |          Ms. Rudolph, are you the opening cross examiner here?
17 |          Just for planning purposes, I don't know how long you
18 | think you have, this is for everybody out there, somewhere just
19 | this side of 3:00 we will take the afternoon break, and then we
20 | will pick up again 10 or 15 minutes after that and go to 4:30 or
21 | quarter to five, somewhere in there at least, okay?
22 |          MS. RUDOLPH:  Very well.  Thank you.
23 |
24 |                     CROSS-EXAMINATION
25 | BY MS. RUDOLPH:

1  Q.  Before we get started, I just wanted to ask one quick

2  question about the exhibit that you had gone through with

3  plaintiff's counsel.

4         One specific question that I sort of was hoping that you

5  can could help me with, on this paper right here, there is an

6  area that's identified as the LACCM, do you see that about four

7  up from the bottom there?

8  A.  Yes.

9  Q.  Okay.  I was having a hard time identifying that area on the

10  reach designation map right here, and I was hoping you could tell

11  us what that area corresponds to.

12  A.  So clearly, it's not on that map.  So can we go back to the

13  table for a moment?

14  Q.  Sure.  I can hand it to you too if that would help.  It's

15  kind of hard to see.

16  A.  It may come to that, but hold on a minute.

17  Q.  Does that help a little bit more?

18  A.  Yes.  Okay, so let's go -- okay, the table is organized so

19  that it goes from south to north.  Let's see, can you move the

20  table down a little bit?

21  Q.  Sure.

22  A.  If you start at the top, we are moving from south to north

23  and we first go up in the direction of the Chicago River and then

24  up toward the North Shore Channel.  Then there is sort of a

25  geographic break under the NSC, North Shore Channel, and I'm

1  thinking out loud here because clearly we have got to try to see

2  if we can understand what this LCALN is.  And then we go back

3  down south and we start with the Calumet branch where the Cal-Sag

4  meets the Chicago Sanitary & Ship Canal.

5          So now let's look at the map, and so we're going -- so

6  now we are on the part of the table that starts here CALL and we

7  are going this way.  So here we are right here.  It's there,

8  correct?

9  Q.  No, that says LCALN, which is this one.

10  A.  And we are looking for?

11  Q.  LACCM.

12  A.  Okay.  So what I can tell you is it's somewhere over in that

13  region and clearly, we have neglected to put it on that map.

14  Q.  Okay, that's fine, I was just trying to identify the area.

15  A.  I understand.

16  Q.  Thank you.

17  A.  You could check, of course -- those reach designations, as I

18  said earlier, were developed in agreement with the Army Corps

19  personnel, so there is a joint record of agreement on those reach

20  designations.  We may have made an error in either the acronym or

21  clearly made an error by not putting it on the map.

22  Q.  Thank you.  The potential for the establishment of Asian carp

23  in Lake Michigan and in the Great Lakes is a major concern for

24  the federal government, right?

25  A.  I believe that's the case on the basis of many statements

1  from management agency personnel and from the framework of the

2  release by the White House.

3  Q.  Now, ecosystem management in the context of invasive species

4  looks at forecasting the introduction and establishment of an

5  invasive species, sort of generally?

6  A.  That is one component that people would see as part of

7  ecosystem management in the context of invasive species.

8  Q.  And then sort of generally in forecasting the potential for

9  establishment and introduction, my understanding is there are

10 certain things that one looks at.  For example, one would look at

11 the potential pathways for introduction?

12 A.  Yes.

13 Q.  The interactions between invasive and native species?

14 A.  Well, we would have to pause here a minute and think about

15 whether we are talking about the probability of introduction, the

16 movement of individuals, or the probability of establishment of

17 individuals should they be released in a region of concern.

18 Q.  Okay.  You would look at the characteristics of the species

19 in terms of forecasting the potential for establishment?

20 A.  Yes, one certainly -- there is a lot of literature, including

21 our own, on silver carp, looking at the relationship or potential

22 relationship between characteristics or traits of species and

23 multiple stages in invasion, the probability of being transported

24 or being introduced, as we said a minute ago.  You could ask the

25 same question about the way in which traits are related to the

1  probability of population establishment, given an introduction

2  and so forth.

3  Q.  And those type of characteristics that one would look at

4  would be reproduction potential in the area would be one that you

5  would look at?

6  A.  Yes, of course.

7  Q.  Sort of eating and food, is there a food source there or

8  alternative food source available?

9  A.  Yes, yes.

10 Q.  And one would also possibly look at how temperature might

11 affect that species if that was something that mattered to that

12 species?

13 A.  Yes, there is a whole host of characteristics of both the

14 species and of the ecosystem that biologists have looked at and,

15 of course, you would look -- your attention would be focused on

16 different aspects, depending on what kind of species and what

17 kind of environment you're talking about, birds, fish, mammals,

18 whatever.

19 Q.  And in sort of looking at sort of those questions that come

20 up when you're forecasting the potential for establishment, in

21 the scientific community you would look to models?

22 A.  Models are an important way often to integrate a variety of

23 information to understand what might happen.

24 Q.  You could conduct field studies?

25 A.  Yes, I mean the -- in an ideal world, scientists would always

1  want first and foremost to do empirical work, to conduct

2  observations and certainly experiments.  Failing the ability to

3  do that, in particular models become an important tool,

4  especially an exploratory tool to begin to understand what the

5  possibilities are.

6  Q.  One might also look at studies conducted in the laboratory?

7  A.  Of course.

8  Q.  You would look at sort of the existing literature?

9  A.  Yes.

10 Q.  And look at sort of and possibly also conduct risk

11 assessments based on some of these other things?

12 A.  Much of what you have already asked me about I would put in

13 the category of components of risk assessment.

14 Q.  And then so the idea is that you put all the information

15 together and you come up with a recommendation based on the known

16 knowledge and evidence at the time?

17 A.  Well, as a scientist, and I think that's the context in which

18 we are talking about, it's usually not the goal to come up with

19 one recommendation, certainly not -- recommendations emerge from

20 management agencies in a broader set of considerations by those

21 responsible for making decisions.

22        As a scientist, my colleagues and I at many institutions

23 in many settings see it as our role to provide guidance relevant

24 to making decisions.  So the advice that I offer is in the

25 context of goals that have been established by broader means in

1 this case, as you asked to begin with, it is the goal of the

2 management agencies from state and federal levels to prevent

3 invasion of the Great Lakes by silver and bighead carp. It has

4 been our goal to provide scientific information and analysis that

5 could inform decisions about how to meet that goal.

6 Q.  Smart people and scientists and people looking at ecosystem

7 management can disagree about those management decisions in a

8 given context?

9 A.  Well, again, it's not the role of scientists to make those

10 recommendations, so, of course, there can be disagreement as

11 citizens about that, and, of course, there can be disagreement

12 about the nature of scientific evidence and inferences that can

13 be drawn just about the scientific inferences and what guidance

14 might be relevant to a given goal or alternative set of goals.

15 Q.  And now, there are certain uncertainties that are sort of

16 inherent, aren't there, kind of in the area of invasive species

17 management?

18 A.  As in all of life.

19 Q.  Now, the report that was discussed earlier around I'm

20 referring to what's titled The Aquatic Invasive Species Risk

21 Assessment for the Chicago Sanitary & Ship Canal, I think you

22 said it was a July 2010 publication?

23 A.  Yes.

24 Q.  Which was accepted as an exhibit earlier today.

25          THE COURT:   That's provisionally admitted Plaintiff's

1  Exhibit 1, just to be clear?

2          MS. RUDOLPH:  Yes.

3          THE COURT:   Okay, thank you.

4  BY MS. RUDOLPH:

5  Q.  In that document, that document describes the most pressing

6  issue stemming, that the most pressing issue that this was

7  looking at stems from the uncertainty in the detection front of

8  Asian carp in the Illinois waterway, is that accurate?

9  A.  Yes, that was the goal.  That was already the established

10  goal of the consortium of management agencies that were working

11  with the Army Corps of Engineers long before we got involved in

12  the cooperative agreement with the Corps.

13  Q.  Now, there is a distinguishment made in this document between

14  what was characterized as a detection front and an invasion

15  front?

16  A.  Yes, the distinction that we would have in mind there is that

17  it links back to what I said earlier under direct examination.

18  Every detection tool has a limit, so even the most sensitive

19  tool, unless it's perfect, and I'm not sure I ever met a

20  detection tool that is, has, that means that all you can say with

21  confidence is that where you have detected it, given your

22  detection limits, the invasion front is at least as far along as

23  that.  The invasion could very well be farther along than that,

24  but you don't have a tool sufficiently sensitive to detect it.

25  That's the distinction that we are making.

1  Q.  And in this report the distinction that's made between

2  invasion front, is that invasion front is considered the

3  self-sustaining population and the detection front is few

4  individuals?

5  A.  That would be a subtlety.  There is really, there is no -- I

6  don't know that that distinction would be common scientific

7  parlance.  We would have to say that's what we mean by that.  And

8  actually, I'm forgetting if that's what we defined it as, and I

9  take your word for it.

10         So there would be two things then that we could be

11  talking about.  One is you could think about the invasion front,

12  and this is the spirit in which I gave my first answer to your

13  question, talk about the invasion front as just where is the

14  foremost individual or individuals of the target species, silver

15  or bighead carp, or you could think about it under a more

16  stringent definition, where is there evidence of establishment.

17  Q.  Now, this report seemed to be speaking about the detection

18  front in terms of few individuals being potentially being above

19  the electric barrier.  You nodded your head.  Could you --

20  A.  We are still referring to the risk assessment report provided

21  in July?

22  Q.  Yes.

23  A.  Yes, I'm sorry, repeat -- was that a question?

24  Q.  The question was that it referred to a detection front,

25  meaning few individuals above the electric barrier?

1  A.  By "detection front" in that context what we mean is simply

2  what's the uppermost, again "uppermost" meaning closest to Lake

3  Michigan, point, geographic point at which we have gotten a

4  positive result.

5  Q.  But you mean individuals, you don't mean a self-sustaining

6  population where you're using that term?

7  A.  Correct, absolutely because detection front would simply be

8  about DNA, and, of course, as I have said repeatedly, we don't

9  know any individuals that DNA evidence alone indicates.

10 Q.  Now, let's talk about the detection of Asian carp

11 specifically with, you know, to the Chicago Area Waterway System,

12 which you obviously have some experience with.

13        Now, as you previously testified to, the Army Corps of

14 Engineers asked you to come up with and work with this eDNA

15 method and conduct sampling of the Chicago Area Waterway System,

16 right?

17 A.  As I previously said, we entered into a cooperative agreement

18 with the Army Corps of Engineers to do that work.

19 Q.  And you briefly sort of touched on this, but just to be

20 clear, there are, as you said, there are advantages and

21 shortcomings to every sort of detection method that's available

22 for detecting aquatic species, right?

23 A.  Correct.

24 Q.  Let's talk a little bit about, I think you spoke a lot about

25 the advantages of eDNA today.  Let's talk just a little bit about

1  some of the shortcomings of eDNA.

2        Again sort of looking at the risk assessment that you

3  provided to the Corps of Engineers, that risk assessment

4  discusses the fact that the functional relationship between the

5  number of positive detections and the number of fish present in

6  the system is unknown, is that accurate?

7  A.  Correct.

8  Q.  And that one of the limitations of eDNA is that there is no

9  way of measuring the relative abundance of fish producing the

10 detection signal, the number of positives, without additional

11 experiments?

12 A.  Yes, I think it's also important to say that when we talk

13 about limitations and strengths, we are always talking in

14 relative terms.  So if we talk about the limitation of DNA,

15 including not being able to relate it directly to the number of

16 fish, you still have to put that in the context of having

17 detected the presence of a fish when in fact the other available

18 tools were not sensitive enough to detect that presence.

19 Q.  So sort of a shorthand of sort of summarizing this might be

20 to say that the eDNA results at the current time do not tell us

21 how many fish might be in the area at that time, they don't give

22 us the number of fish?

23 A.  Correct.  From the very first presentation I think I made to

24 the Army Corps in talking about this, I emphasized the need to

25 couple the surveillance with experiments that would allow us to

1 better understand what the eDNA results might mean with respect

2 to numbers of fish.  The presence or absence is important

3 information, but, of course, what we would all very much like to

4 know is how many fish.

5 Q.  And the eDNA results also don't tell us how that fish got

6 there, assuming that, you know, it really means there is live

7 fish there?

8 A.  No way that eDNA results are ever going to tell you how a

9 fish got somewhere.

10 Q.  And as you have already testified, there are other

11 possibilities out there for the presence, you know, that exists

12 for the presence of eDNA other than live fish, possibilities?

13 A.  Possibilities, considering other evidence not very plausible.

14 Q.  Now, you're aware also that the Battelle Corporation is

15 performing an independent external peer review of the eDNA

16 method?

17 A.  Indeed.  We have cooperated with it.  It is the subject of

18 one of the other modifications or additions to the cooperative

19 agreement under which we operate with the Army Corps of

20 Engineers.

21 Q.  And peer review is part of insuring that a scientific method

22 is reliable and valid, right, as a general sort of term?

23 A.  In general, yes, of course.

24 Q.  And publication in a scholarly journal, that's also very

25 important?

1  A.  Yes.

2  Q.  And replication by other labs, that's also another component

3  that's important?

4  A.  That's usually not seen as part of peer review, but, of

5  course, that is an important goal for any science that one does.

6  Q.  Now, you also discussed today on your direct the EPA audit

7  that was conducted of the eDNA method?

8  A.  Yes, that's the first peer review that was done.

9  Q.  And that audit states in it that the audit did not address

10 the interpretation of eDNA results in regard to the presence or

11 absence, proximity, or abundance of silver or bighead carp, the

12 presumed source of the eDNA, correct?

13 A.  Yes, I believe that's correct.

14 Q.  And that the interpretation of the eDNA results require

15 additional research in order to understand the relationships

16 between the analytical results, the abundance of fish, and the

17 conditions of the sampled water bodies?

18 A.  Yes, in terms of addressing this issue of how a positive

19 result might relate to the number of fish, yes.

20 Q.  Now, this is -- I'm going to -- this is the risk assessment

21 that you submitted, correct, up on the screen?

22 A.  I'll take your word for it.

23         THE COURT:  Can you tell us what page that is and maybe

24 help counsel find it?

25         MS. RUDOLPH:  Page 40.

1        MR. REICHEL:  Your Honor, just in case Dr. Lodge can't

2   read it, may I give him a copy?

