**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF MICHIGAN, STATE OF WISCONSIN, STATE OF MINNESOTA, STATE OF OHIO, and COMMONWEALTH OF PENNSYLVANIA, | ) ) ) ) ) ) | No. 10 C 4457<br><br>Judge John J. Tharp, Jr. |
| Plaintiffs, | ) ) | |
| GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS | ) ) ) ) | |
| Intervenor-Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS and METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| CITY OF CHICAGO, COALITION TO SAVE OUR WATERWAYS, and WENDELLA SIGHTSEEING COMPANY, INC. | ) ) ) ) ) | |
| Intervenor-Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

A group of states bordering the Great Lakes seeks an order requiring the U.S. Army Corps of Engineers ("Corps") and Metropolitan Water Reclamation District of Greater Chicago ("District") to take action—including immediately creating physical barriers in the waterways connecting Lake Michigan and the Mississippi River Basin—to prevent bighead and silver carp (collectively, "Asian carp") from migrating into Lake

Michigan. The plaintiffs argue that the defendants' failure to install physical barriers to physically separate the waterways will cause a public nuisance—namely, invasion of the Asian carp—resulting in grave and irreversible environmental and economic harm to the entire Great Lakes region.

Many organizations, including the Corps, are actively working to stop Asian carp from migrating into the Great Lakes watershed. The plaintiffs acknowledge that the defendants and others are taking steps to prevent Asian carp from reaching Lake Michigan, but they argue that the defendants are not doing enough. They attribute the looming disaster to the man-made hydrologic connection of the Chicago Area Waterway System ("CAWS") and Lake Michigan and maintain that nothing short of severing that connection will adequately mitigate the threat of carp infiltration of the lake. The "central and ultimate relief sought" by their complaint is a permanent injunction requiring hydrologic separation of these bodies of water.

The defendants' motions to dismiss the lawsuit for failure to state a claim are currently before the Court. Plaintiffs have asserted claims under the federal common law of public nuisance and under the Administrative Procedure Act ("APA"). To state a claim for injunctive relief, the plaintiffs must set forth specific acts or omissions that the defendants have taken (or will take) that have resulted (or will result) in a public nuisance (here, infiltration of the Asian carp into Lake Michigan) or otherwise cause a legal wrong or violation of law. As will be seen, however, the primary action that plaintiffs demand to abate the nuisance alleged—hydrologic separation of the CAWS from Lake Michigan— lies outside of the limits of the Corps' congressionally-delegated authority to act. Specifically, Congress has enacted statutes requiring the Corps to sustain through

navigation between Lake Michigan and the Des Plaines River in the Mississippi River Basin and prohibiting any party from constructing a dam in any navigable waterway (including the CAWS) without Congress's prior consent. These statutes preclude the Corps from taking the actions that plaintiffs believe necessary to prevent the Asian carp from reaching Lake Michigan.

The defendants' motion therefore presents the question of whether harms arising from actions or omissions that are required by a federal statute can constitute a public nuisance. Though mindful of, and alarmed by, the potentially devastating ecological, environmental, and economic consequences that may result from the establishment of an Asian carp population in the Great Lakes, the Court is nevertheless constrained to answer the question in the negative. In the absence of a constitutional violation (and none is here alleged), it is not the province of the courts to order parties to take action that would directly contravene statutory mandates and prohibitions, and the common law recognizes that actions required by law do not give rise to liability for nuisance. If the plaintiffs want to remove these congressional impediments to hydrologic separation and to replace them with effective barriers between the waterways, they must do so by means of the legislative process, not by alleging that the Corps' acts and/or omissions, required by federal statutes, violate federal nuisance common law and therefore justify an override of those statutes by the courts. Plaintiffs' complaint, therefore, is dismissed.[1]

---

[1] The intervenor-plaintiff Grand Traverse Band of Ottawa and Chippewa Indians adopted the plaintiffs' allegations, Dkt. 211 ¶ 2, and therefore its complaint is also dismissed. Because the intervenor-plaintiff's complaint is substantially identical to the plaintiffs' complaint, all of the Court's rulings with respect to the plaintiffs apply with equal force to the intervenor-plaintiff.

The Court will, however, grant the plaintiffs leave to re-plead their claims. To the extent that the plaintiffs can, consistent with their obligations under Rule 11, plead causation based on acts or omissions of the defendants that are not explicitly required by law, they may be able to state a viable nuisance claim (or APA claim founded on nuisance as a legal wrong). As the Seventh Circuit held in affirming this Court's denial of plaintiffs' motion for preliminary injunction, Congress has not occupied the field of environmental management of invasive species generally, or of the Asian carp specifically, so completely as to have displaced the common law; there may be room in which the plaintiffs can still maneuver. But while it has not displaced the common law entirely, Congress plainly has precluded the "central and ultimate relief sought" by the plaintiffs in the present complaint and for that reason the complaint, as currently stated, must be dismissed.

## FACTS

The Court assumes familiarity with the underlying facts of the case, which are set forth in detail in the order denying the plaintiffs' motion for preliminary injunction, *Michigan v. U.S. Army Corps of Eng'rs*, No. 10 C 4457, 2010 WL 5018559 (N.D. Ill. Dec. 2, 2010) (Dow, J.) (Dkt. 155) (*Asian Carp I)*, and the Seventh Circuit's opinion affirming that decision. 667 F.3d 765 (7th Cir. 2011) (*Asian Carp II)*. However, because the Court's previous opinion included facts outside of the pleadings (submitted for purposes of the plaintiffs' motion for preliminary injunction), which the Court cannot

consider on these Rule 12(b)(6) motions to dismiss, the Court will briefly restate the necessary facts as alleged in the complaint.[2]

### 1.      Development of the Chicago Area Waterway System

More than 100 years ago, facing sewage and industrial waste problems caused by the discharge of human and industrial waste from the rapidly growing city of Chicago into Lake Michigan, Illinois created the District in order to construct the Chicago Sanitary and Ship Canal ("Canal") connecting the Chicago River and the Great Lakes Basin to the Illinois River and the Mississippi River Basin. The basic solution to the health hazards arising from discharge of Chicago's wastes into Lake Michigan was to reverse the flow of the Chicago River, pushing the waste away from the lake, through the sanitary canal, and ultimately into the Mississippi River. This project, which has been hailed as one of the greatest engineering feats of all time,[3] doubtless has done much over the ensuing 100 years to protect the Great Lakes watershed from pollution and has been critical to the growth of Chicago as one of the nation's largest cities and commercial centers. *See, e.g., Asian Carp II*, 667 F.3d at 767-68.[4]

---

[2] For the purposes of the motion to dismiss, the Court accepts the plaintiffs' factual allegations as true. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

[3] In 2000, the American Society of Civil Engineers named the Chicago wastewater system one of the "Monuments of the Millennium." *See* http://www.asce.org/PPLContent.aspx?id=2147486103 (last viewed 12/3/2012).

[4] As one might imagine, however, those on the receiving end of Chicago's waste flows did not view the creation of the District and Canal with enthusiasm. To the contrary, they sued to stop the diversion of waste into the Canal, claiming that the project created a public nuisance because it would transport Chicago's sewage downstream to Missouri and beyond. The Supreme Court overruled Illinois' demurrer, which asserted lack of jurisdiction and that the state could not obtain equitable relief, but ultimately rejected Missouri's public nuisance claim on the merits. *See Missouri v. Illinois*, 200 U.S. 496 (1906); *Missouri v. Illinois*, 180 U.S. 208 (1901).

The Canal is used to manage wastewater discharges from within the District, for flood control, and also as an avenue of waterborne transportation. As a direct result of the Canal and associated infrastructure created, operated, and maintained by the District and the Corps, there are multiple connections through which fish can move from the waters of the Illinois and Des Plaines Rivers into Lake Michigan. Those connections include the Lockport Lock, sluice gates[5] in the Lockport Dam, the O'Brien Lock, sluice gates in the O'Brien Dam, the Chicago Lock, sluice gates in the Chicago River Controlling Works, and the sluice gate at the Wilmette Pumping Station.

### 2. Introduction of Asian Carp

The plaintiffs allege that invasive Asian carp have used or will use the Canal and other portions of the CAWS to migrate into Lake Michigan. Plaintiffs concede that the Asian carp have not yet developed a sustainable population in the lake, but assert that they soon will. Asian carp are not native to this country, but were imported into the United States for various reasons, including for experimental use in controlling algae in aquaculture and wastewater treatment ponds. As issue here are silver carp, which can grow to weights of sixty pounds and in the presence of motorboats may jump up to ten feet in the air, and bighead carp, which can grow to weights over one hundred pounds. Both species of Asian carp feed almost continuously, can readily adapt to varying environmental conditions, reproduce prolifically, and spread rapidly. The Asian carp escaped from ponds in the lower Mississippi River Basin, and have migrated through and become established in the rivers in the Mississippi River Basin, including the Illinois River. Because of their voracious appetites, the Asian carp substantially disrupt and

---

[5] A sluice gate is a barrier used to control water levels and flow rates in a river or canal.

displace native fish populations, impairing recreational and commercial fishing. And because of their jumping behavior, silver carp can injure boaters and cause property damage, impairing recreational boating.