3        THE COURT:   Sure, I think that's fine.

4   BY MS. RUDOLPH:

5   Q.  And that's just the figure that I was actually putting up

6   here.  Now, that figure is an example of what eDNA band looks

7   like, what you're reading when you're looking at positive versus

8   negatives, correct?

9   A.  Well, I would have to look again to remind myself exactly

10  what this is, but it is a picture of an agarose gel, which is the

11  typical highly conventional way to visualize results of PCR

12  reactions.

13  Q.  Now, and this is be labeled as Figure 9 in the risk

14  assessment just for the record.

15       In terms of these bands, if it's a faint band, that

16  requires an amount of professional judgment to be able to read

17  whether it's a positive or a negative, correct?

18  A.  Yes.  There is a certain amount of subjectivity that enters

19  into the final judgment looking at these gels.  That is one of

20  the points on which the EPA audit suggested improvements,

21  particularly in a way of taking photographs and better, more

22  objectively evaluating whether it's a positive or negative.

23       Very rarely in practice in this project has there been

24  any degree of confusion about whether it's positive or negative

25  and in fact, we have multiple people look at the same gel without

1  knowledge, in blind, in a sense, to make that determination.  And

2  again, these are absolutely the standard practices.

3  Q.  Now, your eDNA results, and by "your" of course, I mean the

4  collaborative group, but the eDNA results are being used to

5  target fishing exercises, sampling, and monitoring in the Chicago

6  Area Waterway System, right?

7  A.  The management agencies have chosen to do so, yes.

8  Q.  Now, looking also at this report again, on Page 38 of this

9  report I believe you're citing to McDonald 2004, but it says

10  that:  "In the case of rare species, the only solution is to

11  change the detection methods to increase the detection

12  probability and/or increase sampling efforts."

13  A.  Can you tell me exactly where we're looking?  This is a page

14  that actually doesn't have a page number on it?

15  Q.  It's Page 38, the sentence above the eDNA method.

16  A.  "In the case of rare species, the only solution is to change

17  detection methods to increase detection probability and/or

18  increase sampling effort," yes.

19  Q.  Now, netting and electrofishing can work and can be effective

20  in certain water bodies, correct?

21  A.  It depends on what your goal is.  It is not a tool that is

22  very effective at sampling rare species.  It is a traditional and

23  highly effective tool for monitoring the abundance, at least in a

24  crude way for populations that are catchable.  On my own research

25  team I have an electrofishing boat, we have nets, we use them,

1  but they're not appropriate for the goal of trying to identify an

2  invasion front where by definition species will be rare.

3  Q.  And, for example, electrofishing works well where the stream

4  or canal is shallow, right?

5  A.  It works better in that situation than where water is deep.

6  Q.  And one could use, I believe they're called larval fish tows,

7  which are certain nets that are designed to, less mesh to sort of

8  collect larva or eggs in the waterway?

9  A.  Often it's not a tow, it's a net that you push in front of a

10 boat in order to catch larval fish, but yes.

11 Q.  Now, and this is again a general question, but it's sort of

12 appropriate to use the appropriate tool in the toolbox for the

13 job?

14 A.  Of course.  I guess I really should ask what does

15 "appropriate" mean and what job we're talking about, however, so

16 I'm not quite sure what that last answer meant.

17 Q.  Now, other than the eDNA results and the one live fish that

18 was caught in Lake Calumet, there hasn't been any other evidence

19 of Asian carp above the electric barrier right?

20 A.  I'm sorry, say it again.

21 Q.  Other than the eDNA results and the one live fish that was

22 caught in Lake Calumet, there hasn't been any other evidence of

23 Asian carp above the electric barrier?

24 A.  I believe that's correct.

25 Q.  And other than the eDNA results in Lake Michigan, the Calumet

1  Harbor I think that you described earlier, there hasn't been

2  other evidence of Asian carp in Lake Michigan?

3  A.  To the best of my knowledge, that's true.

4  Q.  Now, looking at the potential for the establishment of Asian

5  carp specific to Lake Michigan, scientists currently disagree a

6  little bit about the potential for the establishment of Asian

7  carp in the Great Lakes, right?

8  A.  I don't know whether disagreement would be appropriate.  I

9  think everyone to whom I talk and every statement I read

10  acknowledges a great deal of uncertainty about what parts of the

11  Great Lakes might be most at risk from an invasion by either

12  silver or bighead carp.

13  Q.  In fact, you are involved in an ongoing study specifically

14  looking at that potential for establishment, right, with NOAA?

15  A.  We have a number of research projects going on.  We have two

16  new projects that might fall in the category of what we are

17  thinking about.  One is funded by NOAA and EPA, which is focused

18  on forecasting the potential occurrence and spread and impact of

19  a variety of invasive species in the Great Lakes, that's the

20  overall goal.  One of the species and one of the pathways that we

21  highlighted in writing that proposal three years ago was the

22  Asian carp in the canal.

23          In addition, we have another new project funded by the

24  Great Lakes Restoration Initiative to partner with the Fish &

25  Wildlife Service and state agencies to develop, further develop

1   the eDNA tool as a surveillance tool throughout the Great Lakes

2   with a focus initially on those rivers that would appear on the

3   basis of previous analyses to be at the highest risk of invasion

4   by silver or bighead carp.

5   Q.   Now, you're also aware that there are studies that are

6   ongoing that are looking at the potential for Asian carp being

7   able to eat alternative food sources in Lake Michigan.  Are you

8   aware of those studies?

9   A.   Before we talk about alternatives, we would have to define

10  what the first category of --

11  Q.   Alternatives to plankton.

12  A.   Well, so both silver carp and bighead carp are planktivorous,

13  with silver carp typically eating smaller particles or including

14  more small particles than bighead carp in their diet.  Both

15  species, though, are generally described as being planktivorous.

16  However, for these species and almost any other species of fish

17  we would talk about, the typical designations we get have to be

18  regarded with a certain degree of caution because in practice

19  fish are usually much more Catholic in their diets or can be

20  depending on the circumstances than the way in which we initially

21  categorize them.

22  Q.   And there is at that time least one scientist who has

23  referred to Lake Michigan as a plankton desert, modelled that in

24  fact.

25  A.   Yes, I don't remember exactly who might have used that

1  phrase.  I have seen it quoted in a paper by Sandra Cook and

2  co-authors.

3  Q.  So there are studies that are sort of looking at that and are

4  also looking at the potential for alternative food sources in

5  Lake Michigan.  Are you aware of those studies?

6  A.  I'm aware of Sandra Cook's, at least one of her papers.  I

7  think she's published at least two on this topic.  I'm sure I'm

8  not aware of some studies that are ongoing, so I'm not quite sure

9  -- you can ask me in particular about a particular study or

10  scientist, and I'll tell you what I know.

11  Q.  You mentioned earlier the 22 tributaries that were identified

12  as potentially allowing for, to be Asian Carp habitat around the

13  Great Lakes as potentially providing that?

14  A.  Yes, although usually, when those tributaries have been

15  highlighted as potential spawning habitats, so when we talk about

16  habitats, it's probably best to distinguish, particularly for

17  these carp who spawn in one place and typically live most of

18  their lives in another habitat, it's important to distinguish for

19  what purpose the fish may be using a habitat.

20  Q.  And you're aware that USGS is currently taking a further look

21  at those particular tributaries that were identified, as you say,

22  for spawning to further refine and more thoroughly looking at

23  whether or not Asian carp could in fact use those tributaries?

24  A.  We are in frequent communication with USGS scientists about

25  what their goals are and how to go forward in our project and

1  their project and other projects as we become aware of them so

2  that  projects are as complementary and mutually beneficial as

3  possible.

4  Q.  Now, assuming that Asian carp could establish a reproducing

5  thriving population in Lake Michigan, scientists disagree about

6  how long such establishment could take, correct?

7  A.  Again, I would not characterize what discussions and

8  statements that I'm aware of as disagreement.  There is, as far

9  as I know, uniform agreement that no one can predict with great

10  certainty what the pace of any potential invasion might be.  We

11  have examples of invasions by all sorts of organisms that happen

12  apparently rapidly, and we have many examples of invasions that

13  play out very slowly, that is, people become aware of a species

14  only quite a long time after the species clearly became

15  established, but we only recognized that in hindsight.

16  Q.  The history of the Asian carp invasion of the Mississippi

17  River Basin followed a pattern of a population lag phase of

18  several generations, which took decades before the population

19  entered an exponential growth phase, correct?

20  A.  Maybe.  There is a discussion in the biological literature,

21  there is a number of recent papers about lag phases.  I think we

22  have to be cautious about distinguishing a really biological

23  phenomenon, that is, populations may grow slowly initially and

24  then ramp up, and that's typical, but it interacts with another

25  important phenomenon, which is humans' ability to detect

1 something or even their efforts to detect something also has a
2 lag.

3        So that we often don't look or even don't recognize an
4 invasion until long after it's happening, but in hindsight we
5 recognize, oh, we actually saw that or we should have known that
6 was there.

7        So yes, those two things together often mean that the
8 recognition that an invasion has happened and that the impacts
9 are occurring often happen long after the population was
10 established.
11 Q.  Now, you're addressing the potential Asian carp invasion into
12 Lake Michigan from the perspective of an ecosystem manager and an
13 invasive species scientist, correct?
14 A.  No, I'm addressing it as a scientist trying to the best of
15 our abilities to work in close coordination with the management
16 agencies who bear the responsibility of making decisions and
17 implementing them.
18 Q.  Now, the perspective of a scientist does not take into
19 account that the waterway must be maintained for navigation, does
20 it?
21 A.  Again, my role and the role of our research team that's been
22 working on this has been to provide scientific information about
23 the Asian Carp and about what our understanding, what our reading
24 of the literature, what our knowledge of fisheries biologists,
25 what our eDNA research has to say about potential management

1  options.  We may speak sometimes about management goals when it's

2  already clear that there is a goal that has been established

3  through the appropriate means of management agencies and public

4  discourse and our democratic process.

5  Q.  You spoke today about specific things that you thought would,

6  specific remedies that you think should be considered.  But

7  again, those recommendations don't take into account that the

8  waterway must be maintained for flood control, do they?

9  A.  What I have based my statements on in part is a, what's often

10 referred to as the Canal or Asian Carp Summit in 2003 in Chicago

11 that was sponsored by a variety of government agencies, including

12 management agencies, that brought lots of stake holders together

13 and produced a report with a strong recommendation that

14 ecological separation -- I'm not sure whether that was exactly

15 the term that was used, but the idea was a long-term solution for

16 the waterway was to manage it differently to minimize the ability

17 of organisms, any organisms, to traverse the waterway.  So that's

18 the context in which I have sometimes spoken about it.  I'm not

19 sure whether that's --

20 Q.  Well, you spoke today about, you know, closure of the locks,

21 but you didn't take into consideration when saying that the need

22 to allow for the passage of emergency vehicles through those

23 locks, did you?

24 A.  The question that I was asked was whether if you close the

25 gate, it will make it harder for a fish to traverse the waterway.

1  The answer to that is clearly yes.  Are you -- sorry, go ahead.

2  Q.  In discussing the screens, potential for screens covering

3  sluice gates, you haven't looked at the possibility for debris in

4  that screen and the impact to the risk of flooding; that's not

5  something you have looked at?

6  A.  Would you like me to look at that?  Are you asking me to

7  consider that?

8  Q.  No, I'm saying you have not considered that right now?

9  A.  I have not until this moment considered that.

10 Q.  Now, you are also aware of Fish and Wildlife assembled a

11 panel at the request of the Corps of Engineers to look at whether

12 closing the locks and reducing the number of lock openings would

13 in fact statistically increase the likelihood of Asian carp

14 passing through that, are you aware of that risk assessment?

15 A.  I am aware that it happened.  I am not aware that -- if there

16 was a written report, I have not looked at it.

17 Q.  Would it surprise you to know that the majority, in fact more

18 than a majority of that panel, concluded it would not, that the

19 number of lock openings would not statistically reduce the

20 likelihood of Asian carp?

21 A.  I would like very much to see the basis for that argument and

22 logic.

23 Q.  Now, again, everyone here or everyone -- and by "everyone" I

24 mean sort of, you know, the federal family and I think you agree

25 that the name of the game here is to reduce the numbers through

1  active management of Asian Carp in the Chicago Area Waterway,

2  right, keep the numbers low?

3  A.   Yes.

4  Q.   So we want to keep the propagule pressure low in the Chicago

5  Area Waterway?

6  A.   Right.

7  Q.   And we want to eliminate individuals above the electric

8  barrier, right?

9  A.   Are you asking me whether --

10  Q.   I'm asking you.

11  A.   That seems to be -- that is what I understand of the goal of

12  the management agencies, yes.

13  Q.   And on Page 36 of your risk assessment, I believe it states

14  that management should aim to reduce propagule pressure by

15  reducing access to Lake Michigan, correct?

16  A.   Where are we looking?

17  Q.   I'm sorry, Page 36 here, the sentence above "barrier failure

18  and invasion risk."

19  A.   "Consistent with existing management plans," and we cite the

20  Asian Carp Work Group 2010, "management should aim to reduce

21  propagule pressure by reducing access to Lake Michigan,

22  eliminating individuals above the electric barrier, and reducing

23  abundance below the barrier."  That is a restatement of what the

24  management agencies have declared to be their goals.

25  Q.   When you spoke earlier about your figure regarding the

Lodge - cross by Rudolph                    129

1  testing of the electric barriers, you were talking about

2  individuals testing the electric barriers, right, individual

3  Asian Carp?

4  A.  I don't think we know whether we are talking about

5  individuals or populations.

6  Q.  Now --

7  A.  Those data were from the USGS records, as I said earlier,

8  except for the uppermost data points.

9  Q.  Now, on Page 28 of this report it also states that the

10 electric barriers constructed and maintained by the USACE on the

11 Chicago Waterway System and additional management activities now

12 being contemplated to prevent Asian Carp successfully invading

13 the Great Lakes should also be as effective at preventing other

14 invasive species in the Mississippi from invading the Great

15 Lakes, is that correct?

16 A.  You're reading the sentence, yes, I see it.  It doesn't say

17 how effective, it says as effective.

18         MS. RUDOLPH:  I understand.  May I have a moment?

19         THE COURT:   Yes.

20         (Pause)

21 BY MS. RUDOLPH:

22 Q.  You also spoke today about the application of rotenone,

23 correct, and rotenone is pretty effective at killing everything

24 in the water column, right?

25 A.  Very effective at killing fish and kills many other things as

1  well.