### 3.     Attempts to Block the Asian Carp From Reaching Lake Michigan

The Corps has taken a number of steps to prevent the Asian carp from reaching Lake Michigan. Primarily, the Corps has relied on an electrical "Dispersal Barrier System," comprised of underwater steel cables charged with electricity, that is intended to deter the passage of invasive species. The first portion of that system, Barrier I, is located slightly north of the Lockport Dam, approximately 25 miles from Lake Michigan, and has been in operation since 2002. In early 2009, the Corps activated a second electrical barrier, Barrier IIA, approximately 1,300 feet downstream (*i.e.*, farther away from Lake Michigan) from Barrier I. The plaintiffs allege that Barrier IIA is operating at an electrical setting below its full design capacity, and must be turned off periodically for maintenance. (A third barrier, Barrier IIB which is located between Barriers I and IIA, is now operational although it had not yet been completed at the time the complaint was filed).

In addition to operating the Dispersal Barrier System, the Corps has also selectively applied rotenone (a fish kill agent) and temporarily closed the locks at times when the Dispersal Barrier System has been shut down for maintenance. The Corps has also performed environmental DNA ("eDNA") testing to determine whether Asian carp have advanced beyond the Dispersal Barrier System, and has applied additional rotenone in some areas where eDNA has indicated that the carp may be present. And the Corps has used fish nets in various locations to search (unsuccessfully) for Asian carp. All of the

Corps' efforts are designed to keep Asian carp from moving above the Dispersal Barrier System anywhere in the entire CAWS, including the Canal and the Illinois and Des Plaines Rivers.

Despite the Corps' efforts, by 2009 Asian carp "were observed in the Canal." Cmplt. ¶ 32. These sightings prompted the Corps to begin a program of environmental surveillance for Asian carp using the eDNA method of analyzing water samples for the presence of genetic material emitted or secreted by Asian carp. eDNA testing has (accepting the plaintiffs view) indicated that Asian carp are present in the Canal north of the Lockport Lock and the Dispersal Barrier System, which means (according to the complaint) that at least some carp have infiltrated the CAWS and only the system of locks, dams, and pumping stations stands between them and Lake Michigan. In December, 2009, a bighead carp was recovered from the Canal in this same vicinity. In June, 2010, a bighead carp was recovered six miles from Lake Michigan in Lake Calumet, which is part of the CAWS and is connected to Lake Michigan via the Calumet River.

The plaintiffs have urged the defendants to take additional action to prevent Asian carp migration, including requesting that the Corps change its lock and water control operations and implement plans to physically separate the carp-invested waterways from Lake Michigan. In response, the Corps released a number of statements regarding its plans to prevent Asian carp from reaching Lake Michigan. The most significant of these statements is a report issued in June 2010 entitled Interim III, Modified Structures and Operations, Illinois & Chicago Area Waterways Risk Reduction Study and Integrated Environmental Assessment ("Interim III"). In the Interim III report, the Corps proposed

8

to install screens in some sluice gates at the O'Brien Lock, but it rejected closing the locks except intermittently on a case by case basis because the Corps states that there is no "evidence that there is an imminent threat that a sustainable population of Asian carp may establish itself if the locks are not closed." Cmplt. ¶ 73. The Corps further concluded that "there is no individual or combination of lock operation scenarios [sic] will lower risk of Asian carp establishing self-sustaining populations in Lake Michigan to an acceptable level." *Id.* The plaintiffs find fault with the Interim III report, alleging that some experts who were consulted in conjunction with the report concluded that closing the locks would reduce the chances of Asian carp infiltrating Lake Michigan, but that for the purposes of the Interim III report they were not allowed to consider or recommend closing the locks on a long-term or permanent basis.

### 4.      Procedural History

The plaintiffs filed this claim for injunctive and declaratory relief on July 19, 2010, shortly after the Corps issued the Interim III report, and moved for a preliminary injunction the same day.[6] The case was originally assigned to Judge Dow, who denied the motion for a preliminary injunction on December 2, 2010, after extensive witness testimony, argument, and briefing regarding the motion. In holding that the plaintiffs had demonstrated, at best, "very modest" and "minimal" likelihood of success on their nuisance and APA claims, respectively, *Asian Carp I*, 2010 WL 5018559 at *16, *21,

---

[6] The plaintiffs had previously filed, on December 21, 2009, a motion for preliminary injunction with the Supreme Court of the United States, invoking original jurisdiction in the Supreme Court pursuant to Decrees entered in 1930 and 1967 related to the quantity of water that Illinois is allowed to divert from Lake Michigan. The Supreme Court denied the plaintiffs' motion without opinion on January 19, 2010. *See Michigan v. Illinois*, 130 S. Ct. 1166 (2010).

Judge Dow addressed several of the arguments at issue on the motion to dismiss. But he addressed those arguments in the context of ruling on a preliminary injunction motion, where the Court was called on only to assess the "likelihood" that the plaintiffs' claims would succeed. Judge Dow did not need to resolve those arguments definitively. Most significantly, with respect to the present ruling, Judge Dow discussed at some length that, in view of statutory requirements authorizing the Corps to operate the CAWS and to sustain through navigation between the CAWS and Lake Michigan, it would be "difficult to conclude that the Corps has created a public nuisance by acting in accordance with its statutory mandates." *Id.* at *24. Because ruling on the preliminary injunction motion did not require it, however, Judge Dow did not definitively hold that the plaintiffs could not succeed on their nuisance claim on that basis.

The plaintiffs appealed Judge Dow's ruling to the Seventh Circuit, which affirmed the denial of a preliminary injunction on August 24, 2011. In affirming Judge Dow's ruling, the Court of Appeals definitively addressed, and rejected, several legal issues advanced by the defendants in support of Judge Dow's ruling, specifically holding that sovereign immunity did not bar the plaintiffs' claims and that Congress had not displaced the federal common law of public nuisance by its limited legislative actions concerning the subjects of invasive species generally, or the spread of Asian carp specifically. *Asian Carp II*, 667 F.3d at 774-78. The Seventh Circuit did not, however, resolve two arguments raised in the district court, namely whether a common law claim for public nuisance can ever be maintained against a federal agency and the question, discussed at length by Judge Dow, of whether the plaintiffs can maintain a cause of action for public

nuisance where statutes preclude the action alleged to be necessary to prevent the nuisance.

Following the Seventh Circuit's affirmance of denial of the preliminary injunction motion, the defendants moved to dismiss the complaint on January 30, 2012. Shortly after briefing on the motion to dismiss was completed the case was transferred to this Court's docket on June 1, 2012, as part of the Court's standard process of reassigning cases to comprise the initial docket of newly appointed judges. The Corps submitted a "Supplemental Motion to Dismiss" in late September (Dkt. 237), to which the plaintiffs responded on October 9, 2012. Dkt. 240.

### 5. Relief Requested

The plaintiffs argue that the risk of Asian carp migrating into Lake Michigan exists because the District, beginning with completion of the Canal over 100 years ago, connected the Great Lakes basin to the Mississippi River basin. Cmplt. ¶ 15 (the "man-made connection of the Great Lakes Basin with the Mississippi River basin . . . sowed the seeds of the present dispute by allowing…invasive species…to migrate"). The complaint alleges that, in maintaining and operating the CAWS in a manner that preserves the hydrologic connection between the CAWS and Lake Michigan, the defendants have allowed or will allow the migration of Asian carp into the lake. *See, e.g.,* Cmplt. ¶ 1 (defendants "have created and maintained . . . facilities within the CAWS that link Illinois waters . . . to Lake Michigan . . . . To the extent those facilities are maintained and operated in a manner that allows the migration of Asian carp into the Great Lakes and connected waters, they constitute a public nuisance"); ¶ 89 ("the present risk that Asian carp . . . will migrate into Lake Michigan exists precisely because the District created and

11

implemented the diversion project and because the District and the Corps are maintaining and operating the infrastructure of that project in a manner that allows those fish to migrate").

Since the plaintiffs allege that the defendants' creation, maintenance, and operation of the CAWS has caused the threat that the Asian carp will establish themselves in the Great Lakes, it is not surprising that "the central and ultimate relief sought by Plaintiffs is a declaratory judgment that a common law public nuisance exists and a permanent injunction requiring the Defendants to 'expeditiously develop and implement plans to permanently and physically separate carp-infested waters in the Illinois River basin and the CAWS from Lake Michigan.'" Supp. Resp. (Dkt. 240) at 6. Until this permanent separation of these waterways can be implemented, the plaintiffs seek a permanent injunction requiring the defendants "to immediately take all available measures within their respective control, consistent with the protection of public health and safety, to prevent the migration of bighead and silver carp through the CAWS into Lake Michigan." Cmplt. at 31. These intermediate steps include:

> (a) Using the best available methods to block the passage of, capture or kill bighead and silver carp that may be present in the CAWS, especially in those areas north of the O'Brien Lock and Dam.

> (b) Installing block nets or other suitable interim physical barriers to fish passage at strategic locations in the Calumet River between Lake Calumet and Calumet Harbor.

> (c) Temporarily closing and ceasing operation of the locks at the O'Brien Lock and Dam and the Chicago River Controlling Works except as needed to protect public health and safety.

> (d) Temporarily closing the sluice gates at the O'Brien Lock and Dam, the Chicago Controlling Works, and the

Wilmette Pumping Station except as needed to protect public health or safety.

(e) Installing and maintaining grates or screens on or over the openings to all the sluice gates at the O'Brien Lock and Dam, the Chicago River Controlling Works, and the Wilmette Pumping Station in a manner that will not allow fish to pass through those structures if the sluice gates are opened.