2  Q.  And you're aware that rotenone is costly and requires

3  numerous personnel to apply?

4  A.  I am.

5  Q.  And this latest rotenone operation conducted in May of 2010

6  near the O'Brien Lock and Dam collected about 130,000 pounds of

7  fish, right?

8  A.  I'll take your word for it.

9  Q.  And no Asian Carp were found during that exercise?

10  A.  That's correct.  We actually advised against going forward

11  with that rotenoning because of both its cost and our lack of

12  confidence in the presence of carp because as I said earlier, the

13  two previous sampling episodes had really no positive samples in

14  the samples we took.

15  Q.  You're aware that the trigger for that rotenone activity was,

16  I thought the trigger for that activity was the four positives in

17  that area?

18  A.  You would have to ask the management leaders for sure what

19  the trigger was, but it was your understanding and we were in

20  regular communication and continue to be in regular cooperation

21  with the management agencies, that they were prepared to use eDNA

22  results as a trigger for such management actions.  However, the

23  timing was not to my mind appropriate, given that the two

24  previous sampling efforts, one of which was just, if I remember

25  right, a couple of days -- I don't remember exactly, but very

1  close to the event, but we advised not to go forward.  We advised

2  the management leaders, who were, seemed to us to be making those

3  decisions, not to proceed because our most recent results did not

4  give us confidence that there were fish in the area and, of

5  course, considering the expense and effort of doing that effort.

6          MS. RUDOLPH:  Thank you, no further questions.

7          THE COURT:  Okay, why don't we take our -- it's right at

8  3:00, it's a perfect time to take a break, and then when we come

9  back we will see who else has cross-examination questions for Dr.

10 Lodge, okay?  So we will take a break until about 3:15, okay?

11 Thank you everybody.

12          (Recess)

13          THE COURT:   So who else has questions for Dr. Lodge?

14 Mr. Hill?

15          MR. HILL:  I do, but I'm going to defer to Mr. Krauskopf

16 first.

17          THE COURT:   Okay, very good.  Mr. Krauskopf, you can go

18 next.

19          MR. KRAUSKOPF:  Good afternoon, Judge; good afternoon,

20 Dr. Lodge.  I don't believe we have met before.  My name is

21 Stuart Krauskopf.  I represent Wendella Sightseeing Company, Inc.

22          THE WITNESS:  Thank you.

23

24                      CROSS-EXAMINATION

25 BY MR. KRAUSKOPF:

1  Q.  You would agree with me that in the Great Lakes presently

2  there are over 180 invasive species of fish?

3  A.  No, I would not.  In fact, no, that's not true.  There are,

4  probably the number you're thinking of is that there are over 180

5  species by last count, probably 186 or 7 of non-native organisms.

6  Some of those are fish and some of those 180 species would be

7  categorized as invasive, depending on their degree of harm to

8  something that humans care about.

9  Q.  Okay.  And I believe, if I understand what I have heard in

10 terms of your credentials, that you have studied more than just

11 Asian Carp, true, you have studied other invasive species as

12 well, correct?

13 A.  Yes, as I said earlier, much of my professional career has

14 been focused on species that have been moved by humans and

15 looking at their actual or potential impacts on the environment,

16 human economy, and human safety.

17       MR. KRAUSKOPF:  Judge, if I may, again, just for the

18 sake of brevity, if I ask a yes or no question, can we advise the

19 witness to just answer yes or no.  I don't want to be rude, but

20 --

21       THE COURT:  If you want yes or no answers, then you can

22 get yes or no answers, but the consequence of that is obviously

23 Mr. Reichel will have redirect and he can elicit whatever he'd

24 like.

25       MR. KRAUSKOPF:  With all due respect, I have a feeling

1  he will have that anyway.

2          THE COURT:  Okay, very good.

3          MR. KRAUSKOPF:  But I appreciate that.  Thank you so

4  much.

5          THE WITNESS:  I'll aim for brevity.

6          MR. KRAUSKOPF:  Just if I ask a yes or no question, if

7  you could answer yes or no, I would really appreciate that.

8          THE WITNESS:  If the question can be answered that way,

9  I'll endeavor to do so.

10          MR. KRAUSKOPF:  Thank you so much.

11 BY MR. KRAUSKOPF:

12 Q.  And I believe you stated that you have written over 800

13 articles in the areas of fish biology, invasive species, things

14 in that area, correct?

15 A.  I wish I could make that claim.  The answer to that is no.

16 Q.  Okay.  You have written how many articles in total?

17 A.  On the order of 150.

18 Q.  Okay, forgive me.  One of those articles, if I may, and,

19 Judge, for the court's reference it would be, it's attached to

20 Wendella's response to the memorandum or plaintiff's memorandum

21 as Exhibit K, is an article which I believe you co-authored in

22 2002 with Dr. Cynthia Kolar titled Ecological Predictions and

23 Risk Assessment for Alien Fishes in North America.

24          Does that sound familiar, sir?

25 A.  Absolutely.

1  Q.  And in this study you and Dr. Kolar actually reviewed the

2  impact of a number of species or potential species on the Great

3  Lakes, correct?

4  A.  Correct.

5  Q.  Okay.  One of the species that you discuss in this article is

6  in fact silver carp, true?

7  A.  Yes, alluded to that article earlier.

8  Q.  Okay.  Now, I want to just quote from this if I can and just

9  tell me if that sounds familiar to you and that you wrote this.

10        It says in this article, sir, that "Our models also

11  predict that silver carp," and then it, of course, has the Latin

12  term which I'm not about to try to say, "which has quickly spread

13  through the upper Mississippi/Illinois river systems and

14  sometimes hurts boaters as the fish leap from the water, would

15  neither spread quickly nor be perceived as a nuisance in the

16  Great Lakes."

17        That is part of your article, is it not?

18  A.  It is.  There are other parts of the article that qualify

19  that statement.

20  Q.  Again, if I may, just if you can answer that question, I

21  would really appreciate it.

22        There has been some discussion today as to whether or

23  not your eDNA research has been per reviewed.  Is it your

24  contention that the United States Environmental Protection Agency

25  audit is a peer review of your work?

1  A.  Yes, it is a form of peer review.

2  Q.  And do you know as you sit here today whether or not anyone

3  has had the ability to or you have offered for someone to

4  reproduce your work so it actually could be verified?

5  A.  As I testified earlier, we had an agreement with the Army

6  Corps of Engineers to do just that.  That has been our goal.  We

7  have fulfilled our obligations under that.  As I testified

8  earlier, the Army Corps of Engineers Lab at ERDC and Vicksburg

9  has acknowledged their difficulty in doing so because of, to use

10  their words, problem with pernicious contamination in their

11  laboratory.

12        In addition, we are working now with the -- with a local

13  company, as I mentioned earlier, who have successfully and

14  without difficulty reproduced results for blank samples provided

15  to them by us.  So we are at a preliminary stage of validating

16  their ability to reproduce the results, we are working, beginning

17  to work with the U.S. Fish & Wildlife Service, Fish Health Center

18  in LaCrosse to do the same thing.  We have made the offer, again,

19  as I mentioned earlier, to multiple state agencies to do this,

20  and we are committed to working with many agencies to do this.

21        We have been overwhelmed by requests from state, local,

22  federal agencies, consulting firms, many federal agencies to, to

23  teach them, share with them, or do work with them to use eDNA

24  because they see the high value of doing so.

25  Q.  And you say that you're beginning to do that presently, true?

1 A.  What I said was we are beginning to do that with this local

2 company in South Bend, we are also beginning to do that with the

3 Fish & Wildlife Service.  We have been working assiduously with

4 the Army Corps to do that for a number of months, so far without

5 success.

6 Q.  And you would agree with me --

7 A.  Although, let me qualify that.  The first round, the first

8 part of our transition plan with the Army Corps was successful.

9 So the lab at ERDC did in fact reproduce our results with the

10 first set of samples.  It has been a stepwise transition plan

11 that's laid out clearly in the scope of work with the U.S. Army

12 Corps of Engineers, so the lab did in fact reproduce our results

13 in a set of samples that we took together in the Army Corps as

14 the first step of transition.  Since that time when they did

15 successfully reproduce our results, they have been unable to do

16 since then.

17 Q.  You would agree with me that you have held the primers

18 proprietary at Notre Dame?

19 A.  Absolutely.

20 Q.  They have not been released, correct?

21 A.  The primers have been provided to the Army Corps Lab in order

22 for them to do this research.  We order them, we receive them in

23 our laboratory, we take the label off to protect the proprietary

24 information, and then we ship them unopened to the ERDC Lab in

25 Vicksburg just as they arrived to us except without the label.

1  Q.  Again, I would ask you if I ask you a yes or no question,

2  simply to answer it yes or no.

3          THE COURT:   Let me intervene on that for a moment,

4  though.  Part of this purpose is for me.

5          MR. KRAUSKOPF:  Okay, forgive me, Judge.

6          THE COURT:  And so if he answers a question in a way

7  that's nonresponsive, that's one thing.  If he answers in a way

8  that -- the questions don't always lend themselves to yes/no, and

9  that particular one did not.

10          MR. KRAUSKOPF:  Okay, I appreciate that, Judge.

11          THE COURT:  Okay?

12          MR. KRAUSKOPF:  Of course.

13  BY MR. KRAUSKOPF:

14  Q.  Let's talk about the primers if I may, Dr. Lodge.  The

15  primers are something that prior to engaging in your eDNA

16  research is something that your laboratory creates, correct?

17  A.  We don't create them, we design them and have.  As any

18  molecular biology laboratory does, we design them and send our

19  specifications to a company that creates them and sends them back

20  to us.

21  Q.  Okay.  And those are the primers that are actually used by

22  which to match up samples that are located in water, true?

23  A.  As we discussed in earlier testimony, the primers are part of

24  the raw ingredients to initiate a PCR reaction, which results in

25  the duplication of any DNA in the sample that matches the primer.

1  Q.  Okay.

2  A.  Or is, I should say that is the complement of the primer.

3  Q.  One of the things I don't believe that was discussed earlier

4  today is the issue of false positives and the use of long

5  fragments of base pairs versus short fragments.

6          You're aware, of course, that if use of a short fragment

7  in a sample is done by the laboratory, that it will hold less DNA

8  evidence than, let's say, a long fragment, true?

9  A.  Strictly speaking, less DNA evidence meaning, I assume you

10  mean fewer base pairs.  That doesn't mean less reliable evidence.

11  Q.  Well, it does mean, however, I believe you indicated that you

12  had to or your team had to amplify the shorter strands, true?

13  A.  Amplify is what any lab does in a PCR reaction.  Amplify is

14  the verb which describes what a PCR reaction does.  That's

15  standard procedure.  That's what Ficetola did, that's what every

16  molecular biology laboratory does, that's what we have done.  So

17  that's independent from the issue of how many base pairs you're

18  diagnostic fragment of DNA is.

19  Q.  You would agree -- you agree with me that if the primers

20  identify shorter fragments that there is a greater risk of false

21  positive results?

22  A.  I would not agree with that.  I think there may be a

23  misunderstanding, though, about what we mean by false positive.

24  It would not be false -- if the PCR reaction multiplies DNA, it

25  was there, so that's not false.  Perhaps what you're thinking

1  about is a well-known tension in making choices when one starts a

2  project like this that revolves around the length of your

3  diagnostic marker.  Longer markers are more likely to break down

4  in the environment.  So the longer the fragment that you're

5  trying to find, the longer fragment of DNA, that is, the more

6  base pairs of DNA that you're trying to find in the environment,

7  the less likely you are to find it because it will be broken into

8  more pieces than if you're looking in the beginning for a shorter

9  fragment of DNA.

10          So if you design your marker, if you design your primers

11 to select a marker which is short, your test will be more

12 sensitive, that is, those short fragments will be likely to

13 persist in the environment longer than, for a greater duration in

14 a longer fragment will.  So I would say that if you design your

15 primers to identify a shorter marker, you have a more sensitive

16 test.  No way would I describe that as in any way false.  It's

17 simply more sensitive.  You're more likely -- those fragments are

18 more likely to persist in the environment and therefore, you're

19 more likely to be able to detect them than if you're targeting a

20 longer fragment.

21 Q.  So if I understand what you're saying, that in your research

22 that when you locate a fragment of DNA, that would mean that that

23 particular fragment has, has been there for a relatively short

24 period of time or it would degrade?

25 A.  Yes.  What we have found and many others have found, in the

1  conditions like those that occur in a natural waterway near the

2  surface, which is like, a waterway like the waterway system near

3  the surface subject to UV radiation and so forth, DNA degrades

4  and/or is decomposed by bacterial action quite quickly.  That's

5  going to apply no matter what length of fragment you're talking

6  about, but it means you're more likely to detect a shorter

7  fragment than a longer fragment.

8  Q.  Are you saying here today that there are no such things as

9  false positives in eDNA research?

10 A.  No, I'm not saying that it's impossible to have a false

11 positive.  What I'm saying is the choice of fragment length is

12 independent of any occurrence of false positive.  False positives

13 would not result from the choice of your fragment length.  They

14 might result from any number of other things that might happen or

15 poor choices that might be made in the process.

16 Q.  Why don't you tell us where, in what circumstances you can

17 find a false positive in eDNA research?

18 A.  Well, you could find false positives if you have any kind of

19 contamination.

20 Q.  And is that the only circumstance in which you would have

21 false positives, Dr. Lodge?

22 A.  It is the most likely circumstance.  I'm sure there are

23 other -- you can imagine circumstances -- well, if you have not

24 designed your primers appropriately and you have not screened

25 them appropriately, you could get false positives.  If you have

1  made poor choices in the design of the primers or if you made

2  those choices in the face of too limited information available

3  about the DNA sequence that occurs in your target organism.

4        In the case of our application of eDNA research to

5  silver and bighead carp, we have exhaustively screened, and the

6  EPA review team exhaustively confirmed, that we have designed the

7  primers to select a fragment which is species specific on the one

8  hand for silver carp, on another hand for bighead carp.

9        Our fragments that we are designing, that we design for

10 are also much longer, as I said earlier, than those used in the

11 Ficetola work that stimulated us to pursue this.

12       So, for example, Ficetola's studies, all other things

13 being equal, which they weren't, but all other things being

14 equal, Ficetola's choice of marker would have led him in your

15 terms to have a higher false positive rate than we do.  But

16 again, I don't actually even agree with that way of

17 characterizing the situation.