(f) Installing and maintaining block nets or other suitable interim physical barriers to fish passage as needed in the Little Calumet River to prevent the migration of bighead and silver carp into Lake Michigan, in a manner that protects public health and safety.

(g) As a supplement to physical barriers, applying rotenone at strategic locations in the CAWS, especially those areas north of the O'Brien Lock and Dam where bighead and silver carp are most likely to be present, using methods and techniques best suited to eradicate them and minimize the risk of their movement into Lake Michigan.

(h) Continue comprehensive monitoring for bighead and silver carp in the CAWS, including resumed use of environmental DNA testing.

*Id.* at 32-33. Several of these measures are intended, to the extent possible, to sever the hydrologic connection between the waterways immediately. The plaintiffs acknowledge, for example, that the locks "are not designed as barriers to fish passage and may allow some water to pass through them," but maintain that "it is indisputable that when the locks are closed they are far less likely to allow the passage of fish than when they are opened." Cmplt. ¶ 72.

## DISCUSSION

The plaintiffs argue that by refusing to physically separate the Illinois River from Lake Michigan, the defendants have caused a public nuisance and have also violated several laws; those violations, they assert, provide them with a common law action for

13

public nuisance and entitle them to judicial review (and remedy) pursuant to the APA. It is important to stress that this litigation is now before the Court on the defendants' motions to dismiss, rather than on a motion for preliminary injunction, which the Court decided in a previous opinion. For purposes of *this* motion, the Court's task is to determine whether the plaintiffs have stated a claim for public nuisance under federal common law or under the APA, *not* whether it is likely that Asian carp will reach Lake Michigan absent relief, whether the requested relief would reduce or eliminate that likelihood, or whether the costs of the proposed remedy outweigh its potential benefits. Accordingly, for purposes of evaluating the motion to dismiss, the Court assumes that the defendants' operation of the CAWS creates a grave risk that Asian carp will reach (or have already reached) Lake Michigan and that the arrival of carp in the lake threatens the public with grave environmental and economic harm. Cmplt. ¶¶ 87, 89. The question presented by the defendants' motion is not whether those facts are true but whether the defendants, by their acts and/or omissions, are liable for creating the risk of imminent ecologic and economic disaster the plaintiffs have alleged.

I. **The Seventh Circuit Has Already Determined that the Corps' Sovereign Immunity Has Been Waived and that the Asian Carp Statutes Do Not Displace Federal Common Law.**

In its opposition to the plaintiffs' motion for a preliminary injunction, the Corps argued that the plaintiffs could not succeed on the merits of their claims because sovereign immunity barred their suit. The plaintiffs countered by arguing that the APA waives sovereign immunity for this claim, and the Seventh Circuit agreed that the United States has waived sovereign immunity. *See Asian Carp II*, 667 F.3d at 774-76. The Corps also argued that Congress has displaced the common law of public nuisance as it relates to Asian carp because it has enacted legislation that speaks directly to the problems

caused by invasive species generally and Asian carp specifically. *See American Electric Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2537 (2011) ("*AEP*"). But the Seventh Circuit rejected that argument as well, holding that congressional action addressing these problems has not been sufficiently comprehensive to displace the federal common law. *Asian Carp II*, 667 F.3d at 777-80.[7]

The Corps acknowledges that the Seventh Circuit has already decided that sovereign immunity has been waived, MTD Br. (Dkt. 218) at 17, and that "Congress ha[s] not displaced the common law of public nuisance with respect to invasive species generally or Asian carp in particular," *id.* at 9. The Seventh Circuit's ruling on these issues would seem to foreclose reargument, but the defendants proceed anyway, asserting that "findings made at the preliminary injunction stage do not bind the district court as the case progresses." Reply Br. (Dkt. 230) at 2; *Asian Carp II*, 667 F.3d at 782. They acknowledge that rulings on "pure issues of law" at the preliminary injunction stage are binding later in the litigation, but argue that the Seventh Circuit's decisions relating to sovereign immunity and displacement were not pure issues of law, but rather mixed questions of law and fact. Reply Br. (Dkt. 230) at 4. They do not, however, explain what

---

[7] The Seventh Circuit identified the following statutes (including several appropriations statutes) as the universe of statutes enacted by Congress that bear directly on this issue: Aquatic Nuisance Prevention and Control Act, 16 U.S.C. §§ 4701 *et seq.*; Water Resources Development Act, 33 U.S.C. §§ 2201 *et seq.*; Department of Defense and Full-Year Continuing Appropriations Act 2011, Pub. L. No. 112-10, §§ 1101(a)(2), 1104, 1106, 125 Stat. 38, 103 (Apr. 15, 2011); Energy and Water Development and Related Agencies Appropriations Act 2010, Pub. L. No. 111-85, § 126, 123 Stat. 2845, 2853 (Oct. 28, 2009); District of Columbia Appropriations Act of 2005, Pub. L. No. 110-114, § 3061(b)(1), 121 Stat. 1121 (Nov. 8, 2007); Pub. L. No. 98-63, 97 Stat. 301, 311 (July 30, 1983); Pub. L. No. 97-88 § 107, 95 Stat. 1135, 1137 (Dec. 4, 1981); Pub. L. No. 79-525, 60 Stat. 634, 636 (July 24, 1946). These statutes collectively will be referred to as "the Asian carp statutes."

facts the Seventh Circuit relied upon in making these rulings, and for good reason: there were none.

The Seventh Circuit plainly considered and resolved the questions of sovereign immunity and statutory displacement of the common law as "pure issues of law." In deciding whether sovereign immunity barred suit, the Seventh Circuit examined only the interplay between the APA and the FTCA, 28 U.S.C. § 1346(b). It held that the FTCA does not forbid tort claims for injunctive relief and therefore that it does not negate the APA's waiver of sovereign immunity. This is a purely legal question that is not affected by the facts of the case. *Asian Carp II*, 667 F.3d at 774-76. Similarly, the Seventh Circuit found that congressional efforts to curb the migration of Asian carp are not yet so pervasive as to suggest an intention to displace the common law nuisance scheme. *Id.* at 778-79. Therefore, statutes have not displaced the common law tort of public nuisance. This finding also depends only on the statutes and the common law, not the facts of the case. Because the Seventh Circuit's rulings on sovereign immunity and statutory displacement of the common law are pure issues of law, they are binding on this Court, notwithstanding that these rulings were made in the context of reviewing a ruling on a preliminary injunction motion.

The defendants also claim that the Court should revisit the Seventh Circuit's holding with respect to sovereign immunity because one of the cases the Seventh Circuit relied upon, *Veterans for Common Sense v. Shinseki*, 644 F.3d 845 (9th Cir. 2011), has since been reheard *en banc* and is no longer precedential authority in the Ninth Circuit. Though *Veterans for Common Sense* was indeed reheard *en banc*, that alone is not a compelling reason to revisit the Seventh Circuit's holdings. *Veterans for Common Sense*

was but one of several cases the Seventh Circuit relied upon in finding that sovereign immunity was waived. *Asian Carp II*, 667 F.3d at 774-76. The Seventh Circuit relied on it most heavily to confirm that the "final agency action" requirement of the APA does not limit the waiver of sovereign immunity, a point that the defendants have never contested. *Id.* at 775. And the Seventh Circuit's rationale for why sovereign immunity is waived, including the court's examination of the relevant statutes, remains valid, even in the wake of the Ninth Circuit's vacation of *Veterans for Common Sense*. The Asian carp statutes have not displaced the tort of common law nuisance for invasive species generally or Asian carp specifically.

## II. The Plaintiffs Fail to State a Public Nuisance Claim.

In addition to its sovereign immunity and statutory displacement arguments, rejected above, the Corps raises two additional arguments for dismissing the plaintiffs' public nuisance claim.[8] It argues that (i) parties cannot bring public nuisance suits against the federal government; and (ii) that Congress has statutorily prescribed the Corps' actions in the CAWS and proscribed separation of the waterways. MTD Br. (Dkt. 218) at 20-27. In affirming denial of the preliminary injunction, the Seventh Circuit considered but declined to rule on the first argument because the parties had not thoroughly briefed the issue, and because it ultimately concluded that preliminary relief was not warranted in any event. *Asian Carp II*, 667 F.3d at 773-74. The Seventh Circuit did not, however, address the question of whether the plaintiffs had stated a viable claim for public nuisance in light of statutes that preclude the defendants from taking the actions alleged

---

[8] The District joins the Corps' arguments, and makes additional arguments of its own, which the Court addresses below.

to be necessary to prevent the nuisance. While assuming for purposes of reviewing the denial of the preliminary injunction that the plaintiffs' common law claim could proceed, the Court of Appeals expressly left open the question of whether the plaintiffs could state a public nuisance claim. *Id*. at 774.

The Court's analysis of these issues is informed by the Seventh Circuit's definition of a public nuisance as "a substantial and unreasonable interference with a right common to the general public, usually affecting the public health, safety, peace, comfort, or convenience." *Asian Carp II*, 667 F.3d at 771 (citing Restatement (Second) of Torts § 821B). Upon review, this Court concludes that it is possible, based on appropriate facts and circumstances, for a plaintiff to state a common law cause of action for public nuisance against a federal agency. These plaintiffs, however, have failed to state such a claim in this case because it would be unlawful for the defendants to take the action that the plaintiffs allege is necessary to prevent the Asian carp from reaching Lake Michigan, namely hydrologically separating the CAWS from the lake. If, as the plaintiffs allege, failure to sever the connection between these bodies of water is the cause of the nuisance, then the threat of invasion by the carp, by definition, does not constitute an "unreasonable" interference with the public welfare and therefore does not constitute a public nuisance.