18 Q.  In terms of the rate of degradation, and that would be, of

19 course, how long the actual DNA strand would remain in the water,

20 you have applied, I believe in your declaration you said 6 to

21 48 hours is how long we would find DNA in the water before it

22 would degrade?

23 A.  What I have said, and I'll repeat, is that we have done some

24 limited, I would regard as largely preliminary experiments, but

25 experiments that give us some confidence, especially in the

1  context of other published literature, but let me just give you

2  one example of what I would regard as the most relevant

3  experiment that we did, which was to take samples from the field

4  in the routine way that we do so, do our usual eDNA screening,

5  and then for a subset of samples that were positive, put them

6  aside, hold them, and sample them repeatedly over time.

7        The longest time that passed after which we still got a

8  positive result was two days.  For most samples and in most

9  circumstances, in other preliminary experiments we see and in

10 some replicants of that experiment, we see the signal

11 disappearing after a matter of hours.

12 Q.  And I believe, if I'm not mistaken, that these degradation

13 rates that you were using here were actually degradation rates

14 taken from the species of common carp, true?

15 A.  The first experiments we did were from common carp.  The last

16 experiment that I described as what I would regard as the most

17 relevant experiment was done with field samples of silver and

18 bighead carp.

19 Q.  And your first studies of actual eDNA were in September 2009

20 leading up to January of 2010, true?

21 A.  I'm sorry, repeat that question.

22 Q.  Yes, you were talking about your first studies?

23 A.  First studies of what?

24 Q.  Of eDNA in the water were done when?

25 A.  They would have been done in, I believe starting in late

1  2008.

2  Q.  2008.  And at that time you were using the degradation rates

3  of common carp?

4  A.  Initially, we were working with common carp, and some other

5  species that test primers and markers against for their

6  specificity, but for degradation we were working with common

7  carp.

8  Q.  And common carp are not the same species as Asian Carp, true?

9  A.  By definition, but there is no reason to think that the

10  degradation rates of DNA would differ in any substantial way from

11  those of silver or bighead carp.

12  Q.  But it sounded like you just said a few moments ago that you

13  ultimately had to refine degradation rates into using a different

14  species or different study in order to do this, true?

15  A.  No, we were simply using common carp as a laboratory rat to

16  figure out the appropriate conditions under which this technique

17  might work.

18  Q.  Okay.  You have never published your primers to date, true?

19  A.  We have not.  We are -- there is a paper, a manuscript in

20  review in a scholarly journal that includes those.

21  Q.  So presently, for example, if Mr. Ficetola would like to have

22  the opportunity to review them, study them, and assess the

23  accuracy of your study, he would be unable to do so, true?

24  A.  It would depend on the communication with Dr. Ficetola and

25  what arrangements we were to make.  It's standard practice in

1 this kind of research to withhold those primers if they're a

2 value to others until you have been able to publish your work

3 yourself first.

4          But the important point that Ficetola has shown interest

5 in in the statement that he submitted to the court was about the

6 length of the fragment that is amplified, and we have addressed

7 that here.

8 Q.  You have already made as of January -- go ahead, proceed.

9 A.  Thank you.

10          THE COURT:   What's the question?

11          MR. KRAUSKOPF:   I don't know.  If the court would like

12 to hear him speak further on it, you know, I don't want to

13 interrupt him, but I would like to move it on if I may.

14          THE WITNESS:  The question was have we revealed the

15 primers.  They have been revealed to the EPA audit team.  Your

16 question was has anyone else had the opportunity to screen those.

17 The answer is yes, the EPA audit team had full access to all of

18 our information and confirmed that our primers and the fragment

19 that they amplify was species specific to silver on the one hand

20 silver and bighead on the other.

21 BY MR. KRAUSKOPF:

22 Q.  And you would agree with me that there was not one member of

23 the USEPA team that had any expertise whatsoever in eDNA research

24 or ever studied it in the past?

25 A.  No, that's false.

1  Q.  Which person on the USEPA team had actually studied eDNA in

2  water?

3  A.  What do you mean by eDNA?

4  Q.  I'm talking about eDNA, the research which you're here as an

5  expert on, the research of locating species in water by the use

6  of DNA.

7  A.  Experts on the team are molecular biologists with extensive

8  experience using indirect methods to detect species.  In a very

9  strict sense, it's true that none of them had ever used exactly

10 the techniques that we have used in terms of water samples and

11 DNA from those water samples in exactly the way that we have done

12 it.

13 Q.  So let me ask you again then, and just based on people that

14 you know or scientists who have studied eDNA in water, the use of

15 DNA in locating species of water, there was not one expert on

16 this USEPA team that actually had done this in the past before

17 this study, true?

18 A.  Yes.

19 Q.  Thank you.  As of January of 2010, the only experts in the

20 area of the use of eDNA in water would be you, correct?

21 A.  False.

22 Q.  Who else would have seen these primers?

23 A.  That's a different question.

24 Q.  Who else would have the ability to --

25 A.  Which one do you want me to answer?

1  Q.  Who else would have had the ability to reproduce your work in

2  January 2010?

3  A.  That's a third question.

4  Q.  Answer the third one.

5  A.  What was it again?

6  Q.  Other than you, in January of 2010, who would have had the

7  ability to reproduce your work in eDNA research of Asian Carp in

8  the Chicago Waterway System?

9  A.  No one.

10 Q.  Nobody.  Let's talk about something called calibration.  Are

11 you familiar with it?

12 A.  What do you mean by that?

13 Q.  Calibration, a study to be able to determine how many fish

14 are located in areas where eDNA or the DNA of species are found?

15 A.  I think you're probably taking that term from the

16 communication that we have had over a period of many months with

17 the Army Corps of Engineers and other agencies in which it's come

18 to be the term, although it has no sort of technical background

19 in this context, it has no specific definition, but it has come

20 to be the catch-all term that has been used to describe

21 experiments that we have proposed multiple times to multiple

22 agencies now to learn more about what an -- learn more

23 information from an eDNA assessment, including, as you say,

24 potentially the number of fish, but also including very

25 importantly how other environmental characteristics would affect

1  the eDNA signal, hydrodynamics, degradation conditions, et

2  cetera.

3  Q.  This proposed Exhibit No. 1 titled Aquatic Invasive Species

4  Risk Assessment, do you have that in front of you still?

5  A.  I do.

6  Q.  And again, we are stymied without page numbers --

7  A.  Only every other page.

8  Q.  -- but if you look at page 48, the blank page before 49, do

9  you have that in front of you?

10 A.  I do.

11 Q.  The first sentence says that:  "The functional relationship

12 between the number of positive detections and the number of fish

13 present in the system is unknown."  Do you see that?

14 A.  I do.

15 Q.  And it confirms what you have been saying, actually quite a

16 few times today, that as you sit here, you're still and you are

17 completely unable to tell us how many fish, Asian Carp, are in

18 the Chicago Waterway System based on your eDNA research, true?

19 A.  I would regard -- yes, I would regard the eDNA evidence as

20 the poorest basis on which to make a designation.  Of the

21 available evidence, there are other firmer sources on which to

22 make judgments about number of fish.

23       MR. KRAUSKOPF:  Excuse me for one second, please.

24       (Pause)

25       MR. KRAUSKOPF:  Forgive me.

1        THE COURT:  That's okay.

2   BY MR. KRAUSKOPF:

3   Q.  Dr. Lodge, do you remember giving a declaration to the United

4   States Supreme Court in January of 2010?

5   A.  I do.  It ruined my Christmas vacation.

6   Q.  I'm going to read you something from that, sir.  At

7   Paragraph 46, which you have stated I believe under oath, true,

8   your declaration?

9   A.  I suppose so.  I think those declarations were -- I don't

10  know, you tell me.

11  Q.  I'll move on.  It says here in your declaration at

12  Paragraph 46, in January of 2010, that:  "Based on our

13  understanding of the waterway and other potential pathways, we

14  believe that no explanation other than the presence of multiple

15  living silver and bighead carps can plausibly explain the entire

16  spatial and temporal pattern of positive results for silver and

17  bighead eDNA in the waterway."

18        Do you remember that statement?

19  A.  I stand by it.

20  Q.  Okay.  From a scientific perspective in terms of studies,

21  whether I call them calibration studies, however you look at it,

22  whether there is one fish, zero fish, or multiple fish is

23  scientifically unknown, true?

24  A.  Not completely.

25  Q.  Okay.  Sir, when you made this comment that there is multiple

1  living silver and bighead carps, one thing that I didn't see when

2  I read this was a footnote or a statement or anything below here

3  that says that there should be further study done or a

4  calibration study or anything in order to confirm whether or not

5  there are in fact multiple fish above that barrier, true?  There

6  is no footnote, there is no statement, nothing.

7  A.  On many, many occasions over the last few months we have

8  begged and cajoled and written specific proposals to the

9  management agencies to conduct such calibration experiments.

10         As I said earlier, in my very first presentation to the

11  relevant management groups, I emphasized that the usefulness of

12  this eDNA tool will be greatly improved if simultaneously

13  experiments are funded in order to understand more what

14  information can come from an eDNA signal.

15  Q.  Exactly.  Later in that same declaration, you say, and I

16  quote at Paragraph 49:  "However, our eDNA results indicate that

17  at least a few individuals of both silver and bighead carp have

18  already accessed to Lake Michigan via the O'Brien Lock and Dam."

19         Do you see how it's very possible for people who don't

20  understand eDNA research to take this as being a living truth?

21  A.  It is the truth as I believe it, and I believe there is firm

22  evidence for that.

23  Q.  But again, that's as you believe it, not as has been

24  scientifically tested, true?

25  A.  Would you like to know why I believe it?

1  Q.  No.  Let's talk a little bit more if I may.  I want to talk

2  about this document, which you will have to bear with me a little

3  bit.  This was on a slide -- I know I'm only 50, but I don't know

4  how to use this so I'm just going to hold it up if that's okay.

5        THE COURT:  As long as the witness has a copy of it and

6  everybody else knows where you're at.

7        THE WITNESS:  I don't have it in front of me, but I

8  think I know what it says.

9        MR. KRAUSKOPF:  I don't know if it's around. It's the

10  Data Interpretation and Strength of Evidence.

11        (Pause)

12        THE COURT:  Is that the one?

13        MR. KRAUSKOPF:  That's the one.  Thank you.  Forgive me.

14        THE COURT:  All I want to do is make sure everybody is

15  on the same page here, and I think we all are now, so thank you.

16        MR. KRAUSKOPF:  Fantastic.

17  BY MR. KRAUSKOPF:

18  Q.  And this particular document, as I understand it, you have an

19  arrow going stronger to weaker, and you have taken into account

20  various sources of evidence, ideas, and thoughts as to what would

21  be a stronger interpretation of the strength of evidence versus

22  weaker, correct?

23  A.  What it summarizes is the levels of information available for

24  different reaches that bear on inferences that can be drawn.

25  Q.  Okay.  What I don't see in here is this rotenone poisoning of

1  what was it, 6-mile radius in which no Asian Carp were actually

2  found, and I believe -- let me finish -- and I believe that at

3  the time that this was done, no fish Asian Carp, live or dead,

4  had ever found its way above the barrier.

5          Why is that not in this document?

6  A.  There were at least two parts to that question.  As I

7  understood the first part, if it's framed as a question, it would

8  be where is the 6-mile rotenoning in December 2009.

9  Q.  Let's start with that.

10 A.  Is that a question?

11 Q.  Please.

12 A.  That is the second item in the right-hand column.

13 Q.  Okay.  And so what you're saying here, because this is where

14 I don't really understand this.  You're saying that there is

15 stronger evidence for living fish because of the rotenone

16 captured fish below the barrier?  Here, look --

17 A.  Is there -- can you clarify that question, please?

18 Q.  I'll make it easy for you, and again --

19 A.  Yes, just point.

20 Q.  See where it says "Lockport, below the electric barrier,

21 rotenone captured," do you see that, sir?

22 A.  Indeed I do.

23 Q.  There was rotenone poisoning below the electric barrier,

24 right, that's what you're saying here?

25 A.  That is what it says.

1 Q.  And there was a fish that was captured below the barrier,

2 true?

3 A.  There were many fish, including one bighead carp.

4 Q.  Okay.  What does that possibly tell the court as to what,

5 whether or not there is a strength of living fish above the

6 barrier?

7 A.  I don't think there is anything about that table that relates

8 to a distinction between above or below the barrier.

9 Q.  Okay, that's what I guess I didn't understand.  So this

10 particular document itself does not instruct the court about

11 whether or not you have any feelings, whether stronger or weaker,

12 about whether or not there is living fish above the electric

13 barrier, true?

14 A.  That table was not designed to address that particular point.

15 Q.  If I just wasted your time, forgive me, I didn't understand

16 that.

17        THE COURT:  Can I clarify one thing, though?  The

18 netting capture in Lake Calumet is above the barrier, right?

19        THE WITNESS:  Correct.

20        THE COURT:  So this chart has both.

21        MR. KRAUSKOPF:  Right, that's why I'm lost.

22        THE COURT:  I just wanted to make sure I got it.

23 BY MR. KRAUSKOPF:

24 Q.  So there then there was also a rotenone kill above the

25 barrier, true, near Lake Calumet?

1  A.   South of Lake Calumet.

2  Q.   Okay.  Wouldn't it find its way or shouldn't it find its way

3  into the weaker section?  The idea that in fact if you kill a

4  hundred and something thousand pounds of fish above the barrier

5  and you don't find one Asian Carp, that in fact that that's

6  evidence that there are no living fish above the barrier,

7  shouldn't it be there?

8  A.   I think there were multiple parts to that question.  Let me

9  see if I can do the first.

10  Q.   Please.

11  A.   The title of this table is about evidence for living fish.

12  So it's about positive results.  We have discussed in several

13  ways in earlier testimony today the difficulty of interpreting

14  negative results.  We have also discussed the evidence that led

15  the management agencies to take the decision to do the rotenoning

16  in the Calumet River that you're referring to.  It was apparently

17  triggered by some early positive DNA results, but in fact, as I

18  testified earlier, the two sampling periods closest in time to

19  that rotenoning did not reveal any positive results.

20        Thirdly, and still in direct response to your question,

21  it is very important to recognize the limitations of rotenone in

22  addition to the limitations of the traditional samples and eDNA

23  that we have discussed.

24  Q.   Okay.

25  A.   This is still directly applicable to your question.

1  Q.  Forgive me, I didn't mean to interrupt.

2  A.  The confidence and relevance of the rotenone.

3  Q.  I apologize.

4  A.  When rotenoning is done, while there is good evidence, lots

5  of rich experience that most, if not all, fishes are killed, it

6  is clearly true that only a fraction of the fish that are killed

7  are actually recovered.  So it's important to remember that.