### A. A Public Nuisance Claim May Be Stated Against a Federal Agency.

Because claims for public nuisance seek "to vindicate the interest of the sovereign in protecting the public interest," and because the United States is deemed to act in the public interest, the defendants assert that, even where the government has waived sovereign immunity, parties cannot bring public nuisance claims against the federal government or its agencies. Reply Br. (Dkt. 230) at 15. As the Seventh Circuit explained,

this theory harkens back to the "ancient origins" of the doctrine of public nuisance, where "the term described the criminal act of infringing on the rights of the Crown, [and] at least during that era, no one would have contemplated that the King or Queen could be the source of a nuisance." *Asian Carp II*, 667 F.3d at 773 (internal citation omitted). The defendants submit that even today, though public nuisances are no longer treated only as crimes, they are still considered intrusions on the public welfare. MTD Br. (Dkt. 218) at 20-21. The United States, it argues, is the guardian of the public welfare, and frequently sues in its capacity as the protector of the public interest. As such, according to the Corps, plaintiffs cannot bring public nuisance claims against federal agencies, which by definition are carrying out activities deemed to be in the public interest.[9]

So far as the Court (or the defendants, apparently) have been able to find, however, no court has ever held that public nuisance claims cannot run against the United States. In fact, it appears that no court (other than the Seventh Circuit earlier in this litigation) has even discussed the issue.[10] *See Asian Carp II*, 667 F.3d at 773 ("[O]ut of all public nuisance decisions we have identified from either the Supreme Court or the

---

[9] This concept is distinct from the concept of sovereign immunity. *Asian Carp II,* 667 F.3d at 773. The doctrine of sovereign immunity speaks to the question of whether a plaintiff is precluded from asserting a claim against the defendant, but says nothing about whether the claim itself is legally sufficient. *Koehler v. United States*, 153 F.3d 263, 267 (5th Cir. 1998) ("At its core, sovereign immunity deprives the courts of jurisdiction *irrespective of the merits of the plaintiff's claim*.") (emphasis added). In making this argument, the defendants assert that, putting aside any question of sovereign immunity, the claim itself is invalid because action taken by the federal government, by definition, must be deemed to be in the public interest and therefore plaintiffs cannot establish that the alleged nuisance constitutes a public harm.

[10] In its opinion affirming denial of the preliminary injunction, the Seventh Circuit noted that the parties had given only "cursory" attention to the question of whether the United States can be sued for a public nuisance. The parties' briefs on the question in the context of the defendants' motion to dismiss do not advance the discussion any further. None identifies any precedent addressing this question directly.

Courts of Appeals that involve a federal agency as a defendant, none contains a whisper of discussion about whether the claim runs against the United States."). But several courts, including the Supreme Court, have considered public nuisance claims against the federal government or its agents, and have seemed to contemplate, without explicitly deciding, that a public nuisance claim may lie against the federal government. In *AEP,* for instance, the plaintiffs brought public nuisance claims against, among other defendants, the Tennessee Valley Authority, a federally owned corporation. 131 S. Ct. at 2532. Though the Court ultimately held that the public nuisance tort of air pollution had been displaced by enactment of the Clean Air Act, the Court never hinted that a federal agency could not commit a public nuisance.[11] *Middlesex Cnty. Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 4 n.3 (1981), is another case in which the Supreme Court dismissed public nuisance claims against the Corps and the EPA on statutory displacement grounds, and as in *AEP* the Court did not mention any other impediment to bringing the claims against a federal agency. *See id.* at 21-22. Many other courts have decided public nuisance claims against federal agencies without mentioning whether the agencies are inherently immune. *See, e.g., North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291 (4th Cir. 2010); *Committee for Consideration of Jones Falls Sewage*

---

[11] The Corps argues that *AEP*, as well as other cases, actually "do discuss whether public nuisance claims can be brought against federal agencies." Reply Br. (Dkt. 230) at 16. That statement is misleading at best. Although the cited cases discuss whether those plaintiffs raised valid claims against federal defendants, they *do not* discuss the argument that the defendants advance here, namely whether it is impossible for plaintiffs to state a public nuisance claim against federal agencies because their actions, by definition, are in the public interest and cannot therefore be deemed to cause any "unreasonable" interference with the public welfare.

*Sys. v. Train*, 539 F.2d 1006 (4th Cir. 1976) (public nuisance claim against EPA); *Massachusetts v. U.S. Veterans Admin.*, 541 F.2d 119 (1st Cir. 1976).[12]

Drawing inferences from the absence of discussion in a case can be a misleading interpretive methodology (*see Affymax, Inc. v. Ortho-McNeil-Janssen Pharm., Inc.*, 660 F.3d 281, 285 (7th Cir. 2011), noting that courts "often let issues pass in silence" and discouraging inferences based on a court's silence), but for what it is worth, it stands to reason that if a cause of action for public nuisance could not exist against a federal agency, courts would not need to dismiss such actions on the grounds of statutory displacement or sovereign immunity. And if there were a rule that shielded federal agencies from nuisance suits, it would also stand to reason that some court, somewhere, would have invoked it. None ever has. This Court is not inclined, then, to resurrect a doctrine that, along with notions about divine rights and other detritus of monarchy, does not appear to have survived the Revolution.

Beyond the dearth of precedent for the Corps' argument, there does not seem to be a compelling reason to insulate federal agencies from potential public nuisance suits. The federal government needs no judicial assistance to protect itself from such suits. If Congress deems it appropriate to do so, the government can amend the scope of the APA's sovereign immunity waiver. Alternatively, Congress can achieve essentially the same result by enacting legislation that is sufficiently comprehensive to occupy the field and thereby displace any role for the common law doctrine of public nuisance. But

---

[12] Missouri's original challenge, in 1900, to the potentially untoward effects of the creation of the Canal and the CAWS was also in the form of a claim for public nuisance, though no federal agency was named in the suit. *Missouri v. Illinois*, 180 U.S. 208 (1901).

Congress has not carved public nuisance claims out of its sovereign immunity waiver (nor has it occupied the field of environmental regulation of invasive species by enacting a comprehensive legislative scheme that address the problem presented in this case), facts that suggest that Congress itself has not deemed the prospect of such suits particularly problematic. Indeed, creating a broad judicial exemption from public nuisance claims for the federal government would, so far as may be discerned from its scope as set forth in the APA, effectively countermand the breadth of the waiver that Congress has deemed to be appropriate. That is not this Court's prerogative.

Even if judicial creation of a secondary level of quasi-immunity for federal agencies were not objectionable, the premise on which the defendants' argument is based is open to question. The "agency as guardian of the public welfare" assumption on which it is founded is a frequent subject of debate and criticism from many quarters—legislative, judicial, and academic. In an ideal world, an administrative agency would represent the interests of citizens and always maximize the public welfare, but "the world is not ideal." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 499 (7th Cir. 2011). Rival concerns that agencies necessarily focus on a narrow field and may therefore be oblivious to the broader implications of their actions, or are vulnerable to "capture" by regulated entities, or are prone to institutional biases and self-preservation, provide ample reason to question the legitimacy of a doctrine premised, essentially, on agency infallibility.[13] Even

---

[13] *See, e.g., Adkins*, 644 F.3d at 499 (noting that "regulatory agencies are subject to the phenomenon known as 'agency capture'"); *Wood v. General Motors Corp.*, 865 F.2d 395, 418 (1st Cir. 1988) (describing agency capture as the "undesirable scenario where the regulated industry gains influence over the regulators, and the regulators end up serving the interests of the industry, rather than the general public"). *See also, e.g.*, Thomas O. McGarity, *Administrative Law as Blood Sport: Policy Erosion in a Highly*

crediting regulators with the best of intentions, that an agency acts to promote public welfare in a particular manner, or arena, does not necessarily imply that such actions cannot adversely affect public welfare in other ways, and perhaps to a degree sufficient to constitute a public nuisance, *i.e.,* an unreasonable interference with the rights of the community at large. In a case where a plaintiff may plausibly claim that the agency's action has caused an unreasonable interference with the public welfare, those allegations suffice to state a claim for public nuisance and the Court therefore declines to carve out an exemption to application of federal common law for federal agencies. If there are policy reasons to exempt federal agencies from such suits, it is up to Congress to assess them and to determine whether the scope of its sovereign immunity waiver should be revisited.

### B. The Defendants' Actions Are Fully Authorized by Statute, and the Requested Relief Is Unlawful.

To state a claim for public nuisance, the plaintiffs must identify acts or omissions by the defendants that cause "a substantial and unreasonable interference with a right common to the general public, usually affecting the public health, safety, peace, comfort, or convenience." *Asian Carp II*, 667 F.3d at 771 (citing Restatement (Second) of Torts §

---

*Partisan Age,* 61 DUKE L.J. 1671 (2012) (describing and positing the potential adverse implications of "blood sport" administrative decision-making relating to high-profile public policy issues); Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEX. L. REV. 15, 21-23 (2010) (summarizing reasons creating risk of agency capture by regulated interests); Evan J. Criddle, *Fiduciary Administration: Rethinking Popular Representation in Agency Rulemaking*, 88 TEX. L. REV. 441, 451-52 (2010) (addressing theory that agencies cater to narrow interest group preferences rather than broader public interests); Nicholas Bagley and Richard L. Revesz, *Centralized Oversight of the Regulatory State,* 106 COLUM. L. REV. 1260, 1282-1304 (2006) (describing and critiquing dominant theories critical of regulatory efficiency and public welfare maximization by means of administrative law).