8  Q.  So is it your testimony here today that there is a

9  possibility of dead Asian Carp sitting at the bottom of the

10  Cal-Sag channel or Lake Calumet that could have been killed?

11  A.  Yes,  not Lake Calumet.  Lake Calumet has not been rotenoned.

12  Q.  In the areas of the rotenone, there could be dead fish at the

13  bottom of that area?

14  A.  They would be long gone now, but yes, shortly after the

15  rotenoning absolutely is possible.

16  Q.  And then I want to make sure I get this one fact.  You're

17  saying that at one point you tested in that area where there was

18  rotenone --

19  A.  Later.

20  Q.  -- and there was a positive hit.  Later, there were more

21  tests and there were negative hits, true?

22  A.  Yes.

23  Q.  And that would suggest what, that the fish were there at one

24  point for a day or two and left?

25  A.  I don't know about the day or two part, but if you eliminate

1 the day or two from your question, the answer is yes.

2 Q.  But it doesn't suggest to you that there might have been

3 false positives the first time that you actually did those tests?

4 A.  No.

5        MR. KRAUSKOPF:  Give me one more moment.  I'll be done

6 in just a few moments, Judge.

7 BY MR. KRAUSKOPF:

8 Q.  I want to talk very briefly, if I can, about these

9 alternative explanations for the eDNA in the water.  You had

10 quite a bit of time with counsel and you ruled out the

11 alternatives or at least some of them, true?

12 A.  "Ruled out" is probably too strong a term, but I suggested

13 they were less plausible as an explanation of the overall

14 temporal and spatial pattern of results than the presence of live

15 fish.

16 Q.  And you're aware, I believe you said in your testimony that

17 you're aware of this Asian Carp Working Group Control Plan, some

18 250 page document created in 2007.  Are you familiar with that?

19 A.  Yes, at least vaguely familiar, but if we want to talk about

20 details, please provide a copy.

21 Q.  Well, let me just ask you this.  Are you familiar with the

22 idea that in that control plan there were a discussion of these

23 alternatives as real possibilities for the presence of eDNA in

24 the water?

25 A.  They remain, as I have said repeatedly, possibilities, but

1 not plausible explanations of the overall pattern.

2 Q.  Are you aware of the fact that the U.S. Coast Guard has now

3 or since placed restrictions on the release of ballast water

4 passing through these areas?

5 A.  Yes, I referred specifically to that in my earlier testimony

6 today.

7        MR. KRAUSKOPF:  I'm almost done, Judge.

8        THE COURT:   Okay.

9        MR. KRAUSKOPF:  Give me one second.

10        THE COURT:   Sure.

11        MR. KRAUSKOPF:  I just have a couple follow-up

12 questions, if I may.

13 BY MR. KRAUSKOPF:

14 Q.  You were asked questions about the efficacy of the locks, the

15 Chicago Locks and the O'Brien Locks as using as preventative

16 measures from Asian carp and I believe other invasive species

17 from passing through the waterway system into Lake Michigan.  Do

18 you recall that testimony?

19 A.  I do.

20 Q.  You haven't studied that yourself, have you, the efficacy of

21 the locks?

22 A.  It doesn't take a sophisticated study to recognize that a

23 physical barrier can slow fish down.

24 Q.  But as you sit here today, you don't know whether or not that

25 physical barrier actually serves as a complete barrier, do you?

1  A.  I made no claims about completeness.

2  Q.  So there could be areas through the locks where fish, Asian

3  Carp or other fish, could actually swim through in either

4  direction, true, as far as you understand it?

5  A.  The locks that I have seen would be highly unlikely to allow

6  an adult fish to swim upstream.

7  Q.  I just want to make sure that I understand.  The locks that

8  you have seen, Chicago Locks and the locks down at O'Brien --

9  A.  Chicago Locks I'm specifically thinking of, are the ones I

10  have seen.  But I will not claim to have expertise in exactly the

11  function of any of those locks.  I'm simply answering the

12  question about a physical barrier prohibiting fish from moving at

13  least in part.

14       MR. KRAUSKOPF:  Fantastic.  That's all the questions I

15  have, your Honor.

16       THE COURT:  Okay, thanks, Mr. Krauskopf.

17       Mr. Hill, are you next?

18       MR. HILL:  Yes.

19       THE COURT:  Okay, very well.

20       MR. HILL:  Good afternoon, Dr. Lodge, my name is Ron

21  Hill.  I represent the Water Reclamation District.  I just have a

22  few questions.  I hope I don't repeat what everybody has asked.

23  I'm trying to sort it out as we're going ahead here, but I

24  apologize if I do.

25       THE COURT:  Obviously, all of you have to adjust on the

1  fly in that regard.

2                        CROSS-EXAMINATION

3  BY MR. HILL:

4  Q.  Dr. Lodge, you indicated in your January 4, 2010 declaration

5  that as of the time you filed your declaration, the traditional

6  sampling efforts for Asian Carp by the pertinent agencies was

7  modest relative to the habitat, is that correct?

8  A.  Yes, I'll take your word for it and I have some memory of

9  that.  The testimony you're referring to is the affidavit for the

10 Supreme Court?

11 Q.  Correct.

12 A.  Yes.

13 Q.  And because it was filed the first week of January 2010, your

14 statement obviously did not consider all the increased sampling

15 efforts that have gone on since that time, is that correct?

16 A.  Yes.

17 Q.  And you also indicated, I believe, in your declaration what

18 you refer to as traditional tools for sampling fish such as

19 electrofishing, netting, and poisoning have very limited success

20 where modest sampling effort is expended relative to the area of

21 habitat and the fish numbers are low, is that correct?

22 A.  Yes.  I mean, if details are important, perhaps we should

23 refer to specific sections of the testimony.

24 Q.  Did that statement sound accurate?  I believe that was in

25 Paragraph 6 and 7 of your --

1  A.  Yes, if you're reading from the testimony, yes.

2  Q.  And your discussion of electrofishing --

3          MR. REICHEL:  I'm sorry, paragraphs 6 and 7?

4          MR. HILL:  Paragraphs 6 and 7 of the declaration.

5          MR. REICHEL:  I'm sorry.

6  BY MR. HILL:

7  Q.  Your discussion of electrofishing in January 2010 could not

8  have considered the continuous electrofishing of the four

9  extended reaches in the waterway that are now being conducted on

10  a regular basis, correct?

11  A.  I'm sorry, repeat that.  Are you reading again from the

12  statement?

13  Q.  Well, your statement was issued in January 2010.  Since that

14  time there has been continuous electrofishing going on in four

15  extended reaches of the waterway, are you familiar with that?

16  A.  Yes.

17  Q.  And that would be approximately 75 miles above the barriers

18  that are being continuously electrofished at this time?  Does

19  that sound about right?

20  A.  That sounds about right.

21  Q.  Okay.  And also, since the time of your January declaration,

22  there has been five fixed site monitoring stations upstream of

23  the electric barriers in the CAWS that are now being monitored

24  for Asian carp by electrofishing and netting on at least a

25  biweekly basis, does that sound correct?

1  A.  These are actions that management agencies are taking. I

2  claim no particular knowledge of that, but yes, I have understood

3  that that's the case.

4  Q.  And isn't it true that both commercial fishermen and the

5  agencies with expertise are constantly tweaking or refining their

6  approach in using these traditional methods to capture fish?

7  A.  That I do not know.

8  Q.  Now, you indicated in your January declaration that it takes

9  extraordinary effort to catch as many as 10 percent of a fish

10 population, is that correct?

11 A.  Yes, that number is based on extensive literature in the

12 fisheries and biological academic studies.  10 percent is the

13 target for -- which is generally regarded as a rule of thumb as

14 the minimum aimed for to do a mark-recapture estimate of a

15 population.  The point I was using that to make is that it is

16 extraordinarily difficult even in smaller habitats to achieve

17 that 10 percent recapture, which implies that you have caught

18 10 percent of the population.

19        As an example I provided earlier, I mentioned earlier a

20 study recently published in 2010 by Greg Sass and co-authors in

21 which they recaptured less than 1 percent of the silver and

22 bighead carp in a mark-recapture study even with extensive

23 efforts using the traditional, using electroshocking.

24 Q.  So with respect to the ongoing activities that have occurred

25 since your January declaration with the electrofishing, the

1  rotenone applications, the biweekly monitoring stations that are

2  going on, would you consider those efforts extraordinary?

3  A.  They have certainly increased, and they are extraordinary

4  against -- when compared to the traditional efforts that a

5  management agency typically conducts.  Whether they are

6  sufficient to catch even a small fraction of the population of

7  any of the species that exist in the areas that are being fished

8  is uncertain and I think unlikely.

9  Q.  So you don't know at this time, but would you concede that

10 they're more than modest?

11 A.  Certainly, I think we have to be clear about what our

12 benchmark here is . What's the benchmark that you would like for

13 me to compare the effort with?

14 Q.  How do you define "modest"?

15 A.  Let me be clearer.  If we are comparing it to efforts that

16 are traditionally applied by management agencies, these are

17 extraordinary.  If we compare it to the goal of detecting the

18 invasion front, I think it's unlikely that a sufficient

19 proportion of the population is being caught to have a very

20 sensitive detection limit using those traditional tools even with

21 these efforts that one might regard as extraordinary with respect

22 to what management agencies usually do.

23        Again, consider that under these circumstances, a very

24 small proportion of the fish that exist are being caught.

25 Compare, for example, I think, and I don't have the numbers in my

Lodge - cross by Hill                      162

1 head at the moment, but it would be instructive to compare the

2 number of fish that are being caught in netting and

3 electrofishing efforts relative to the number of fish that are

4 recovered in the rotenoning efforts in the same waterways,

5 remembering that many, perhaps most, of the fish that are killed

6 and rotenoned are not actually recovered.

7         That gives you an index for what proportion of the fish

8 you're catching in a given reach with the traditional methods.

9 You could use that to estimate your detection limit using the

10 traditional tools, and I think that detection limit would not be

11 very good with respect to rare fish, which by definition, if

12 you're looking for the invasion front, we are talking about rare

13 fish.

14 Q.  So you could put it somewhere between modest and

15 extraordinary, is that correct?

16 A.  I can't answer it any more clearly than I just did.

17 Q.  You're aware that over the years traditional sampling efforts

18 have in the past and currently identified a significant number of

19 Asian Carp in the Marseilles Navigation Pool, is that correct?

20 A.  They have caught silver and bighead carp in the Marseilles

21 pool, yes.

22 Q.  And the Marseilles pool is not on this map?

23 A.  Yes, I believe the Marseilles pool is to the left.

24 Q.  Further southward?

25 A.  Yes.

1  Q.  And the next pool north of Marseilles is the Dresden Island

2  pool, is that correct?

3  A.  I believe that's correct.

4  Q.  And you're aware that traditional sampling efforts indicate

5  that the Asian Carp are also present in the Dresden Island

6  Navigational Pool, is that correct?

7  A.  Yes, that is true.  That was true before we got involved.

8  Q.  And I believe that you state in your January declaration that

9  management agencies employing traditional sampling tools had

10 shown both species of Asian Carp to be present in abundance in

11 those southerly pools, is that correct?

12 A.  In abundance sufficient to catch them with those traditional

13 tools.

14 Q.  Would you agree that although Asian Carp are present in the

15 Dresden Island pool, that traditional sampling efforts capture

16 significantly fewer carp from the Dresden Island pool than from

17 the Marseilles pool?

18 A.  Yes.

19 Q.  Isn't it true that Asian Carp, and I believe that was

20 indicated on one of your prior exhibits, were first detected in

21 the lower reaches of the Illinois River over a decade ago?

22 A.  Yes.

23 Q.  And isn't it true that Asian Carp have been captured in the

24 Dresden Island pool since at least 2002?

25 A.  I'll take your word for it.

1  Q.  I think it was in one of your prior exhibits.

2  A.  I think when we are comparing efforts, however, it's very

3  important to  compare on the basis of effort, so I'm not sure

4  where we are going with this.

5  Q.  I'm just asking if they were actually detected through

6  traditional sampling methods as far back as 2002 in the Dresden

7  Island pool?

8  A.  I'll take your word for it, yes.

9  Q.  If you look at the next navigational pool moving northward,

10  that would be known as the Brandon Road pool?

11  A.  Correct.

12  Q.  And you note in your January 2010 declaration that there has

13  been no recovery of Asian Carp from the Brandon Road navigational

14  pool, isn't that correct?

15  A.  Except for -- the capture of a fish, but as we discussed

16  earlier, the sighting of a silver carp.

17  Q.  And that was one carp, I believe you indicated?

18  A.  That was one carp prompted by our eDNA results.

19  Q.  So as of today there still have been no carp captured, but

20  there has been one sighting in the Brandon Road pool?

21  A.  I believe that's true, but again, it's very important to talk

22  about effort when you talk about catch.  You won't catch any fish

23  if you don't try.

24  Q.  So the Asian Carp have been recovered from the Illinois River

25  using traditional methods for a decade and the Dresden Island

1  pool since at least 2002, but they have not been recovered from

2  the next pool going north, the Brandon Road road pool, is that

3  correct?

4  A.  Correct.

5  Q.  And the navigational pool directly north of the Brandon Pool

6  pool is the Lockport pool?

7  A.  Yes.

8  Q.  And are you aware to date that only one Asian Carp has been

9  captured from the Lockport pool and there was downstream of the

10  barrier?

11  A.  As we discussed earlier, yes, I'm aware of the rotenoning,

12  again, important to talk about effort.

13  Q.  You indicated in your declaration, I believe it was paragraph

14  48, that "Establishment success is positively related to

15  propagule pressure," do you recall that?

16  A.  Of course.

17  Q.  "And an important component of propagule pressure asserted by

18  the Asian Carp is the number of carp," isn't that true?

19  A.  That is what we generally mean, we biologists mean, when we

20  are talking about propagule pressure, is the number of

21  individuals and also often the numbers of times in which

22  individuals are released or have the opportunity to move.

23  Q.  So is it a fair statement to say that judging from

24  traditional monitoring results, the propagule pressure appears to

25  decrease as one moves northward on the Illinois Waterway toward

1   the Brandon pool and Lockport pool?

2   A.  I have not seen an analysis rigorous enough to make that

3   statement with confidence.

4   Q.  What would it take for you to make that statement with

5   confidence?