821B). The Restatement sets out factors to consider in deciding whether an interference is unreasonable, including "(a) [w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or (b) whether the conduct is proscribed by a statute, ordinance, or administrative regulation, or (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect . . . . Restatement (Second) of Torts § 821B(2). "It is only when . . . conduct is unreasonable, in the light of its social utility and the harm which results, that it amounts to a nuisance." William L. Prosser, *Nuisance Without Fault,* 20 TEX. L. REV. 399, 418 (1942).

It follows, then, that where a defendant's actions are specifically approved by statute or regulation, the result of such actions does not constitute a nuisance. "Although it would be a nuisance at common law, conduct that is fully authorized by statue, ordinance or administrative regulation does not subject the actor to tort liability." Restatement (Second) of Torts § 821B cmt. f. Stated another way, conduct authorized, or required, by statute cannot ***cause*** a public nuisance. As will be seen, the defendants' operation of the CAWS, and maintenance of the hydrologic connection between the CAWS and Lake Michigan is not only lawful, it is also specifically authorized, and in fact required, by statute. Therefore, even if the defendants' actions would otherwise suffice to constitute a public nuisance—*i.e.*, to cause substantial harm to the general public—that harm is not "unreasonable"—and therefore cannot constitute a nuisance— because it is the inevitable by-product of the defendants' compliance with requirements set forth in valid statutes.

Conceding that the Seventh Circuit's opinion does not expressly address the defendants' argument that the complaint fails to state a nuisance claim for this reason, plaintiffs assert that the opinion "implicitly" rejects the proposition because the court held that they had shown a "good or even substantial likelihood of success on the merits of their public nuisance claim." MTD Resp. Br. (Dkt. 229) at 11 (quoting *Asian Carp II,* 667 F.3d at 786). Nowhere in the Seventh Circuit's opinion, however, did the court even advert to, much less address, the question of whether the Corps' failure to separate the CAWS from Lake Michigan was authorized, or required, by federal law. As noted above, the Court of Appeals simply assumed that the plaintiffs could state a claim for public nuisance and based its decision affirming denial of the preliminary injunction not on that basis but on its conclusion "that a preliminary injunction would cause significantly more harm that [sic] it would prevent." *Asian Carp II,* 667 F.3d at 789.

Similarly, when the court stated that the plaintiffs were permitted to pursue the Corps for nuisances "caused by their operation of a manmade waterway between the Great Lakes and Mississippi watersheds," the statement was made in the context of the court's rejection of the premise that nuisance law did not apply to the defendants because the carp were invading of their own volition; as the court appropriately noted, creating and maintaining the conditions that allow the invasion is sufficient participation to be liable for a nuisance arising from the existence and operation of the CAWS. That point, however, does not resolve the question of whether the carp invasion constitutes a nuisance—*i.e.*, an "unreasonable" interference with the public welfare—where the acts alleged to be the cause of the invasion were taken in compliance with statutory mandates and the acts alleged to be necessary to prevent the nuisance are forbidden by law. The

Seventh Circuit's opinion considered whether the United States has waived sovereign immunity for nuisance claims, whether Congress has displaced the common law on the subject of invasive species, and whether acts by federal agencies can ever be considered to constitute public nuisances, but it did not address the question of whether public harm that can be prevented solely by actions that Congress has barred can constitute a public nuisance.[14] That is the question before this Court on the present motion and the one this Court answers in the negative. The plaintiffs have not alleged specific actions that the defendants have taken or failed to take—other than actions directly authorized and required by statute and omissions to take actions forbidden by law—that cause a public nuisance.

## 1. The Plaintiffs Demand Physical Separation of Lake Michigan From the CAWS.

The plaintiffs allege that the defendants have maintained a public nuisance by allowing conditions in which Asian carp are likely to migrate to Lake Michigan. Cmplt. ¶ 90. Specifically, plaintiffs allege that the defendants have allowed the possibility of Asian carp infiltration by refusing to close the O'Brien and Chicago locks, failing to apply rotenone in areas that have tested positive for Asian carp eDNA, failing to provide any

---

[14] The Seventh Circuit did, at one point in its opinion, state that "all sides agree that if invasive carp were to achieve a sustainable population in the Great Lakes, the environmental and economic impact would qualify as an unreasonable interference with a public right." *Asian Carp II,* 667 F.3d at 781. That statement, however, was made in the context of assessing the magnitude of the potential harm that would result if Asian carp reach Lake Michigan, and is accurate to that extent; none of the parties disputes that grave economic and environmental problems could result from failing to prevent the carp from reaching the lake. But, as evidenced by the defendants' motion to dismiss, that does not mean that the defendants agree that "the environmental and economic impact" of a carp invasion would qualify as a public nuisance (*i.e.* an ***unreasonable*** interference); again, "conduct that is fully authorized by statute" does not give rise to liability for public nuisance. Restatement (Second) of Torts, § 821B cmt. f.

temporary barrier to fish passage between Lake Michigan and the Little Calumet River, and failing to accelerate evaluation of permanent separation of the CAWS from the Great Lakes. *Id.* ¶ 61. In more general terms, the plaintiffs argue that "[b]y creating and maintaining conditions through which these injurious species are likely to enter the Great Lakes"—*i.e.*, refusing to physically separate the CAWS from Lake Michigan—"the District and the Corps will cause severe and foreseeable injury to public rights." *Id.* ¶ 90. They argue that "the Corps [is] under a duty to deny the carp access to the Great Lakes," and propose that the defendants do so through "hydrologic separation of the carp-infested waters of the Illinois River from Lake Michigan" by placing physical barriers at strategic locations within the CAWS. MTD Resp. Br. (Dkt. 229) at 15, 19.

The plaintiffs essentially allege that the defendants must do whatever it takes to keep the Asian carp out of Lake Michigan. As the plaintiffs see it, if the defendants maintain and operate the CAWS "in a manner that allows the migration of Asian carp into the Great Lakes and connected waters, they [cause] a public nuisance." Cmplt. ¶ 1. According to the plaintiffs, the defendants must operate the CAWS in a manner eliminates the possibility that Asian carp can reach the Great Lakes, or cease operating it at all. MTD Resp. Br. (Dkt. 229) at 15.

It is important to note that, although some portions of the plaintiffs' requested relief would not involve physically separating the waterways, the gist of their claim is that the defendants' failure to sever the hydrologic connection between them causes the public nuisance. *See* Mot. Prelim. Injunct. (Dkt. 9) at 2 ("The Complaint seeks a judgment requiring Defendants to implement, as soon as possible, permanent measures to physically separate the Asian Carp-infested Illinois waters from Lake Michigan."); Supp.

Resp. (Dkt. 240) at 6 ("the central and ultimate relief sought by Plaintiffs" is an injunction "requiring the Defendants to expeditiously develop and implement plans to permanently and physically separate carp-infested waters in the Illinois River basin and the CAWS from Lake Michigan"). As the Court understands the present complaint, the plaintiffs do not allege that taking only intermediate steps short of physical separation would be sufficient to abate the Asian carp nuisance; they maintain that nothing short of a complete separation of these water systems will suffice.[15] To that end, they seek closure of the locks until permanent physical barriers between the CAWS and Lake Michigan can be constructed. The problem with this argument, which the plaintiffs cannot avoid, is that separating the waterways would require the defendants to violate several existing statutes.

### 2. Multiple Statutes Prohibit Physical Separation Of The CAWS from Lake Michigan.

The Rivers and Harbors Act prohibits entities, including the Corps and other federal agencies, from placing barriers in canals and navigable rivers, such as the CAWS,

---

[15] The defendants argue that the Progress Act, which requires the acceleration of the Great Lakes and Mississippi River Interbasin Study (the "GLMRIS" study), a study intended to explore options and technologies to prevent Asian carp and other aquatic nuisance species from transferring between the Mississippi River basin and the Great Lakes basin, moots the portions of the plaintiffs' request that seeks an injunction expediting that same study. Supp. MTD (Dkt. 237) at 2-3; Cmplt. p. 33 ¶ 2 (seeking injunction requiring Corps to expedite the preparation of feasibility study). But the complaint, and the plaintiffs' briefs, clearly indicate that the plaintiffs are not satisfied merely with an accelerated GLMRIS timeline. Supp. Resp. (Dkt. 240). Rather, they want the defendants to physically separate Lake Michigan from the CAWS as soon as possible. Therefore, the Progress Act does not moot the plaintiffs' complaint as a whole. And though the plaintiffs would apparently be satisfied with the speed of the GLMRIS study if the Corps meets the Progress Act deadline, the plaintiffs' specific request for an expedited timeline is not "moot" simply because Congress has imposed a similar deadline. The Corps has not yet released the GLMRIS study, and therefore it remains possible that the Court would need to issue an order requiring the Corps to meet the deadline requested by the plaintiffs and demanded by Congress.

without congressional approval. *See United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) (applying the Rivers and Harbors Act to the Calumet River); *United States v. Arizona,* 295 U.S. 174, 183-84 (1935) (Rivers and Harbors Act prohibition on dams applies to federal and state actors as well as to private actors). It states, in relevant part:

> It shall not be lawful to construct or commence the construction of any bridge, causeway, dam, or dike over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for . . . (2) the dam or dike shall have been submitted to and approved by the Chief of Engineers and Secretary of the Army.