6   A.  A rigorous evaluation of catch per effort of fishing.

7   Q.  So based on the numbers that you have seen and all the

8   efforts that have been discussed here today, as you sit here you

9   can't make that statement?

10  A.  It seems to me that that's likely to be the case.

11  Q.  Thank you.  Where in the Illinois Waterway in relation to

12  Lake Michigan is the closest known reproducing population of

13  Asian Carp?

14  A.  I am not confident of the answer to that.  The kind of

15  evidence that one would use in that regard is the presence of

16  young of year fish.  I believe it's true that that's the case in

17  Marseilles pool, but again, I'm not confident of that answer and

18  one has to be very cautious about the likelihood of capturing

19  fish.

20  Q.  So as you go down the map from Dresden down to Marseilles and

21  further south, you couldn't answer that question for certain at

22  any point on the Illinois River?

23  A.  You'd have to catch a large number of fish to be confident

24  about whether, what the age classes of fish are that are present

25  and whether in particular to address your question, young of year

1  fish are present, which would indicate that spawning and

2  successful reproduction had occurred in that location or

3  somewhere upstream.  One has to remember in this waterway which

4  direction the water is moving, so if you were to capture young of

5  year, one would assume that they were spawned somewhere upstream.

6  Q.  So you're not able to answer that question?

7  A.  I am not.

8  Q.  In your investigation of the Asian Carp, have you ever

9  reviewed Chlorophyll-a concentrations in the navigational pools

10 on the Illinois Waterway?

11 A.  I'm sorry, repeat the question.

12 Q.  In your investigation of the Asian Carp, have you ever

13 reviewed Chlorophyll-a concentrations in the navigational pools

14 on the Illinois Waterway?

15 A.  It may be the case that one of the members of our team has

16 accumulated data that might be available.  We certainly talked

17 about it, but we have not analyzed rigorously Chlorophyll-a data.

18 Q.  Do you know what the significance is of Chlorophyll-a

19 concentrations?

20 A.  I believe it would depend on the goal of the study, but

21 Chlorophyll-a is a typical metric for, or a typical index that's

22 used to indicate the abundance of phytoplankton.

23 Q.  Are you aware that Chlorophyll-a concentrations drop

24 dramatically as you move northward on the Illinois River?

25 A.  Yes.

1  Q.  Thank you.  Dr. Lodge, how many eDNA samples were taken in

2  2010 above the barrier?

3  A.  I'm not completely sure about that.  Somewhere on the order

4  of, oh, probably 500, maybe as many as 600, but not sure about

5  that.  Have to consult my notes on that.

6  Q.  Out of these 500 to 600, how many were positive for silver

7  carp?

8  A.  Well, 450 of those samples have yet to be fully analyzed, so

9  right off the bat, most of those we can't address, and as to the

10 ones that have been reported, I don't know, I would have to look

11 at the records.  We have reviewed earlier the general patterns,

12 but I cannot tell you off the top of my head the specific number

13 of samples.

14 Q.  I'm sorry, then for 2010 how many samples have been analyzed?

15 A.  I cannot recall with confidence how many samples we have

16 fully analyzed and therefore reported to the Corps.

17 Q.  In your testimony you referenced multiple hits on the same

18 day, I believe, is that true?

19 A.  For some reaches, yes.

20 Q.  The eDNA analysis does not tell you if the eDNA is all from

21 the same fish or from different fish, does it?

22 A.  Correct.

23 Q.  And you also used the term "invasion front," I believe.  Is

24 there a certain number of fish that constitute an invasion front

25 from a scientific perspective?

1  A.  As we discussed in previous rounds of questions this

2  afternoon, we have to be very clear about what we are defining as

3  the invasion front.  We have talked about three possibilities

4  this afternoon, a detection front, which is simply where is the

5  northernmost spot in which we get a positive DNA hit if we are

6  talking about detection with DNA.

7        We could talk about invasion as the occurrence of

8  organisms, any organism of the target species that the minimum

9  estimate of that might correspond to the eDNA detection front, or

10  we could talk about where there is evidence of establishment,

11  which gets to your previous question about where is reproduction

12  occurring.

13  Q.  Does that tie into the abundance issue also?

14  A.  Can you clarify that question.

15  Q.  Well, I think in one of your declarations you talked about

16  the abundance of fish in Marseilles and Dresden.  Does the

17  invasion front -- strike that.

18        Can you place the invasion front on the Illinois

19  Waterway at a certain point in your opinion?

20  A.   If we define it as a detection front, that's very

21  straightforward.  It would be Lake Michigan or the Calumet Harbor

22  sample would be the location closest to Lake Michigan, or indeed,

23  depending on how you define it, in Lake Michigan where we found

24  it, when we found DNA.  If you defined it in other ways, the

25  answer would be less certain.

1  Q.  Could you answer the other two ways, define it?

2       You said if you looked at it, there are three ways to

3  look at it.  You just told me one way to look at it.

4  A.  Well, if you say "invasion front" as where is the

5  northernmost detection?  Well, the northernmost detection is eDNA

6  detection front, so that's the same.

7       If you say where is there evidence of establishment,

8  that's somewhere downstream, and again, we have already

9  ascertained that I'm not sure exactly where that is, and it would

10  be highly uncertain based on the kinds of sampling and effort

11  that's been put in.

12  Q.  I just have one more area of this, which may have already

13  been touched on so I'll be brief, but you previously had some

14  testimony about the installation of gates or screens on sluice

15  gates, and I believe you indicated you're not an engineer, is

16  that correct?

17  A.  Correct.

18  Q.  And you didn't study the feasibility of installing gates or

19  screens on the O'Brien Lock and Dam, the Chicago River

20  Controlling Works, or the Wilmette pumping station, did you?

21  A.  No.

22  Q.  And you didn't visit the specific locations and look at each

23  structure to determine what would be involved in doing so, did

24  you?

25  A.  No.

1  Q.  And you didn't determine what size grates and screens would

2  be effective, did you?

3  A.  No.

4  Q.  And you didn't evaluate the impact that your recommendations

5  may have on flooding, did you?

6  A.  No.

7  Q.  How about on water quality?

8  A.  No.

9  Q.  Navigation?

10  A.  No.

11          MR. HILL:  Thank you.

12          THE COURT:   Okay, thanks, Mr. Hill.

13          Mr. Rieser.

14          MR. RIESER:  Thank you, your Honor, Dr. Lodge, and I

15  will try and keep it brief and --

16          THE COURT:   Hopefully, we are filtering -- as your

17  fellows cover the territory that you would have covered, just

18  kindly cut that out and we will go on to the points you've got

19  left.

20          MR. RIESER:  You bet.

21          THE COURT:  Thank you, sir.

22          MR. RIESER:  Dr. Lodge, my name is David Rieser, law

23  firm of McGuire Woods.

24

25                    CROSS-EXAMINATION

1  BY MR. RIESER:

2  Q.  Looking at the chart, the Data Interpretation Strength of

3  Evidence for a Living fish, the items at the top under the

4  stronger involve areas where you have been able to correlate an

5  eDNA finding with a live fish, is that correct?  Would that be a

6  correct interpretation of it?

7  A.  Yes, that is evidence that satisfies the most people.

8  Q.  Okay.  The fish that was found in the vicinity of the O'Brien

9  Lock and Dam, I think you testified a number of times that there

10 were no positive eDNA hits during 2010 in that area?

11 A.  Not in Lake Calumet.  Yes, correct.

12 Q.  Okay.  And the samples, based on one of the other exhibits,

13 that show positive hits for that area were all of silver carp,

14 isn't that correct?

15 A.  Yes.

16 Q.  And the fish that was found in the vicinity of the O'Brien

17 Lock and Dam was a bighead carp?

18 A.  The fish recovered in Lake Calumet was a bighead carp.

19 Q.  In what way does the silver carp eDNA found six months before

20 the location of the bighead carp in Lake Calumet correlate that

21 eDNA data?

22 A.  It doesn't.  What we are referring to on that table and with

23 the vicinity of O'Brien Locks is referring to the bighead carp

24 positive results, which we have had multiple times in the region

25 especially south, south of O'Brien Lock.

1  Q.  So looking at the Cal Riv segment on this exhibit, which is

2  the sampling results from 5-13-10 report, the Cal Riv, I assume

3  that's the segment of the Calumet River right in the immediate

4  area of the O'Brien Lock and Dam?

5  A.  We would have to look back at the map for sure, but I believe

6  that's the section that is above the O'Brien Lock and Dam.

7  Q.  And that shows no detections --

8  A.  Of bighead.

9  Q.  In '09, no detections for bighead and multiple positives only

10 for silver carp in December of '09?

11 A.  Correct.  That's what I just referred to.

12 Q.  And in the area below that -- okay.

13         In your statement -- we have talked a lot about the

14 statement that you have presented to the Supreme Court, which I

15 believe is Exhibit 14 to the brief submitted by the states.  At

16 Paragraph 38 you make the statement that:  "The confidence that

17 eDNA indicates the presence of at least one individual live fish

18 of a target species applies especially strongly to locations

19 where we have detected eDNA on multiple sampling trips," and then

20 continues.

21         When you use the word "confidence" in that sentence,

22 you're using it in the context of your personal confidence and

23 your results, not in statistical confidence, isn't that correct?

24 A.  No, I would disagree.  No, I'm using confidence in the

25 context of the kinds of evidence that scientists would usually

1  regard in a context like this of interpreting the presence of

2  fish.

3  Q.  Had you performed a statistical evaluation of your results

4  and identified a margin of error at the time that you wrote this

5  in January of 2010, it would allow you to derive a confidence

6  level, a statistically reliable confidence level?

7  A.  I'm not aware of a relevant statistical test or what

8  confidence level you refer to that one would do.  We have in the

9  context of confidence in this case what is relevant is all the

10  quality control and quality assurance approaches that we use to

11  guard against the possibility of false positives.  Those are the

12  relevant considerations with regard to false positive.

13  Q.  At the time -- well, you're not saying that there is no

14  methodology, statistical methodology for evaluating the data set

15  that can provide a statistical confidence level with respect to

16  the -- with respect to that data set and how accurate it is?

17  A.  There are, of course, hundreds of statistical tests, each of

18  which has a realm of relevance.  So we have to be very specific

19  about what hypothesis we are testing when we talk about a

20  statistical test, and it's unclear to me what you have in mind.

21  Q.  Did you perform any statistical test with respect to your

22  data as of January 2010?

23  A.  As I said, I'm unaware of any statistical test which would

24  get at the relevance or confidence about whether a test that we

25  have conducted is detecting the presence of DNA in the water.  If

1  that's the hypothesis we're testing, a statistical test is not

2  relevant.  What is relevant is the quality assurance/quality

3  control techniques that we have employed exhaustively in our

4  laboratory and that were validated by the EPA audit of our

5  procedures.

6  Q.  I would like to be clear, as of January 2010 you had not

7  performed a statistical test with respect to your data?

8  A.  That question is unanswerable without reference to what

9  hypothesis is being tested.

10 Q.  Proceeding on in your Supreme Court statement, you make the

11 statement at paragraph -- I'm sorry, Paragraph 40, you discuss

12 the meaning of negative results and you say, as I think you have

13 said here today, "A negative result does not necessarily imply

14 that no silver or bighead carp are present.  It means only that

15 the concentration of eDNA was lower than the detection level of

16 our current eDNA protocols."  Do you recall that, sir?

17 A.  Yes.

18 Q.  At the time that you made the statement in January of 2010,

19 had you identified detection limits for your current eDNA

20 protocols?

21 A.  You would have to say detection limits with respect to what.

22 We have done analyses in the laboratory to assess how much DNA it

23 takes to give us a positive hit, but that's not the relevant

24 detection limit with respect to the issues that are under

25 consideration here today.  Rather, the detection limit that's

1  relevant to these considerations is how does DNA relate, the DNA

2  signal relate to the presence, which we have, I think,

3  established and to the abundance of fish, which we have not

4  established.

5  Q.  I think it's a very simple statement, it means only that the

6  concentration of eDNA was lower than the detection limits of our

7  current eDNA protocols, these are your words. What detection

8  limits were you discussing when you wrote them?

9  A.  The second --

10 Q.  Excuse me, and had you done any scientific evaluation to

11 arrive at those detection limits?

12 A.  It was the second category of detection limit that I was

13 referring to, and no, we have not had the opportunity despite

14 repeated attempts to garner the resources necessary to do such

15 calibration studies.

16 Q.  When you say "the second," you're referring to --

17 A.  The relationship between DNA positive results and the

18 abundance of fish.

19 Q.  And abundance.  And it says, the sentence before, "A negative

20 result does not necessarily imply that no silver or bighead carp

21 are present, it means only that the concentration of eDNA was

22 lower than the detection limits of our current eDNA protocols."

23 So not to argue, but that refers to the presence or absence of

24 one fish based on a negative result?

25 A.  I'm not sure I understand -- well, you didn't ask a question.

1  I'm not sure I understand your statement.  You seem to want me to

2  answer, so maybe you could clarify the question.

3  Q.  I'll move on.  Was it a finding actually of the EPA lab

4  report, one of their criticisms of your work, that you had not

5  identified a detection limit at the time that they did their

6  evaluation in, well, they wrote the report in February of '10.

7  A.  Was that a question?

8  Q.  Yes.

9  A.  I'm sorry, repeat.

10        MR. RIESER:  Would you read it back, please.

11        (Record read)

12  BY THE WITNESS:

13  A.  I'll take your word for it if that's what was said, although

14  I do remember that the, I think "criticism" would be an

15  inappropriate term because there were various recommendations and

16  they were described as such in the EPA audit report.

17        I don't remember, I don't recall whether, which

18  detection limit was being referred to at that point.  I'm sure we

19  discussed both.

20  BY MR. RIESER:

21  Q.  It states that the audit team -- this is at VI of the EPA

22  report -- "The audit team was unable to assess the potential for

23  false negative PCR results (failure to detect Asian Carp eDNA

24  when it is present in the sample) because the laboratory has not

25  yet conducted the experiments necessary to estimate sensitivity

1  limits of the eDNA detection protocol."

2  A.   Again, I'd have to probably read a little bit more of the

3  context there to be completely sure, but I believe that's

4  probably referring to the first category detection limit, that

5  is, how much DNA needs to be in a sample for us to detect it.

6        I believe that we have done experiments since then to do

7  that, but I don't recall the details of those.  The more relevant

8  detection limit is about how does that relate, how does our

9  ability to detect DNA relate to abundance of fish.