33 U.S.C. § 401. The Corps argues that a barrier hydrologically severing the bodies of water is a dam under the Rivers and Harbors Act, and that Congress has not given approval for such a dam. MTD Br. (Dkt. 218) at 25. The plaintiffs do not dispute that the Rivers and Harbors Act applies to the CAWS. Nor do they dispute that the Act requires the defendants to obtain congressional approval before separating the CAWS from Lake Michigan, or that the defendants have not yet received such approval. Rather, they argue that (if the Court grants the injunction) the Corps could "seek and obtain congressional authorization for implementation of such plans to the extent required by statute." MTD Resp. Br. (Dkt. 229) at 19. But an unapproved plan will not stop the carp. If Congressional authorization is required before separation can be implemented, then the Corps' failure to effect that separation cannot be the proximate cause of the alleged nuisance.[16] Only Congress, not the Corps, can authorize the action that the plaintiffs allege is necessary to abate the Asian carp nuisance.

---

[16] Because congressional approval is required to hydrologically separate the CAWS from Lake Michigan, granting the proposed injunction could be construed as a judicial directive to Congress. It would violate the constitutional principle of separation of powers

In addition to the Rivers and Harbors Act, Congress has also specifically spoken regarding the Corps' duty to operate and maintain the CAWS in the interests of navigation. Congress appropriated funds to the Corps "to operate and maintain the Chicago Sanitary and Ship canal portion of the Waterway in the interest of navigation." Energy and Water Development Appropriations Act of December 4, 1981, Pub. L. 97-88, 95 Stat. 1135, 1137. It later clarified that the Corps was to use funds to maintain and operate the Chicago Lock "and other facilities *as are necessary to sustain through navigation from Chicago Harbor on Lake Michigan to Lockport on the Des Plaines River*." Supplemental Appropriations Act of July 30, 1983, Pub. L. 98-63, 97 Stat. 301, 309 (emphasis added). Somewhat disingenuously, the plaintiffs argue that the Corps could preserve navigation "in" the CAWS even with hydrologic separation. But the Supplemental Appropriations Act does not require the Corps just to preserve navigation "in" the CAWS, but rather requires the Corps to preserve "through navigation" between Lake Michigan and the Des Plaines River. *Id.* Plainly, this requires the defendants to maintain and operate the CAWS in a manner that allows ships and other vessels to transit

---

for a court to direct Congress to enact legislation the Court deems necessary to abate a public nuisance. *See United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 497 (U.S. 2001) ("A district court cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited."); *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 731 (1980) (invoking legislative immunity "to insure that the legislative function may be performed independently without fear of outside interference"); *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 797 (6th Cir. 1996) ("Federal Courts do have jurisdiction and power to pass upon the constitutionality of Acts of Congress, but we are not aware of any decision extending this power in Federal Courts to order Congress to enact legislation.") (quoting *Skillken & Co. v. City of Toledo*, 528 F.2d 867, 878 (6th Cir. 1975)); *Lewis v. Dist. Of Columbia Judiciary*, 534 F. Supp. 2d 84, 85 (D.D.C. 2008) (separation of powers doctrine precludes courts from compelling Congress to adopt certain rules).

between these two bodies of water. Hydrologic separation, of course, would not permit "through navigation" and would therefore contravene the text and purpose of the appropriations acts.

The defendants' compliance with these statutory requirements cannot give rise to a public nuisance. Only an "unreasonable" interference with public welfare can constitute a public nuisance. Restatement § 821B(1). And where the alleged cause of the putative nuisance is an act or omission required by law, the identified harms flowing from that action do not, by definition, constitute a public nuisance. *Id.,* cmt. f. *See also, e.g., North Carolina,* 615 F.3d at 309-10 (operation of TVA power plants under permits required by Congress and the EPA cannot be deemed a public nuisance); *Smith v. Tennessee Valley Auth.,* 436 F. Supp. 151, 154 (E.D. Tenn. 1977) (construction blasting not a public nuisance where project authorized by federal legislation). "Judges must not order agencies to ignore constitutionally valid statutes," *Klene v. Napolitano*, 697 F.3d 666, 668 (7th Cir. 2012), even in the name of abating conduct that some may deem to create a public nuisance.

Mischaracterizing the Corps' position, the plaintiffs assert that the Corps argues that so long as it fulfills its obligation to sustain navigation, it is not liable for any nuisance. MTD Resp. Br. (Dkt. 229) at 13. Rather, the Corps argues that it *cannot deviate from* its statutory mandate in order to prevent a potential nuisance. MTD Br. (Dkt. 218) at 26-27. While the difference between these formulations is subtle, it is important. Under the Corps' argument (and the Court's holding), it is not immune from suit for all manner of damages caused by its operation of the CAWS merely because it is required to operate the CAWS. Rather, it is immune only for those harms that are unavoidable if it is to

fulfill its statutory mandate. If, for example, the Corps maintained navigation in the CAWS in an unreasonably noisy manner, it might be liable for nuisance due to the excessive noise, assuming that the implementation of noise abatement strategies would not preclude it from fulfilling its statutory obligations (allowing navigation and keeping the waterways free of unauthorized dams). But here, the facts pleaded in the plaintiffs' complaint establish that the Corps can successfully prevent the Asian carp nuisance only by disregarding its statutory duty to sustain through navigation between the CAWS and Lake Michigan. The complaint therefore fails to state a claim for public nuisance because the conduct allegedly causing public harm is required by statute. In such a case, the alleged nuisance, by definition, is not an "unreasonable interference."

Plaintiffs insist that the Corps "cannot sit idle when the duty to act arises" (begging the question of when such a duty arises), but they provide no basis on which the defendants would be authorized to effect the hydrologic separation the plaintiffs seek absent Congressional authorization. Indeed, their primary argument to justify disregard of these explicit statutory requirements is that "*circumstances have changed* since these enabling statues were enacted." MTD Resp. Br. (Dkt. 229) at 14 (emphasis in original). But federal agencies do not have license to disregard congressional directives whenever they believe that *circumstances have changed* (even if they have changed enough to warrant italicization) and the plaintiffs' suggestion in this regard borders on the frivolous.

The examples the plaintiffs provide to buttress their argument add nothing. Take "the vacant property owner" they posit (MTD Resp. Br. (Dkt. 229) at 15). Should vagrants occupy vacant property and create a nuisance, they argue, the property owner has a duty to deny them access to the property. Fair enough, but how? A fence might be a

solution, but if zoning laws do not permit the owner to install a fence at all, or permit only a fence that would not be effective in denying the determined vagrants access to the property, the property owner is not free to disregard those laws and, as the Restatement reflects, his omission to take an action that violates those zoning laws would not give rise to nuisance liability. The city council's zoning ordinance, not the property owner's failure to design or build a fence, would be the proximate cause of the public harm arising from the vagrant's occupation of the land.

Like the owner of the property who does not control whether he may build a fence to exclude third parties, the Corps does not control whether it may physically separate the waterways. The key to liability for nuisance is not ownership, but control. *In re Resource Tech. Corp.*, 662 F.3d 472, 475 (7th Cir. 2011); s*ee also Wilder Corp. v. Thompson Drainage & Levee Dist.*, 658 F.3d 802, 806 (7th Cir. 2011) (a claim for nuisance does not lie against a party who has no control over the cause of the nuisance); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 539 (3d Cir. 2001) (for public nuisance to be actionable, "the defendant must exert a certain degree of control over its source"). Congress, not the defendants, controls the question of whether the CAWS may be separated from Lake Michigan and this Court has no authority to require Congress to effect that separation, even where it may be necessary to prevent harms to third parties. *Cf. Wisconsin v. Duluth,* 96 U.S. 379, 387 (1877) (rejecting Wisconsin's claim for injunctive relief to bar operation of a canal by Duluth, Minnesota, where operation of canal was authorized by congressional appropriations, and holding that if "Congress, in the exercise of a lawful authority, has adopted and is carrying out [a canal project], this court can have no lawful authority to forbid the work").