10 Q.   You have answered a number of questions as a scientist, but

11 you would agree with the statement that as a scientist one of

12 your goals is to be able to produce work that is reproducible by

13 other scientists, correct?

14 A.   Yes.

15 Q.   Was it not one of the findings of the EPA audit that at the

16 time they did the audit, your work was not reproducible?

17 A.   Yes.

18 Q.   It was also a finding that at the time of the report you did

19 not do any sequence analysis confirmation, and they recommended

20 that you do that sequence analyst confirmation and you agreed to

21 do that for some percentage of your samples, do you recall that?

22 A.   Yes.

23 Q.   What does sequence analysis confirmation do that you weren't

24 doing at the time they recommended it?

25 A.   It is just one additional step to confirm that what you are

1  seeing on an agarose gel, which is the way to visualize the

2  results of PCR, is in fact what you think it is.  It's a double

3  check on the specificity of primers and markers.  We have done

4  that, and in every case it has confirmed the original

5  interpretation.

6  Q.  If you recall that Dr. Ficetola in his paper that you have

7  cited to indicates that he did sequence analysis confirmation on

8  some proportion of his samples, correct?

9  A.  Yes.

10 Q.  But you chose not to do that in establishing your protocols

11 for these samples until the EPA recommended it?

12 A.  Up until that time we had not done so.

13 Q.  I'm sorry?

14 A.  Up until that time we had not done so.

15 Q.  The material that has been proffered as I believe Plaintiff's

16 Proposed Exhibit 1, that doesn't contain -- that doesn't remotely

17 contain all of the data you accumulated with respect to the eDNA

18 sampling activities over the past year, correct?

19 A.  No.  The scope of work that this report, Plaintiff's Exhibit

20 1, addresses is really the first initial scope of work under the

21 cooperative agreement with the Army Corps.

22      The results from the regular, what became a regular eDNA

23 surveillance was reported in very regular and very frequent

24 written reports to the Army Corps.

25 Q.  And the data that was reported to the Army Corps included the

1  exact location of the samples, the date and time of the samples,

2  the chain of custody for samples, is that correct?

3  A.  Some of that, but not all of that information.

4  Q.  Which was included?

5  A.  Well, let's step through them.  You ask me.

6  Q.  I'm sorry?

7  A.  Let's step through them.  Which do you want to know?

8  Q.  Let me ask you since it was your data, what data was

9  presented to the Army Corps with respect to your --

10 A.  I think it changed a little bit over time.  There were in

11 many cases, especially later on when we got requests from the

12 management agencies for more specific information when rotenoning

13 or electrofishing or netting was contemplated, we provided maps

14 and as detailed information as was requested that was relevant

15 for those management decisions.

16         Early on, before those things were contemplated, I

17 believe we did not supply as much information.

18 Q.  As of the eDNA sampling in May of 2010, with respect to that

19 sampling, what data did you provide the Army Corps of Engineers?

20 A.  For that particular May 2010 sampling?

21 Q.  Correct?

22 A.  You know, I'm not sure I would recall in detail.  I'm sure we

23 have the reports present, be happy to look at one.

24         (Courtroom lights dimming).

25         THE COURT:  They'll come back on.  I didn't do it.

1           (Laughter)

2           MR. RIESER:  Thank you, your Honor.  I appreciate that

3    confidence, your Honor.

4           (Laughter)

5           THE WITNESS:  I'll be happy to look at the report with

6    you.

7    BY MR. HILL:

8    Q.  I'm sorry, I didn't hear that.

9    A.  I would be happy to look at the report with you.

10   Q.  Well, I would be happy to look at the report also, but I

11   haven't seen it.

12          Are you aware of what reason the Army Corps might have

13   for not sharing with other stake holders the information that's

14   contained in that report?

15   A.  Those reports provided in recent, the most recent months have

16   been provided not only to the Army Corps, but to other management

17   officials, certainly including the Illinois Department of Natural

18   resources, John Rogner and others, as a result of our request to

19   the Army Corps to agree that it was a good idea to provide those

20   reports to more agencies than just the Army Corps.

21   Q.  Do you have an understanding of why that information has not

22   been provided by any of those agencies to public stake holders?

23   A.  Those -- there have been numerous Freedom of Information Act

24   requests to which we have, when asked, have always agreed.  There

25   have been times when we have --

1  Q.  I'm sorry, let me follow up on that particular thing.  When

2  you say you agreed, does that mean that you have turned over to

3  the Freedom of Information requester all of your data with

4  respect to locations of the samples, quality assurance, quality

5  control data regarding the sampling, how many samples resulted in

6  amplification, and how many did not, all that information was

7  turned over?

8          MR. REICHEL:  Objection, compound.  It's a whole laundry

9  list of things.

10         MR. RIESER:  I appreciate that, your Honor.  On the

11 other hand, the witness has asked me to provide a list of things

12 that I'm asking about.

13         THE COURT:  I'm going to overrule the objection to the

14 extent that Dr. Lodge can answer that question.

15         THE WITNESS:  Or can remember them all.

16         THE COURT:  If it's confusing, you'll have to unpack it.

17         THE WITNESS:  One at a time, please.

18         MR. RIESER:  Okay.

19 BY MR. RIESER:

20 Q.  Let me ask it this way.  Do you recall what information you

21 turned over in response to the FOIA request?

22 A.  There have been two or possibly three information requests to

23 the Army Corps.  In every instance the Army Corps has asked us if

24 we have any objection to releasing the requested information.  In

25 all instances we have said no, we do not have any objection,

1  please release the information.  In fact, we have said please

2  release, make sure you release this information too.

3  Q.  There was a discussion earlier about proprietary control in

4  the primers, do you remember that discussion?

5  A.  Yes.

6  Q.  Do you and your lab have a proprietary interest in data that

7  doesn't include the description of the primers?

8  A.  We have a proprietary interest routinely guarded by academics

9  in order to be able to be the first to publish the data that you

10 collect.  We have not withhold information relevant to making

11 management decisions and have worked extensively in many formats

12 repeatedly to requests from the management agencies, including

13 the Army Corps, to provide them the information that they think

14 they need to make management decisions.

15 Q.  Are you aware of whether the Army Corps or any of the other

16 agencies to which this data has been released has in fact

17 released it to the public?

18 A.  In at least the most recent FOIA request, I got a CD from the

19 Army Corps with all the data that, with all the reports that were

20 released, and Dr. Chris Jerde on our team verified that those

21 indeed were all the documents that we had asked be released.

22 Q.  You were asked a question about the rotenone application at

23 the O'Brien Lock and Dam in May, May, I believe, of 2010, and I

24 believe your answer indicated that -- indicated the difficulty of

25 recovery of dead fish as a potential basis for why no Asian Carp

1  were recovered as a result of that activity?

2  A.  It's a possibility.

3  Q.  Are you aware that the one of the agencies, and I don't know

4  who, took underwater pictures of the bottom of the Calumet River

5  at that location to identify the possibility of Asian Carp on the

6  bottom?

7  A.  I heard that some photographs were taken.

8  Q.  In your report that has been proffered as Plaintiff's

9  potential Exhibit 1 -- by the way, this was presented to the Army

10 Corps in May of 2010 or did you say that's a different date?

11 A.  I believe we first provided it to the Army Corps in April

12 as -- I'm probably going to forget the right terminology, some

13 interim final report or some kind of qualified final report, for

14 comment and feedback from our colleagues at the Army Corps in

15 order for us to prepare what would be the final report, which we

16 then revised in response to their request very, very moderate

17 revisions and provided them with this copy in July.

18 Q.  In July of 2010?

19 A.  Yes, as I said earlier, on page 3 the date is wrong.

20 Q.  Are you aware of why this report wasn't released until you

21 provided it today, I should say until the States provided it

22 today?

23 A.  I can't say why it wouldn't have been released.  I'm not

24 sure.

25 Q.  One of the discussions you have in this exhibit is the rate

1 of progress of Asian Carp up the Illinois River and towards the

2 Sanitary & Ship Canal, and one of the statements that are in this

3 report is that one of the difficulties for measuring the rate of

4 progress had to do with the morphology of the stream, the shape

5 of the stream.  As it got closer to the Sanitary Ship Canal, it

6 became more channelized, less bays and inlets, and that as a

7 result of that, it was difficult to find Asian Carp using

8 traditional methods, correct?

9 A.  Yes, I think you're referring to the parts of the canal that

10 are quite deep and rectangular.  That's not very good habitat for

11 the effectiveness of electrofishing.

12 Q.  Is it equally possible that the Asian Carp are not there

13 because that's not a habitat that's favorable to them.

14 A.  Possible.

15       MR. RIESER:   Excuse me, your Honor.

16       (Pause)

17       THE COURT:   So just a moment ago I think we were all

18 here except Lois, and that was good for her to take a break, but

19 what we have ascertained here, as best I can tell, is that Mr.

20 Rieser has five more minutes, Mr. Ames has nothing on cross, Mr.

21 Reichel will do his best to do his redirect quickly, and we all

22 turn into pumpkins at 5:20, fair enough?

23       MR. RIESER:  Thank you, your Honor.

24       THE COURT:  And then if that means Dr. Lodge has to come

25 back, that's what it will mean, but let's hope it doesn't mean

1  that, looking at the pained look on his face.

2         Go ahead, Mr. Rieser.

3  BY MR. RIESER:

4  Q.  You were asked questions earlier by Mr. Reichel about the

5  Chicago Area Waterway System as a conduit for invasive species to

6  move both directions, from the lake to the river and from the

7  river to the lake.

8         Would you agree that the St. Lawrence Seaway is also a

9  conduit for invasive species?

10  A.  Yes, but a much less important one since it connects an

11  ocean, salt water ocean with a fresh water ocean.

12  Q.  So there have not -- would you agree that there have been a

13  significant number of invasive species that have been delivered

14  to the Great Lakes via the St. Lawrence Seaway?

15  A.  Oh, absolutely.  Roughly 65, 70 percent of the species

16  non-native, not necessarily invasive species in Great Lakes have

17  been delivered by ships.

18  Q.  You were asked a number of questions by Mr. Reichel about

19  potential management strategies regarding the Chicago Waterway

20  System.

21         Do you know whether there is any discussions or have you

22  been involved in any discussions regarding applying those same

23  management activities to the St. Lawrence Seaway?

24  A.  Yes, we have done a number of studies and continue to be

25  involved in research relevant to shipping as a pathway of the

1  delivery of non-native species also.

2  Q.  Have there been discussions about closing the St. Lawrence

3  Seaway in response to the invasive species that are coming

4  through it?

5  A.  Yes, there have been discussions among many parties about

6  that.

7  Q.  In addition, you're aware that there have been a number of

8  Asian Carp identified in Lake Erie?

9  A.  Yes, what I know is derivative from the compilation of

10 research in the Kolar, et al. book that I referred to earlier

11 with additional information coming conversations with Dwayne

12 Chapman and others.  It's my understanding that there have been

13 five individual bighead carp caught in Lake Erie.

14 Q.  Do you know whether -- have you been -- strike that.

15        Have you been in discussions with anybody about

16 performing an eDNA analysis in Lake Erie?

17 A.  Yes, as I described earlier, we are just launching a newly

18 funded Great Lakes Restoration Initiative Project to help the

19 agencies develop a surveillance program targeting the tributaries

20 of all the Great Lakes that would appear to be at the highest

21 risk or rather those that would be most favorable to reproduction

22 by silver or bighead carp.

23 Q.  In the literature about eDNA which you have cited to, has a

24 methodology been identified for calculating a margin of error?

25 A.  A margin of error of what?

1  Q.  With respect to positive versus negative findings?

2  A.  Again, we would have to have a more specific question.  I

3  don't know what to add other than the detection limit discussion

4  we had earlier.

5  Q.  Is it your answer then that you don't know whether there is a

6  margin of error methodology discussion in the literature about

7  eDNA?

8  A.  Nothing is coming immediately to mind, but margin of error is

9  a general concept that can be applied to many specific things, so

10 I just am not sure to what you refer.

11 Q.  Have you developed a margin of error with respect to your own

12 findings with respect to the eDNA?

13 A.  We have by the EPA audit's estimation taken extraordinary

14 measures for a research laboratory for quality assessment/quality

15 control, and as we have already discussed, since the EPA audit we

16 have instituted yet more quality assurance and quality control.

17 We have communicated in complete detail those practices to the

18 Army Corps of Engineers and to others who have expressed interest

19 in it.

20 Q.  Have you made any statistical calculations with respect to a

21 margin of error as to the accuracy of the sampling?

22         MR. REICHEL:  Objection, your Honor.  This has been

23 asked I think multiple times.

24         THE COURT:   I'm going to sustain the objection.

25 Someone did ask him that, I can't remember which one, but

1  someone.  There was a discussion of statistics.

2          MR. RIESER:  Okay.

3  BY MR. RIESER:

4  Q.  You were asked a question, I believe by Mr. Krauskopf, about

5  the number of samples that were taken above the -- no, I'm sorry,

6  it was by Mr. Hill about the number of samples that were taken

7  above the barrier in 2010, and I think your answer was it was

8  somewhere between 500 and 600 samples.

9  A.  That is what I said.  I also qualified that that I wasn't

10  sure I was recalling that correctly.

11  Q.  So if Colonel Quarles in his affidavit submitted as part of

12  the United States briefs that it was 530, that sounds like a good

13  number?

14  A.  I would go along with Colonel Quarles.  If he is saying that

15  on the basis of the reports that we have delivered to him, then

16  that's fine.

17  Q.  I believe you also said that --

18  A.  Sorry, that probably does not include the 450, which are the

19  result of a separate modification in response to a request from

20  the Corps to do additional samples.  Those are the samples to

21  which I have referred multiple times that are still under

22  analysis.

23  Q.  So the 450 samples that you referred to in your testimony is

24  not a subset of the 500, all of the 500 --

25  A.  I do not think so.

1  Q.  All the 530 have been analyzed?

2  A.  Again, I have not read Colonel Quarles' declaration, so I

3  don't know exactly what it says.  My guess would be that he would

4  be referring to those samples that have been completely analyzed

5  and therefore reported to him.

6  Q.  And of those samples is it correct that only 10 showed

7  positive for Asian Carp species?

8  A.  I do not remember, but again --

9  Q.  And the 450 are samples in addition to this that's part of

10 the -- part of the transition from your laboratory to the Army

11 Corps' laboratory of this activity?

12 A.  Well, in a sense it's instead of the transition.  It is an

13 interim measure to which we reluctantly agreed in order to sort

14 of fill in the gap until the Army Corps lab is able to take over

15 the surveillance program.