The plaintiffs also seek to bolster their demand for action by the Corps by pointing to recent statutes authorizing the Corps to implement additional measures "to prevent aquatic nuisance species from dispersing into the Great Lakes." MTD Resp. Br. (Dkt. 229) at 17 (citing Energy and Water Development and Related Agency Appropriations Act of 2010, Pub. L. 111-85; 123 Stat. 2845, 2853; Energy and Water Development Appropriations Act of 2012, Pub. L. 112-74, 125 Stat. 786, 857) ("2012 Act"). But these measures did not, as the plaintiffs suggest, provide sweeping powers to the Corps to disregard existing statutory constraints. As the Seventh Circuit observed in holding that Congress had not displaced the common law in this area, "neither the Corps nor any other agency has been empowered actively to regulate the problem of invasive carp." *Asian Carp II,* 667 F.3d at 780.[17] Congress authorized the Corps to conduct a feasibility study to prevent the spread of aquatic nuisance species, for example, but it has not yet directed the Corps to consider the question of hydrologic separation, much less authorized that separation. Nor has it suggested in any way that the authorized emergency measures include hydrologic separation or closing the CAWS to navigation. To the contrary, the explanatory statement by the Congressional Conference Committee on the 2012 Act advised that "[t]he conferees do not consider hydrologic separation of the Great Lakes Basin from the Mississippi River Basin to be an emergency measure authorized by

---

[17] As Judge Dow's opinion adverts, *see Asian Carp I,* 2010 WL 5018559, *24 n.22, there is no inconsistency between a holding that Congress has not entirely displaced the operation of the common law with respect to issues pertaining to the problem of invasive species infiltrating the Great Lakes and one that recognizes that the defendants cannot violate express statutory requirements in the name of abating a common law public nuisance. The displacement holding reflects only that Congress has not evinced an intention to occupy the field to the exclusion of the common law, not that the common law trumps any statutory mandate that may affect that field.

this Act." 2012 Joint Explanatory Statement of the Committee of Conference regarding the Energy and Water Development and Related Agency Appropriations Act, H.R. Rep. No. 112-331, Division B at 431 (2011). This explanatory statement, as plaintiffs point out, is not part of the statute. But combined with the statute's silence regarding hydrologic separation, it plainly rebuts the plaintiffs' assertion that Congress has by more recent legislation authorized the Corps to disregard existing statutory requirements that preclude hydrologic separation. The only inference to be drawn from Congress's activity in this area is that (rightly or wrongly) Congress has not yet deemed hydrologic separation to be necessary.

The Court therefore concludes that applicable statutes preclude the defendants from taking the action alleged to be necessary to prevent the carp from infiltrating Lake Michigan.[18] The defendants' compliance with these statutory mandates and their maintenance of the hydrologic connection between the CAWS and Lake Michigan is lawful and reasonable, even if it results in harm to third parties such as the plaintiffs. *See*

---

[18] The District notes that, besides the statutory prohibitions on physically separating the waterways, federal regulations require it to maintain certain water levels in the CAWS and to manage sanitary, waste, and storm water, conduct flood control, and maintain the area waterways. District MTD (Dkt. 221) at 2; 33 C.F.R. 207.420; 33 C.F.R. 207.425. But these regulations do not, standing alone, completely prohibit the District from physically separating the waterways. For example, there is no logical reason why completely separating the waterways would *necessarily* prevent the District from maintaining the CAWS at appropriate water levels. The District would presumably argue that it could not maintain the required water levels if the CAWS is severed from Lake Michigan. That, however, is a question of fact not susceptible to resolution at the motion to dismiss stage. The same goes for the District's other duties; it is not clear, as a matter of law, that hydrologic separation would necessarily prevent the District from maintaining water quality or managing waste water. Therefore, unlike the Corps' and District's statutory requirements, discussed above, the District's obligation to perform its regulatory duties does not necessarily mean (as a matter of law) that it cannot physically separate the CAWS from Lake Michigan. However, the District (like the Corps) is prohibited from severing the respective waterways by the Rivers and Harbors Act.

*Richards v. Washington Terminal Co.,* 233 U.S. 546, 553 (1914) ("the legislature may legalize what otherwise would be a public nuisance"); *TVA*, 615 F.3d at 310 ("[a]n activity that is explicitly licensed and allowed by . . . law cannot be a public nuisance"). An interference caused by failure to violate a statute cannot be an "unreasonable interference," Restatement § 821B, cmt. f., and the plaintiffs cannot, therefore, state a valid claim for public nuisance on the basis of the defendants' failure to implement the action the plaintiffs deem essential to abating the risk that the Asian carp will infiltrate Lake Michigan, that is, severing the hydrologic connection between the lake and the CAWS.

> **3. The Plaintiffs Have Leave to File an Amended Complaint.**

As explained above, the plaintiffs have not alleged any specific failures by the defendants to take *lawful* actions that have caused or will cause a public nuisance. Conceivably, the plaintiffs could amend the complaint to remedy that failure, though to do so they will have to allege that the defendants' failure to take steps short of full hydrologic separation suffice to cause the nuisance, *i.e.*, the severe threat that the carp will reach the lake. The Court is skeptical that the plaintiffs can do so. While the injunctive relief the plaintiffs seek includes intermediate actions that do not implicate the statutory mandates to preserve through navigation and to keep the waterways clear of dams not authorized by Congress, their complaint does not allege that the defendants failure to take only those actions is sufficient to create the risk that the carp will reach the lake (*i.e.,* to cause the alleged nuisance). Plaintiffs, for example, want the defendants to use rotenone more often, but they do so as a means of enhancing the efficacy of lock closures as an interim step to severing the hydrologic connection between the waterways. The present complaint does not allege that the failure to use rotenone more frequently, or

the failure to take the other intermediate steps collectively, constitutes a proximate cause of the alleged nuisance (*i.e.,* that the failure to take those intermediate actions, rather than the maintenance of the hydrologic connection, is the cause of the risk that the carp will reach the lake).[19]

Nevertheless, the Court will afford the plaintiffs the opportunity to amend their complaint. As Judge Dow previously advised in *Asian Carp I*, however, 2012 WL 5018559, *24 n.22, the plaintiffs "must come to grips" with the fact that this Court cannot order the defendants to do what Congress has barred them from doing. Unless Congress alters the relevant statutes, an amended complaint will not succeed if it asks for an order requiring hydrologic separation (whether temporary or permanent) or any other action that is prohibited by statute. To state a valid claim, the plaintiffs must identify actions (or failures to act) that are within the scope of the defendants' Congressionally-authorized discretion.

### III. The Plaintiffs' Fail to State an Administrative Procedure Act Claim.

In Count II of their complaint, the plaintiffs allege that the Corps (but not the District) has violated the APA. Under 5 U.S.C. § 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Section 706(1) provides that a court may "compel agency action unlawfully withheld or unreasonably delayed . . . ." A court may also "[h]old unlawful and set aside agency actions, findings

---

[19] To see this, consider whether an injunction requiring those actions (but not lock closure) would satisfy the plaintiffs that the alleged nuisance—carp in the lake—had been abated sufficiently. Based on the allegations of the present complaint, it surely would not; the plaintiffs' theory is not that severing the connection between the waterways is gilding the lily but rather that it is essential to preventing the carp from reaching the lake.

and conclusions found to be– (a) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2). "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ." 5 U.S.C. § 551(13). Only "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."[20] 5 U.S.C. § 704; *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'").

The parties first contest which of the Corps' actions constitute "final actions" as required for APA review. The parties also dispute whether the plaintiffs have suffered a "legal wrong" because of the Corps' actions. Finding that the plaintiffs have not sufficiently alleged that the Corps caused them to suffer a "legal wrong," the Court dismisses Count II of the complaint.

## A. The Only "Final Action" at Issue is the Corps' Interim III Decision.

Agency action is "final" when two conditions are satisfied. "First, the action must mark the 'consummation' of the agency's decisionmaking process –it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178.

---

[20] "Agency action[s] made reviewable by statute" are also reviewable under the APA, but no one claims that this provision implicates any of the Corps' actions here. 5 U.S.C. § 704.

The plaintiffs identify four agency actions that, they claim, are "final": (1) the Corps' Interim III report; (2) the Corps' operation of the CAWS in a manner that contributes to the migration of Asian carp through the Caws to Lake Michigan; (3) the Corps' operation of the Dispersal Barrier System; and (4) the Corps' refusal to take additional action such as applying rotenone, permanently installing screens in all sluice gates, installing physical barriers in the Little Calumet River, and expediting plans to permanently separate the CAWS from Lake Michigan. Cmplt. ¶¶ 73-80, 100. The Corps concedes that the Interim III report is a final agency action, but submits that none of the other actions are final. MTD Br. (Dkt. 218) at 13. In affirming denial of the preliminary injunction, the Seventh Circuit agreed with the Corps, stating in dicta that other than the Interim III report, the other "'actions' are not discreet at all; and those that might be so classified do not represent the final outcome of any decisionmaking process by the Corps." *Asian Carp II*, 667 F.3d at 787.

The Seventh Circuit did not definitively rule on the issue (finding it unnecessary to do so in view of its holding that the plaintiffs' APA claim was contingent upon its public nuisance claim), but the plaintiffs have not presented any compelling argument for why the Corps' day-to-day actions are "final agency actions" under the APA. They assert that whether an agency action is final is a question of fact, but "[w]hether federal conduct constitutes final agency action within the meaning of the APA is a legal question." *Colorado Farm Bureau Federation v. United States Forest Service,* 220 F.3d 1171, 1173 (10th Cir. 2000). It is plain from the face of the complaint that, with the exception of the Interim III Report, the acts and omissions on which the plaintiffs base their APA claim do not constitute final agency action. Rather, they describe day-to-day actions that do not

mark the "consummation" of any agency decisionmaking process and that do not "determine" any "rights or obligations." It is the plaintiffs' burden to allege facts that, taken as true, establish that the agency has taken final action. *Id.* Here, the facts they allege are sufficient only to establish the counter-proposition. Accordingly, the Court agrees with the Corps and the Seventh Circuit that only the Interim III report is a final agency action. In any event, this question is not dispositive, because neither the Interim III Report nor any of the other putative final actions identified by the plaintiffs provides a right of review under § 702.