16 Q.  Do you know when the data from that sampling is going to be

17 made available?

18 A.  It should be soon.  We made it clear when we agreed to do

19 that that it had to take a lower priority to other commitments

20 that we had made in the laboratory.

21        MR. RIESER:  Thank you very much.  I have no further

22 questions.

23        THE COURT:  Mr. Rieser, thank you.  Okay.

24        And Mr. Ames has nothing for now, thank you, sir.

25        And so Mr. Reichel.

1          MR. REICHEL:  Thank you, your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. REICHEL:

4    Q.  Dr. Lodge, I would just like to follow up on one line of

5    questioning.

6    A.  Only one?

7    Q.  No.  On one -- I'm sorry.  I should be careful when a lawyer

8    says one more question.  I was going to qualify that.

9    A.  I think I have heard that a few times today.

10   Q.  Okay.  If you look at what was marked as Plaintiff's proposed

11   Exhibit 1, the risk assessment report, is that still in front of

12   you?

13   A.  Yes.

14   Q.  Will you please turn to Page 28.  Ms. Rudolph asked you a

15   question about some language that appears at Page 28 in the

16   second full paragraph on that page, sir?

17   A.  Yes.

18   Q.  The sentence that said in part, said that "The electric

19   barriers constructed and manned by the USACE," et cetera,

20   skipping text, "should be as effective at preventing other

21   invasive fish species in the Mississippi from invading the Great

22   Lakes."  Do you see that?

23   A.  Yes.

24   Q.  Okay.  After that sentence that she asked you about, did you

25   and your co-authors make any other observations about the effect

1  of the barrier vis-à-vis other fish movement in other directions

2  or other species?

3  A.  Yes.  The point of acknowledging that was to contrast the

4  effectiveness, the unknown effectiveness of the barrier against

5  fishes with its effectiveness against other kinds of organisms.

6  So in the rest of that same paragraph, what we go on to say is

7  that there are many other organisms, plants, for example, for

8  which the barrier would have no effectiveness whatsoever.

9       In addition, we note in that same paragraph that Barrier

10 IIA, the second barrier to be made operational, was designed to

11 be more effective toward upstream migration of fishes rather than

12 downstream migration of fishes.  And of course, we are putting

13 that in the context of the threat of dispersal that occurs for

14 fishes and other organisms in both directions.

15 Q.  Dr. Lodge, I'm going to -- may I approach, your Honor?

16      THE COURT:  Oh, sure.

17      MR. REICHEL:  Just for the record, I'm handing the

18 witness what was Exhibit 14 to our motion for preliminary

19 injunction, which, Dr. Lodge, I represent to you is a copy of

20 your January 2010 declaration.  You were asked a series of

21 questions about that I just wanted to follow up on.

22 BY MR. REICHEL:

23 Q.  Could you turn, sir, to Paragraph 49, which I believe Mr.

24 Krauskopf asked you about.  I believe it's the last paragraph or

25 one of the last.

Lodge - redirect by Reichel                          193

1  A.  Yes.

2  Q.  Okay.  I can't recall verbatim what he asked you.  I believe

3  you were asked -- well, first of all, on Paragraph 49,

4  paraphrasing since I don't have it in front of me at the moment,

5  you observed in substance that you believed there were at least a

6  few bighead or silver carp above the barrier, is that correct?

7  A.  Yes, our eDNA results indicate that at least a few

8  individuals of silver and bighead carp have ready access to Lake

9  Michigan via the O'Brien Lock and Dam.

10  Q.  I recall on cross-examination you offered to explain why you

11  reached that conclusion, you were not given an opportunity to do

12  so.  So I'm going to give you the opportunity now to explain from

13  a scientific perspective why it is that first, that you believed

14  at the time you wrote that, and to the extent you believe it

15  today, why you conclude that the data indicated that at least a

16  few of those fish existed above the barrier?

17  A.  Well, I think the pattern, the spatial pattern of occurrence

18  of positive eDNA results is most likely the result of multiple

19  fishes when you consider the great distances that separate

20  positive results for both silver and bigheads.  So that would be

21  one modest line of evidence on which I would draw that

22  conclusion.

23        Given the information that's become available since I

24  wrote this, I would regard the evidence that has come from the

25  intensive efforts at shocking and electrofishing, contrasted with

1 the great number of fish recovered from rotenoning as a stronger

2 line of evidence for the occurrence of many fish when you

3 consider the proportion of fish that are likely captured in

4 traditional tools, the proportion of fish that are likely

5 recovered in rotenoning, and the fact that there have been in

6 three instances at least either silver or bigheads seen or

7 caught, that would indicate just on a statistical basis alone

8 that there are probably one or more orders of magnitude more fish

9 there than have been caught.

10 Q.  And I think you were asked this question by a number of

11 counsel for defendants, but this is also a subject that you

12 addressed in your declaration, and that is the method that you

13 and your colleagues have employed for eDNA analysis does not --

14 you have explained repeatedly that a positive result you infer as

15 indicating the recent presence of at least one live fish in the

16 vicinity, et cetera, correct?

17 A.  Yes.

18 Q.  But you're uncertain scientifically, given the limitations on

19 the method, as to, you're not able to quantify the number of fish

20 that would be associated with or potentially associated with any

21 one individual positive result, is that correct?

22 A.  Yes, the most conservative interpretation is the one that I

23 provided, which is at least one.

24 Q.  But from a scientific standpoint, is it also possible that a

25 single positive result may be associated with more than one fish?

1   A.   It could certainly be associated with more than one fish.

2   Q.   Mr. Krauskopf asked you a question, I'm just looking at my

3   notes, something about the Asian Carp Control Plan from 2007.  I

4   may not be stating this correctly, but I believe in the context

5   of his question he was referring to a document that was developed

6   by the U.S. Fish & Wildlife Service.  Are you familiar with that?

7   A.   Vaguely familiar with it, as I said earlier.

8   Q.   Well, in any event, I believe he asked you about whether or

9   not -- he said something about that 2007 document referring to

10  alternative explanations for eDNA.

11          Again, assuming, if you don't have it in front of you, I

12  want you to assume that that document or plan was developed in

13  2007.  Do you find it plausible that the document would have

14  referred to the use of eDNA for the detection of bighead and

15  silver carp?

16  A.   No, it could not possibly have nor could it have taken into

17  account the many discussions and considerations that have

18  occurred since then about trying to evaluate the plausibility of

19  those alternative pathways.

20  Q.   Okay.  A couple of counsel have asked you questions about the

21  number of negative -- total number of samples taken in a given

22  time period, and in substance how many of those were positive

23  versus negative or asking you in effect to compare the number of

24  positive to negative samples.

25          Again, you may have touched on this earlier, but I want

1  the record to be clear as to how you as a scientist using this

2  method and your understanding of what can be inferred from a

3  positive versus a negative sample.

4           Does the fact that a number of negative samples in a

5  given time period, the fact that you have got a number of

6  negative samples, does that establish that only, only that

7  bighead or silver carp were only present in the waterway where

8  positive samples existed?

9  A.  No.

10 Q.  And why is that?

11 A.  A positive result conveys much more information than a

12 negative result.

13 Q.  I believe Mr. Hill asked you some questions about the EPA

14 audit report.  And again, bear with me as I try to decipher my

15 notes here, but I think one of the questions he asked you was

16 along the lines that the, that the EPA audit team found that your

17 work was not reproducible.  Do you recall being asked that?

18 A.  Yes.

19 Q.  And I can give you a copy of the report if you would like to

20 refer to it.  Do you have any understanding of what -- to the

21 best of your recollection --

22 A.  Yes.

23 Q.  -- what did the report say about reproducibility?

24 A.  The context of that was primarily that we had not written

25 down all the procedures that we used, particularly the quality

1  control/quality assurance procedures.  So the report was

2  laudatory about our practices, but recommended that we formalize

3  those in writing so that we could hand others a document that

4  would more completely allow someone else to reproduce the

5  results.  It did not reflect any concern about the lack of

6  reproducibility of the results if another lab followed our

7  procedures, it simply reflected a concern that we had not

8  formally written our procedures sufficiently so that another lab

9  could be confident that they would follow the same procedures.

10 Q.  Mr. Krauskopf also asked you some questions about an article

11 that you and Cynthia Kolar co-authored, I believe in 2002,

12 Ecological Predictions and Risk Assessment For Alien Fishes in

13 North America.  Do you recall being asked about that?

14 A.  Yes.

15 Q.  And I believe he asked you about the appearance or the

16 categorization in that study of the species silver carp.  Do you

17 recall being asked about that?

18 A.  Yes.

19 Q.  Do you recall from memory whether or not elsewhere in the

20 text of that report you offered any further explanation or

21 commentary upon presence or absence of potential adverse impact

22 of that species?

23 A.  Yes, we commented specifically on our results, qualified

24 those conclusions with respect to silver carp on the basis that

25 silver carp has such unusual characteristics, specifically with

1  this jumping behavior that has been so important to the human

2  reaction to it, that our statistical analysis based on traits

3  common to species that have been invasive and on the other hand

4  those that had not been invasive simply was not able to

5  accommodate such an unusual fish, so we were less confident in

6  those results than for other fishes.

7  Q.  Do you recall whether or not in that same article, Dr. Lodge,

8  you addressed the question of or you attempted to distinguish

9  between the potential adverse impacts of that species in the

10  Great Lakes versus some other waters connected to the Great

11  Lakes?

12  A.  Yes, I think we also were cautious because already at that

13  time it was clear to knowledgeable observers that silver carp had

14  had quite substantial negative impacts in the Mississippi River

15  and the Illinois River and that gave us pause in concluding in

16  the face of that evidence to be too confident about a lack of

17  effect in the Great Lakes, acknowledging that they're different

18  environments.

19  Q.  Sure.  And again, this is a report you authored some years

20  ago.  Do you recall whether or not in that report you drew any

21  distinction between, for lack of a better term, the open waters

22  of the Great Lakes and rivering systems?  If you don't recall --

23  A.  I don't recall that.  I can imagine what we might have said

24  had we said something about it.

25          MR. REICHEL:  Your Honor, may I approach?

1          THE COURT:   Sure.

2    BY MR. REICHEL:

3    Q.  Dr. Lodge, I'm landing you a copy of that article that we

4    referred to.

5    A.  Yes.

6    Q.  And I would like to direct your attention to -- this appears

7    at Page 1235 of this published version and the center uppermost

8    column -- just take a moment to read that and tell me if that

9    refreshes your recollection.

10   A.  Yes.  So the statement says:  "In addition, all our

11   predictions are applicable to the Great Lakes proper, not to

12   tributaries and large river systems in which these carp species,

13   for example, are already established and causing strongly

14   negative consequences."

15          So that again was in reference in the context of this

16   article to both silver carp and black carp, which we also

17   considered in this article.  We had not considered bighead carp.

18          So that was acknowledging the fact that our, the focus

19   of this entire article was on the Great Lakes proper, not on the

20   tributaries, and in this context it's important to recognize

21   that, that impacts in the tributaries could be very important in

22   addition to impacts in the lakes.

23          MR. REICHEL:  May I have just a moment, your Honor?

24          THE COURT:   Sure.

25          (Pause)

Lodge - redirect by Reichel                    200

1        MR. REICHEL:  With that, your Honor, I'm finished with

2  my redirect.

3        THE COURT:  Okay, very well, thank you, sir.

4        MR. RIESER:  Thank you, Dr. Lodge.

5        THE COURT:  Anybody have anything on the six points that

6  Mr. Reichel just covered with Dr. Lodge.  Anyone?

7        (No response)

8        THE COURT:  Okay.  Hearing no takers, I'll excuse Dr.

9  Lodge.  Thank you very much, sir, for your entire day.

10       THE WITNESS:  Thank you, your Honor.

11       (Witness excused)

12       THE COURT:  Let's talk about tomorrow then just for a

13 couple minutes in terms of -- you have no further witnesses at

14 this time?

15       MR. REICHEL:  That's correct, your Honor.

16       THE COURT:  Okay, very well.  So we will, maybe what I

17 can do is ask you all to confer amongst the defense side and see

18 what order you want to put the witnesses in tomorrow, unless you

19 have already done that.  Have you already done that?  Are there

20 people who have to go tomorrow?  Obviously, we have got the

21 witness coming on at 10:30 who has to go tomorrow.

22       Are there other people who are available only tomorrow?

23 Mr. Krauskopf.

24       MR. KRAUSKOPF:  Dr. Cook, Sandra Cook is here.

25       THE COURT:  How long do you anticipate?

1              MR. KRAUSKOPF:  Short.

2              MS. RUDOLPH:  Your Honor, General Peabody is also only

3    available tomorrow as well.  We will confer amongst defendants.

4              THE COURT:  Okay, and as I said before, this was about

5    what I think we anticipated for Dr. Lodge.  I was told about two

6    and a half hours of direct and that's about what we had, and the

7    cross and redirect and recross, there was no -- was about two and

8    a half hours.

9              We can start a little earlier tomorrow, and I'm going to

10   suggest tomorrow why don't everybody be ready to go at 9:30.  I

11   have a status at 9:30 that I'm hoping will be very short and I

12   will make sure we start -- sometimes I don't come out until five

13   or ten after 9 because usually when we call the 9:00s right at

14   9:00, we don't have both sides present in most of the cases, but

15   we will work on that tomorrow and hope that we do well.

16             So if we start at 9:30 tomorrow, I'm hoping we will get

17   through by 5:00 everybody, that's my hope.  As I said before,

18   obviously, if anybody trickles into Friday, so be it.  It just

19   may cut into the amount of time you guys have to argue.  That may

20   be merciful for all of us.

21             Anyhow, I appreciate everybody being here today and

22   maybe if you guys could coordinate on your order of witnesses and

23   just let me know first thing in the morning how we are going to

24   do it just so I can know come what's coming down the pike, okay?

25   If we start at 9:30 tomorrow, that will maximize our likelihood

1  of getting everybody in tomorrow, okay?

2          Anything else you all wanted to take up tonight before

3  we break?

4          (No response)

5          THE COURT:  Thanks to everybody.  Then we will see you

6  tomorrow at 9:30.  Take care.

7          (Adjournment to September 8, 2010, at 9:30 a.m.)

8            *                    *                    *

9      I certify that the above is a true and correct

10     transcript of proceedings had in the above matter.

11     /s/ Lois A. LaCorte

12     _____        _____

13        Lois A. LaCorte                Date

14

15

16

17

18

19

20

21

22

23

24

25