### B. The Plaintiffs Have No Right of Review under § 702.

Only persons suffering a legal wrong, or who are otherwise adversely affected or aggrieved within the meaning of another federal statute may assert a § 702 claim. The plaintiffs allege that they have a right of review both because they have suffered a "legal wrongs"—namely, a public nuisance—as a result of the Corps' final actions and that the Corps' actions and omissions in failing to eliminate the potential migration of the Asian carp into Lake Michigan have violated three statutes: the Lacey Act, the Nonindigenous Nuisance Prevention and Control Act, and the Water Resources Development Act.[21] None of these alleged wrongs gives rise to an APA claim, however.

---

[21] The Seventh Circuit's opinion says that "the states have not alleged that the Corps's actions failed to comply with some statutory provision." *Asian Carp II*, 667 F.3d at 787. The plaintiffs do, however, allege in their complaint that the Corps violated the Lacey Act and the Nonindigenous Aquatic Nuisance Prevention and Control Act (Cmplt. ¶ 88-89); the Seventh Circuit's incorrect statement is likely attributable to the fact that the plaintiffs did not discuss those allegations in their preliminary injunction briefs in that court, arguing instead that their APA claim is "free-standing." *Asian Carp II*, 667 F.3d at 787 The Seventh Circuit rejected that contention, but in their briefing on the motion to dismiss, the plaintiffs clearly argue that the Corps violated these statutes, along with the Water Resources Development Act. MTD Resp. Br. (Dkt. 229) at 25-29. The Court will therefore address these arguments.

### 1. Public Nuisance

As explained in detail above, the complaint does not state a claim for public nuisance. Therefore, the plaintiffs have not alleged that the Corps' actions caused them to suffer a "legal wrong" in the form of a public nuisance. *See Asian Carp II*, 667 F.3d at 787 ("[T]he states' APA claim [based on an allegation that the Corps' final actions have caused them a legal wrong] against the Corps sinks or swims (so to speak) with its public nuisance theory."). The plaintiffs, however, have leave to re-plead their public nuisance claim, and if they do so and properly allege a public nuisance claim, they may also state a claim for violation of the APA. Therefore, the APA claim, like the public nuisance claim, is dismissed without prejudice.

### 2. Nonindigenous Aquatic Nuisance Prevention and Control Act

The plaintiffs also fail to allege sufficiently that the Corps violated the Aquatic Nuisance Prevention and Control Act (the "Act"). The Act states:

> Whenever the Task Force determines that there is a substantial risk of unintentional introduction of an aquatic nuisance species by an identified pathway and that the adverse consequences of such an introduction are likely to be substantial, the Task Force shall, acting through the appropriate Federal agency, and after an opportunity for public comment, carry out cooperative environmentally sound efforts with regional, State and local entities to minimize the risk of such an introduction.

16 U.S.C. § 4722(c)(2).

The first impediment to plaintiffs' claim is that they fail to allege the prerequisite to statutory violation. The Act requires action only when "the Task Force determines that there is a substantial risk of unintentional introduction of an aquatic nuisance species." *Id.* The plaintiffs do not allege that the Task Force (of which the Corps is allegedly a

member) has made such a determination. If the Task Force has not made this determination, then the Act imposes no duty to take any preventive action.

But even if the Task Force were to determine that there is a substantial risk that the Asian carp will be introduced to Lake Michigan through the CAWS, the Act creates only a broad statutory mandate that would require, at most, that the Corps "carry out cooperative environmentally sound efforts . . . to minimize the risk of such an introduction." *Id.* The Supreme Court has held that "courts are not empowered [under the APA] to enter general orders compelling compliance with broad statutory mandates" like that set forth in the Act. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004). If this Court were to enter a general order under the Act's highly generalized requirements, it would ultimately have to supervise the parties and determine exactly which efforts are "environmentally sound" and which "minimize the risk of an introduction." *Id.* at 66-67. "The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." *Id.* at 67; *see also id.* at 64 (an APA claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*") (emphasis in original). Therefore, the Court cannot find that the Corps has violated the Aquatic Nuisance Prevention and Control Act.

### 3. Lacey Act

The plaintiffs also allege that the Corps violated the Lacey Act, a statute prohibiting, among other things, the interstate transport of "any fish . . . taken, possessed, transported, or sold" in violation of any law of the United States or of any state. *See* Cmplt. ¶ 102(b). The plaintiffs presumably mean to allege that the Corps has specifically violated 16 U.S.C. § 3372, a provision of the Lacey Act stating that "[i]t is unlawful for

any person . . . [to] transport . . . in interstate or foreign commerce . . . any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State."[22] "The term 'transport' means to move, convey, carry, or ship by any means, or to deliver or receive for the purpose of movement, conveyance, carriage, or shipment." 16 U.S.C. § 3371(k).

There are at least two dispositive problems with this allegation. First, the plaintiffs fail to allege facts showing that the Corps "transported" Asian carp as that term is defined in the Lacey Act. Rather, they have alleged only that the Corps "contribute[s] to the threatened interstate movement" of Asian carp by operating the CAWS. Cmplt. ¶ 102(b). The plaintiffs do not allege, as is required for a violation of the Lacey Act, that the Corps moves, conveys, carries, or ships Asian carp by any means. 16 U.S.C. § 3371(k). The plaintiffs, therefore, fail to state a claim that the Corps has violated the Lacey Act.

Second, to violate the Lacey Act, the fish "transported" must previously have been "taken" within the meaning of the statute. *See United States v. Romano,* 137 F.3d 677, 681-83 (1st Cir. 1998) (reversing conviction where wildlife had not been "taken" prior to unlawful purchases); *United States v. Carpenter,* 933 F.2d 748, 750 (9th Cir. 1991) (reversing conviction based on unlawful hunting of migratory birds not previously "taken"). "[T]o violate the Lacey Act a person must do something to wildlife that has already been 'taken or possessed' in violation of law." *Carpenter,* 933 F.2d at 750. Even if the Corps could be deemed to be transporting the Asian carp, that act would not violate

---

[22] A regulation promulgated under authority of the Lacey Act also directly prohibits "[t]he importation, transportation, or acquisition" of Asian carp. 50 C.F.R. §16.13(a)(2). Because the plaintiffs do not plausibly allege that the Corps has engaged in the "importation" or "acquisition" of Asian carp, whether the Corps has violated either the statute or the regulation turns on whether the Corps "transported" Asian carp.

the Lacey Act because the carp have not previously been "taken or possessed in violation of" any law.

### 4. Water Resources Development Act–GLMRIS Study

Finally, the plaintiffs argue that the Corps has unilaterally redefined and altered the scope of the GLMRIS study in violation of its congressional mandate. In the Water Resources Development Act of 2007, Congress directed the Secretary of the Army to conduct "a feasibility study of the range of options and technologies available to prevent the spread of aquatic nuisance species between the Great Lakes and Mississippi River Basins through the Chicago Sanitary and Ship Canal and other aquatic pathways." Pub. L. 110-114 § 345(d). In response, the Corps has made preliminary public comments stating, in effect, that it "will explore options and technologies . . . that could be applied to *prevent or reduce the risk* of [Asian carp] transfer between the basins through aquatic pathways." 75 Fed. Reg. 69984 (Nov. 16, 2010) (available at http://www.gpo.gov /fdsys/pkg/FR-2010-11-16/pdf/2010-28824.pdf) (emphasis added); *see also* Inventory of Available Controls for Aquatic Nuisance Species of Concern, Chicago Area Waterway System at 2 (available at http://glmris.anl.gov/documents/docs/ANS_Control_Paper.pdf) ("Prevent includes the reduction of risk to the maximum extent possible, because it may not be technologically feasible to achieve an absolute solution."). The plaintiffs claim that the Corps is "rewriting the language of [the] statute" and "lowering the bar to encompass mere 'risk reduction,'" and that these actions violate the Water Resources Development Act. MTD Resp. Br. (Dkt. 229) at 29.

The plaintiffs claim cannot succeed for several reasons. First, the Corps' preliminary statements regarding its study are inarguably *not* final agency actions. Because the Corps has not yet taken any final action regarding the GLMRIS study, APA

review is unavailable at this time. Second, the Corps' statements indicate that it is following the Congressional directive. Defining "prevent" to mean reducing the risk to the maximum extent possible is entirely reasonable. The only way the Corps could ever achieve 100% certainty that Asian carp would not infiltrate the Great Lakes is to eradicate the entire species worldwide, an action that is neither technologically feasible nor (in all likelihood) desirable. Therefore, the Corps' statements regarding the GLMRIS study do not violate any statute and do not provide a basis for APA review.

\* \* \*

For all of these reasons, the Court grants the defendants' motions to dismiss. Count I of the complaint is dismissed without prejudice. Count II is dismissed without prejudice insofar as the APA claim depends on the public nuisance claim. But because the plaintiffs cannot amend their complaint to remedy their claims that the Corps violated the Aquatic Nuisance Prevention and Control Act, the Lacey Act, or the Water Resources Development Act, Count II is dismissed with prejudice insofar as the APA claim is predicated upon a violation of one or more of those statutes.

If the plaintiffs do not amend their claims by January 11, 2013 (whether because they cannot do so consistent with their obligations under Rule 11 or simply because they opt to stand on their existing complaint), the Court will dismiss this case. At that point, the plaintiffs will have the option to appeal the dismissal of their claims in the Seventh Circuit. Alternatively, the plaintiffs may at any time prior to January 11 file with the Court a notice of their intention not to amend their complaint further, in which case the Court will promptly dismiss the case, allowing an appeal to be filed sooner, rather than later.

Date: December 3, 2012

John J. Tharp, Jr.
United States District Judge